## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JULIUS H. SCHOEPS, BRITT-MARIE
ENHOERNING, and FLORENCE VON
KESSELSTATT,
*Plaintiffs,*

v.

No. Case No. 22-cv-07013

Honorable Jeremy C. Daniel

SOMPO HOLDINGS, INC., SOMPO
INTERNATIONAL HOLDINGS LTD.,
SOMPO FINE ART FOUNDATION, and
SOMPO MUSEUM OF ART,
*Defendants.*

---

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION TO DISMISS

---

Thomas J. Hamilton (admitted *pro hac vice*)
John J. Byrne, Jr. (admitted *pro hac vice*)
**BYRNE, GOLDENBERG &
HAMILTON, PLLC**
1025 Connecticut Avenue, N.W., Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9779
E-mail: jjb@bghpllc.com
       tj.ham@cox.net

Marty J. Schwartz
**SCHAIN BANKS**
70 W. Madison St., Ste. 5400
Chicago, IL 60602
Telephone: (312) 345-5700
E-mail: mschwartz@schainbanks.com

# TABLE OF CONTENTS

Page

COVER PAGE ..................................................................................................... i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... vi

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS ......................................................................................................... 1

   I.   INTRODUCTION AND SUMMARY ........................................................... 1

   II.   BACKGROUND AND STATEMENT OF FACTS ....................................... 3

   III.   THE RESPECTIVE LEGAL BURDENS OF THE PARTIES ON
       MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(2)
       FAVOR THE HEIRS .................................................................................... 7

   IV.   ARGUMENT ................................................................................................. 7

      A.   THE HEIRS ENJOY STANDING TO ASSERT THEIR CLAIMS ......... 7

      B.   THE FIRST AMENDED COMPLAINT PROPERLY INVOKES
          FEDERAL SUBJECT MATTER JURISDICTION OVER THE HEIRS'
          CLAIMS ................................................................................................ 10

        1.   The Court Has Federal Subject Matter Jurisdiction Pursuant to 28
            U.S.C. § 1331 Based Upon the U.S. Supreme Court Decisions in
            Grable & Sons Metal Products, Inc. v. Darue Engineering and
            Manufacturing and Gunn v. Minton .............................................. 10

        2.   The Court Has Federal Subject Matter Jurisdiction Under 28 U.S.C.
            § 1331 Because the Claims of the Heirs to Apply Federal Common
            Law and for an Exercise of the Court's Plenary Equitable Authority
            Arise Under Federal Law ................................................................ 10

           a.   The Heirs Enjoy a Valid Claim for Applying Federal Common
               Law Which Establishes Federal Subject Matter Jurisdiction ...... 10

           b.   The Defendants' Challenge to the Heirs' Claim for an
               Application of Federal Common Law Is Without Merit .............. 11

           c.   The Heirs Enjoy a Valid Claim for an Exercise of the Court's
               Plenary Equitable Authority Which Also Establishes Federal
               Subject Matter Jurisdiction ........................................................... 13

C.   THE FAC ALLEGES MULTIPLE LEGAL BASES FOR NEGATING
     THE SEPARATE IDENTITY OF EACH CORPORATE DEFENDANT
     AND *PROVES* THAT DEFENDANTS HAVE COMMINGLED THEIR
     PRIMARY BRANDING ASSET – *SUNFLOWERS* – TO COMMIT
     BOTH FRAUD AND CRIMES AND TO FRUSTRATE SIGNAL
     FEDERAL POLICIES ............................................................................16

  1.   The FAC Invokes Multiple Legal Doctrines that Negate the Discrete
       Corporate Identity of Each Sompo Corporate Defendant ....................................16

D.   THE FIRST AMENDED COMPLAINT PROPERLY ASSERTS
     SPECIFIC JURISDICTION OVER ALL SOMPO CORPORATE
     DEFENDANTS....................................................................................18

  1.   Constitutional Due Process For Specific Jurisdiction Is Satisfied
       When: (a) a Foreign Defendant "Purposefully Avails" Itself of the
       Benefits and Privileges of the Forum; (b) the Claim is Sufficiently
       "Related To" Those Contacts, and; (c) Asserting Specific Jurisdiction
       Otherwise Is Reasonable ......................................................................18

  2.   Ford Motor Co. Confirms that Specific Jurisdiction Entails Only that
       the Defendant's Conduct in a Forum State "Relate To" the Plaintiff's
       Claim and Need Not Cause or "Give Rise To" the Claim....................................22

  3.   uBid, Inc. v. The GoDaddy Group, Inc. Establishes that the Contacts
       of a Defendant with Forum State Sufficiently "Relate To" the Claim
       of a Plaintiff When these Contacts Pertain to the "Quid Pro Quo"
       Bargain that Defendants Tacitly Assume When They Invoke Forum Benefits ....24

  4.   Defendants and their Corporate Predecessors Have Purposefully
       Availed Multiple Illinois Forum Benefits and Incurred Inherently
       Reciprocal Obligations in Two Discrete Contexts ................................................26

    a.   By Displaying *Sunflowers* at the 2001 Chicago Exhibition the
         Defendants Arrogated Multiple Discrete Illinois Forum Benefits
         that Occasioned Reciprocal Duties.................................................................27

    b.   By Perpetually Exploiting the Painting on the Sompo Holdings
         Website as a *Marketing Adjunct* to Their "Brick and Mortar"
         Chicago Office and Through the *Wall Street Journal* Article of
         October 31, 2022 the Defendants *Continue* to Realize
         Commercial and Marketing Benefits in the Illinois Forum that
         Foster Reciprocal Responsibilities .................................................................28

  5.   The Heirs' Claims Are Integrally "Related to" the Defendants'
       Contacts with Illinois Within the Meaning of Both Ford and uBid ....................29

6. Asserting Specific Jurisdiction Over Defendants for the Heirs' Claims Comports with "Fair Play and Substantial Justice" and is Reasonable ................33

    a. Requiring the Sompo Defendants to Defend the Heirs' Claims in Illinois Imposes No Unreasonable Burden Upon Them as They Have Cultivated a National U.S. Business Model and Litigate Regularly in U.S. Courts ...............................................................33

    b. Illinois Has an Acute Governmental Interest Under Both Illinois and Federal Law in Adjudicating this Controversy.......................................34

    c. The Heirs Have an Especial Interest in Securing a Fair and Efficient Remedy for the Defendants' Wrongful Retention and Commercial Exploitation of What They Long Have *Known* Is a Nazi-Tainted Painting.....................................................................35

    d. The Interest of the Interstate Judicial System in Resolving this Controversy Supports Specific Jurisdiction ...................................36

    e. The Shared Interest of the Several States and *Nations* in Furthering Fundamental Substantive Policies Prioritizing the Restitution of Nazi-Confiscated Artworks *Entails* that the Court Assert Specific Jurisdiction over Defendants.................................36

7. Defendants Spuriously Maintain that Because They Have Not Targeted Illinois Exclusively the Court Somehow Lacks Specific Jurisdiction Over Their Claims ...............................................................38

    a. That Defendants' Regularly Conduct Business in Illinois with an Office in Chicago and a Website Accessible Nationally Satisfies the Requirements for Specific Jurisdiction ...................................38

    b. Defendants Improperly Fractionalize Each Discrete Element that Comprises How They Commercially Exploit the Painting in Illinois...........39

    c. The Defendants' Contention that the Court Lacks Specific Jurisdiction Because the Image of *Sunflowers* is in the "Public Domain" is Fatuous and Ignores Both the Legal and Factual Foundations of the Heirs' Claims.................................................40

8. The First Amended Complaint Properly Asserts Specific Jurisdiction Over Defendants Under 735 ILCS § 5/2–209(a)(2) Prescribing Jurisdiction Over a Non-Resident For Committing a "Tortious Act" In Illinois ..41

    a. Specific Jurisdiction Attaches for Multiple Tortious Acts that Defendants Committed by Misusing the Painting to Sell Insurance in Illinois .........................................................41

iv

      b.    Specific Jurisdiction Attaches as a Result of Defendants' Breach of Their Duties to Help the Heirs Recover *Sunflowers* and to Refrain from Commercially Exploiting It ....................................................41

  E.    THE DOCTRINE OF *FORUM NON CONVENIENS* PRECLUDES TRANSFERRING THIS PROCEEDING TO JAPAN AS DEFENDANTS REQUEST .....................................................................................42

    1.    That the Claims of the Heirs to Recover Sunflowers Would Be Time-Barred in Japan Precludes Applying Forum Non Conveniens ...........................42

    2.    Even Assuming Japan Were an Adequate Forum the Balance of Relevant Private and Public Interests Would Preclude Applying *Forum Non-Conveniens* .......................................................................................43

V.    CONCLUSION ............................................................................................44

v

## TABLE OF AUTHORITIES

Page

**Cases:**

*Anderson v. Abbott*
    321 U.S. 349 (1944) ................................................................... 16

*Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*
    480 U.S. 102 (1987) ............................................................. 35, 36

*Burger King Corp. v. Rudzewicz*
    471 U.S. 462 (1985) ................................................. 18, 19, 21, 22, 33

*C.H. Johnson Consulting, Inc. v. Roosevelt Rds. Naval Station Lands & Facilities*
    *Redevelopment Auth.*
    No. 1:12-cv-08759
    2013 WL 5926062 (N.D. Ill. 2013) ...................................... 26

*Chang v. Baxter Healthcare Corp., et.al.*
    599 F.3d 728 (7th Cir. 2010) .................................................. 42

*Chicago Transit Retiree Health Care Trust v. Dilworth Paxon, LLP*
    No. 19-cv-07570
    2020 WL 6393006 (N.D. Ill. 2020) ...................................... 26

*Cort v. Ash*
    422 U.S. 66 (1975) ................................................................... 12

*Curry v. Revolution Labs., LLC*
    949 F.3d 385 (7th Cir. 2020) ...................................... 29, 33, 38

*Deb v. SIRVA, Inc.*
    832 F.3d 800 (7th Cir. 2016) .................................................. 42

*Eli Barzilai v. Israel Museum*
    2022 WL 16856131 (N.Y. Sup. Ct. Nov. 10, 2022) .............. 31, 32

*Erie R. Co. v. Tompkins*
    304 U.S. 64 (1938) ................................................................... 10

*Expeditee LLC v. Entities Listed on Exhibit 1*
    No. 21 C 6440
    2022 WL 1556381 (N.D. Ill. May 17, 2022) .......................... 7

*Feis Equities, LLC v. Sompo Int'l Holdings*
    2020 Ill.App. 191072 (2020) ................................................ 34

*First Nat'l City Bank v. Banco Para Commercio Exterior de Cuba*
    462 U.S. 611 (1983) ................................................................ 16

*Flentye v. Kathrein*
    485 F.Supp.2d 903 (N.D. Ill. 2007) ...................................... 7

*Ford Motor Co. v. Montana Eight Judicial Dist. Court*
   141 S.Ct. 1017 (2021) ................................................ 18, 19, 20, 22, 23, 27, 29, 30

*Gladstone v. Hillel*
   203 Cal.App.3d 977 (1988) .................................................................. 41

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*
   545 U.S. 308 (2005) .............................................................................. 10

*Graff v. Leslie Hindman Auctioneers, Inc.*
   342 F. Supp.3d 819 (N.D. Ill. 2018) ............................................... 31, 32

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*
   527 U.S. 308 (1999) .............................................................................. 13

*Gunn v. Minton*
   568 U.S. 251 (2013) .............................................................................. 10

*Hishon v. King Spalding*
   467 U.S. 69 (1984) .................................................................................. 7

*Illinois Bell Tel. Co., Inc. v. Global Naps Illinois, Inc.*
   551 F.3d 587 (7th Cir. 2008) ............................................................... 16

*Illinois v. Hemi Grp., LLC*
   622 F.3d 754 (7th Cir. 2010) .......................................................... 29, 38

*In Re Syngenta Mass Tort Actions*
   No. 3:16-cv-00255-DRH
   2017 WL 2117728 (S.D. Ill. 2017) ..................................................... 26

*Int'l Shoe v. Washington*
   326 U.S. 310 (1945) .................................................... 18, 19, 22, 30

*J. McIntyre Mach., Ltd. v. Nicastro*
   564 U.S. 873 (2011) .............................................................................. 18

*KAJ Foods, LLC v. Berkshire Refrigerated Warehousing, LLC*
   No. 16-cv-672-wmc
   2017 WL 2602328 (W.D. Wisc. 2017) ............................................... 26

*Kansas v. Nebraska*
   574 U.S. 445 (2015) .............................................................................. 14

*Keeton v. Hustler Magazine*
   465 U.S. 770 (1984) .......................................................... 18, 20, 26, 34

*Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*
   172 F.Supp.2d 992 (N.D. Ill. 2001) ..................................................... 7

*Kukovec v. The Estee Lauder Cos.*
   No. 22 CV 1988
   2022 WL 16744196 (N.D. Ill. 2022) ................................................... 29

*Ledesma v. Marriott Int'l, Inc.*
No. 18-CV-3947
2021 WL 2953145 (N.D. Ill. July 14, 2021) ................................. 42

*Liu v. Sec. & Exch. Comm'n*
140 S.Ct. 1936 (2020) ................................. 14, 15

*Lukas Mktg. v. Prince Georges Cmty. Coll.*
No. 1:13–cv–04062
2013 WL 5818592 (N.D. Ill. 2013) ................................. 26

*Lyons v. Hyatt Hotels Corp., et.al.*
No. 3:21-CV-126 DRL-MGG
2021 WL 5015128 (N. D. Ind. Oct. 19, 2021) ................................. 43

*Mallory v. Norfolk Southern Ry.*
600 U.S. 122 (2023) ................................. 22

*Mashayekhi v. Iran*
515 F.Supp. 41 (D.D.C. 1981) ................................. 11, 14

*Miller v. French*
530 U.S. 327 (2000) ................................. 13

*Mitchell v. Robert De Mario Jewelry, Inc.*
361 U.S. 288 (1960) ................................. 13

*Moore v. Brandenberg*
248 Ill. 232 (1910) ................................. 9

*O'Connor v. Sandy Lane Hotel, Co., Ltd.*
496 F.3d 312 (3rd. Cir. 2007) ................................. 20, 24, 25

*O'Neal v. Bumbo Int'l Trust*
16 F. Supp.3d 952 (S.D. Ind. 2014) ................................. 26

*Piper Aircraft Co. v. Reyno*
454 U.S. 235 (1981) ................................. 42

*Porter v. Warner Holding Co*
328 U.S. 395 (1946) ................................. 13

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*
324 U.S. 806 (1945) ................................. 30

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*
582 F.3d 1083 (9th Cir. 2009) ................................. 11, 14

*Ptasinska v. U.S. Dep't of State*
No. 07 C 3795
2007 WL 3241560 (N.D. Ill. Nov. 1, 2007) ................................. 7

*Republic of Philippines v. Marcos*
806 F.2d 344 (2d. Cir. 1986) ................................. 11

viii

*Romag Fasteners, Inc. v. Fossil, Inc.*
  140 S.Ct. 1492 (2020) ............................................................................ 15

*Schoeps v. Andrew Lloyd Webber Art Found.*
  884 N.Y.S.2d 396 (2009) ......................................................................... 9

*Schoeps v. Museum of Modern Art*
  594 F.2d 461 (S.D.N.Y. 2009) .................................................................. 9

*Simic v. City of Chicago*
  851 F.3d 734 (7th Cir. 2017) .................................................................. 15

*Sosa v. Alvarez-Machain*
  542 U.S. 692 (2004) .............................................................................. 10

*Tamburo v. Dworkin*
  601 F.3d 693 (7th Cir. 2010) .................................................................. 19

*Taylor v. Meirick*
  712 F.2d 1112 (7th Cir. 1983) ................................................................ 41

*Texas Indus., Inc. v. Radcliff Materials, Inc.*
  451 U.S. 630 (1981) .............................................................................. 10

*TGI Sys. Corp. v. Jens Giessler & Neumann & Muller GMBH & Co. KG,*
  *Defendant*
  No. 15 C 4341
  2016 WL 878264 (N.D. Ill. Mar. 8, 2016) ........................................... 42, 43

*UBid, Inc. v. The GoDaddy Grp., Inc.*
  623 F.3d 421 (7th Cir. 2010) ................................... 20, 24, 25, 29, 38

*Ungaro-Benages v. Dresdner Bank AG*
  379 F.3d 1227 (11th Cir. 2004) ........................................................ 11, 14

*United States of Am. v. Vitek Supply Corp.*
  151 F.3d 580 (7th Cir. 1998) .................................................................. 16

*Van Saher v. Norton Simon Museum of Art*
  592 F.3d 954 (9th Cir. 2009) .................................................................. 11

*Wach v. Byrne, Goldenberg & Hamilton, PLLC*
  910 F.Supp.2d 162 (D.D.C. 2012) ............................................................ 9

*Walden v. Fiore*
  571 U.S. 277 (2014) .............................................................................. 20

*Wilson v. Sundstrand Corp.*
  2002 WL 99745 (N.D. Ill. Jan. 25, 2002) .................................................. 8

*World Wide Volkswagen Corp. v. Woodson*
  444 U.S. 286 (1980) .......................................................................... 19, 21

*YCB Int'l Inc. v. UFC Trading Co.*
  No. 09 C 7221
  2010 WL 2928069 (N.D. Il. July 21, 2010) .............................................. 43

*Zuckerman v. Metro. Museum of Art*
   928 F.3d 186 (2d. Cir. 2019) ................................................................ 12

**Statutes:**

15 U.S.C. § 45 ........................................................................................ 15, 28

18 U.S.C. § 1001 .................................................................................... 28, 30

18 U.S.C. § 1341 ............................................................................ 15, 28, 30

18 U.S.C. § 1343 .................................................................................... 28, 30

18 U.S.C. § 2314 .................................................................................... 28, 30

22 U.S.C. § 2459 .............................................................................. 5, 28, 30

28 U.S.C. § 1331 .......................................................................................... 10

28 U.S.C. § 1367 .......................................................................................... 10

German Civ. Code § 2039 .............................................................................. 8

**Constitutions:**

U.S. Const., art. III, § 2 ...................................................................... 2, 13, 15

**Court Rules:**

Fed. R. Civ. P. 8 .......................................................................................... 16

Fed. R. Civ. P. 12 ............................................................................... 1, 7, 43

Fed. R. Civ. P. 17 ........................................................................................... 7

**Other:**

16 Ill. Law and Practice, Descent and Distribution § 33 (Oct. 2022) ............ 9

735 ILCS § 5/2–209 .................................................................................... 41

Anagha Sundarajan, *Foreign Affairs Federalism: The Doctrine of Foreign Affairs*
   *Preemption and State Regulation in Light of the Paris Agreement*, 55 U.S.F.L.
   363 (2021) ..................................................................................................... 6

HEAR Act § 2 ............................................................................................... 35

HEAR Act § 4 ............................................................................................... 33

Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J. 1213 (2023) ............ 13, 14

Pub. Law. No. 114-308 (Dec. 16, 2016) ....................................................... 6

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I.  INTRODUCTION AND SUMMARY

The Mendelssohn Heirs (Heirs or plaintiffs) respond to Memorandum of Law in Support of Defendant's Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens* (Defendants' Memorandum). The comparative burdens of the parties on motions to dismiss under Fed. R. Civ. P 12(b)(1) & 12(b)(2) – as well as many material questions of fact – make clear that the Court should deny Defendants' motion. The Heirs demonstrate herein that:

**1.** they enjoy ***judicial standing*** to prosecute their claims as the inheritance laws of both Germany and Illinois permit the heirs of a decedent to prosecute claims in their personal capacities when no executor or administrator was appointed for the decedent's estate and no claims or liabilities whatsoever can be asserted against it. Then there is no requirement that an administrator or executor be appointed;

**2.** they satisfy the requirements for ***specific jurisdiction*** on two discrete bases: (1) displaying *Sunflowers* at an exhibition of van Gogh paintings in Chicago in 2001 sponsored by the Art Institute of Chicago (AIC) and the van Gogh Museum in Amsterdam; and (2) continuing to commercially exploit the Painting on their corporate website to sell insurance in Illinois – and incidental to – their "brick and mortar" corporate office on Madison Street in Chicago. In both contexts the Defendants realized discrete benefits – and continue to accrue benefits – from the Illinois forum by exploiting the Painting as a branding and marketing asset while repudiating the reciprocal obligations that these benefits occasioned. These benefits and reciprocal obligations made the claims of the Heirs to recover the Painting and for unjust enrichment reasonably ***foreseeable*** – the ultimate touchstone for due process in asserting specific jurisdiction – as the Heirs' claims relate closely to both. In addition – and dispositively – before bringing the Painting to Chicago a corporate representative of the Defendants expressed concern that the Painting was

1

a casualty of Nazi persecution and so might be seized as contraband, establishing that the Defendants **foresaw in fact** the Heirs' claims. Moreover, to maximize the utility of *Sunflowers* in selling insurance in Illinois – and to forge closer contacts with Illinois insurance consumers – Defendants employ *Sunflowers* in an innovative marketing strategy known as "archetypal branding." This strategy seeks to transfer archetypal imagery embedded in *Sunflowers* bespeaking creativity and care to the subliminal subconscious of Illinois insurance consumers. These considerations confirm that the Heirs have established specific jurisdiction based upon controlling judicial decisions of both the Supreme Court and the Seventh Circuit;

**3.** they both allege and establish facts that **as a matter of law negate the discrete corporate identities of the several Defendants,** thereby making each correspondingly and vicariously liable for the extensive and perpetual wrongdoing of the others concerning *Sunflowers.* The Heirs invoke multiple supporting legal doctrines including *alter ego*, agency, aiding and abetting, "piercing the corporate veil" for fraud, and employing a corporation to frustrate federal policy. Moreover, that Defendants have not contested these allegations makes clear that the Court should accept them as true in deciding the Motion;

**4**. the Court enjoys **plenary equitable authority** under Article III, Section 2 of the U.S. Constitution both to return *Sunflowers* to the Heirs and to compel Defendants to restore the unjust enrichment that they wrongfully have reaped by commercially exploiting the Painting as **conscious wrongdoers**. The Defendants have misused the Painting both in knowing violation of the Heirs' superior ownership rights as well as the signal U.S. and international foreign policy that prioritizes the return of Nazi-confiscated artworks like the Painting to rightful owners. The Supreme Court consistently has reaffirmed that when the public interest is impaired – as it is in this proceeding when Defendants not only violate U.S. foreign policy but also *necessarily* continue to commit multiple crimes and torts in order to commercially exploit *Sunflowers* – federal courts enjoy expansive equitable authority to protect the public interest, rectify injustice, and enjoin continuing wrongdoing.

**5.** the doctrine of ***forum non conveniens*** does not support the Court transferring this case to Japan as Defendants request. That the claims of the Heirs to recover the Painting and for unjust enrichment are time-barred in Japan as a matter of law precludes Japan from being a reasonable option to Illinois to adjudicate this controversy. Moreover, Defendants have failed both to agree to waive the relevant Japanese prescriptive period, and to demonstrate that a Japanese court would accept their waiver. Defendants' failure to meet these requirements forecloses applying ***forum non conveniens***. In addition, both the comparative private equities as well as multiple public interests favor Illinois overwhelmingly to Japan as an appropriate forum.

The Defendants continuing and colossal ***malfeasance*** with the Painting evokes the foundational equitable maxim estopping wrongdoers from benefitting from their own misdeeds, and counsels the Court to exercise its extensive plenary equitable authority liberally.

## II.  BACKGROUND AND STATEMENT OF FACTS

Paragraphs 1–8 of the FAC under the subheading "**Nature of the Action and Summary of Claims**" summarize the Heirs' claims to recover *Sunflowers,* and to recoup the concomitant unjust enrichment that Defendants have reaped. As related, the Heirs' ancestor – the prominent Berlin Jewish banker and private art collector Paul Von Mendelssohn-Bartholdy – relinquished the Painting in 1935 as a direct and grave consequence of systematic Nazi coercion in violation of the international law of human rights calculated to evict Jews from the economy and society of Germany.[1] A U.S. District Court Judge has affirmed the *bona fides* of the Heirs' claim to recover *Sunflowers* on this basis.[2]

When Christie's auction house in London offered the iconic *Sunflowers* at auction in March 1987, the Defendants' corporate predecessor (the Yasuda Fire and Marine Insurance Company (Yasuda) seized a non-recurring opportunity to burnish its corporate image with the mystique and luster of this famous painting and its legendary artist, and to associate its corporate

---

[1]    FAC ¶ 2.

[2]    FAC ¶ 4; FAC Exhibit 2.

3

identity in the public conscious with both.[3] Determined to buy *Sunflowers* at any cost, Yasuda broke a contemporaneous auction record by paying nearly $40 million for the Painting, but realized four times this value in publicity and media attention.[4] But in its rush to acquire the Painting at any cost, Yasuda ignored the history of ownership (provenance) of the Painting that Christie's published, which strongly intimated that the Painting was a casualty of Nazi policies. Defendants also disregarded Christie's express disclaimer that encouraged prospective buyers to investigate independently all materials. offered at auction to ensure that they were securing good title.[5] The accompanying Declaration of James Glenn Scoggins[6] attests to the "immense benefits in public relations, marketing, and brand awareness" that Defendants have derived by "owning, controlling and using the iconic van Gogh *Sunflowers* painting in their business and marketing."[7] In fact, "Van Gogh and *Sunflowers* are so closely connected in Japan that they are virtually synonymous."[8] *Sunflowers* has benefitted the Defendants' corporate brand almost "immeasurably" by casting it "in a most positive – if not radiant – cultural light."[9]

But in accessioning *Sunflowers* and the related benefits that it promised for enhancing Yasuda's corporate brand and concomitant ability to sell insurance, Yasuda ventured a classic ***Devil's Bargain***: the inherent cost of utilizing *Sunflowers* as a stunning branding and marketing asset entailed perpetually suppressing its conspicuous Nazi provenance.

In 2001, Yasuda brought *Sunflowers* to Chicago to display at a prestigious exhibition of van Gogh paintings that the AIC was co-sponsoring with the van Gogh Museum in Amsterdam. The exhibition offered Yasuda an opportunity to further its corporate objective in acquiring

---

[3]    FAC ¶¶ 5, 237.

[4]    FAC ¶¶ 5, 238.

[5]    FAC ¶¶ 5, 238-39.

[6]    *See* Declaration of James Glenn Scoggins (Scoggins Declaration), attached hereto as Exhibit 1. Mr. Scoggins is a historical researcher, writer, and academician with degrees from both Yale and Harvard. He has a cultivated interest in the fine arts, and is a 40-year resident of the Tokyo area. Scoggins Declaration ¶¶ 1&2.

[7]    *Id.* ¶ 1.

[8]    *Id.* ¶ 3.

[9]    *Id.* ¶ 9.

*Sunflowers*, and which had entailed an investment of nearly $40 million in shareholder funds: to make Yasuda's discrete corporate brand coextensive with the Painting in order to amplify corporate profits. By contributing *Sunflowers* to the Exhibition, Yasuda received as an additional benefit a commitment from the van Gogh Museum that it would contribute two van Gogh paintings to a future exhibition in Tokyo that Yasuda was planning.[10] But by this juncture Yasuda was expressly aware that *Sunflowers* had a Nazi taint, and Yasuda representative Masura Igarashi cautioned the van Gogh Museum that "***Nazi [sic] confiscation problem may arise in America and Holland***." (Emphasis and italics supplied).[11] To avert the possibility that the U.S. government might seize *Sunflowers* as Nazi contraband, Yasuda colluded with AIC to defraud the U.S. Department of State to issue a Certificate of Non-Judicial Seizure protecting *Sunflowers* from this contingency by filing a false application under the Immunity from Judicial Seizure Act[12] concealing the Painting's Nazi taint.

While ***knowing*** that *Sunflowers* is a Nazi-confiscated painting, the Defendants nonetheless have capitalized upon its immense celebrity by employing the Painting on their website to effectuate an innovative and captivating marketing strategy known as archetypal branding.[13] As related, archetypal branding amplifies the Defendants' commercial contacts and connections to Illinois and other insurance markets by invoking archetypal imagery embedded in *Sunflowers* to inform and influence the subliminal subconscious of corporate stakeholders and insurance consumers. The accompany Declaration of archetypal branding authority Katie Quinn Spangenberg, Ph.D. (Spangenberg Declaration) explains the genesis and rationale for archetypal branding and its capability to influence consumers on a deep, subconscious level.[14] Importantly,

---

[10]  *See* Exhibits A and B to the Declaration of John J. Byrne, Jr. (Byrne Declaration), which is attached hereto as Exhibit 2.

[11]  FAC ¶ 247 and FAC Exhibit 1.

[12]  22 U.S.C. § 2459.

[13]  FAC ¶¶ 257-64 and accompanying Declaration of Katie Quinn Spangenberg (Spangenberg Declaration), which is attached as Exhibit 3.

[14]  *See* Spangenberg Declaration at ¶ 10.

the unique brand identity that Defendants cultivate by employing *Sunflowers* in archetypal branding helps them ***differentiate*** their company from competitors. Accordingly, *Sunflowers* "plays a pivotal role" in how Defendants market insurance in Illinois and elsewhere.[15]

Since 1998 especially, ***both*** branches of the U.S. Government that the Constitution entrusts with foreign policy – Congress and the Executive – through multiple statutes and Executive agreements have prioritized returning Nazi-confiscated artworks to rightful owners.[16] Section 3(1) of the Holocaust Expropriated Art Recovery Act of 2016 (HEAR Act)[17] identifies these (in part) as "the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." As the FAC points out, because the policy to restitute Nazi-confiscated artworks enjoys the express concurrence of ***both*** Congress and the Executive, it necessarily preempts any Illinois law that obstructs or otherwise would preclude these objectives.[18]

In September 2022, the Heirs submitted a comprehensive claim to the Defendants with evidence confirming that *Sunflowers* was a casualty of Nazi policies and requesting that Defendants meet with them to discuss their claim. While Defendants acknowledged the Painting's Nazi taint, they refused to discuss the Heirs' claims asserting that specific jurisdiction could not be grounded in Illinois nor could U.S. law govern the Heirs' claims.[19]

---

[15]   *Id*. at Conclusion.

[16]   The FAC discusses these foreign policy pronouncements at ¶¶ 221-235.

[17]   Pub. Law. No. 114-308 (Dec. 16, 2016).

[18]   FAC ¶ 235, observing that "[w]hen the President and Congress act in concert, any state law that touches the arena of foreign relations is preempted," and citing Anagha Sundarajan, *Foreign Affairs Federalism: The Doctrine of Foreign Affairs Preemption and State Regulation in Light of the Paris Agreement*, 55 U.S.F.L. 363, 397 (2021).

[19]   *See* Byrne Declaration, Exhibit F.

### III.   THE RESPECTIVE LEGAL BURDENS OF THE PARTIES ON MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) and 12(b)(2) FAVOR THE HEIRS

In evaluating motions to dismiss under to Fed. R. Civ. P. 12(b)(1) and 12(b)(2), the Court will accept as true all well-pleaded facts and draw all reasonable inferences in favor of the plaintiffs, and reads the complaint liberally with every inference favoring the plaintiff.[20] Courts also must resolve factual disputes in affidavits in favor of the plaintiff.[21]

A "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[22] "Where a claimant fairly alleges an entity exists as the *alter ego* of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied."[23]

### IV.   ARGUMENT

#### A.   THE HEIRS ENJOY STANDING TO ASSERT THEIR CLAIMS

The German Heirs' capacity to sue is governed by German law since they are not suing in a representative capacity. Fed. R. Civ. P. 17(b)(1). In any event, the Heirs have standing under both German and Illinois law, as discussed below.[24] Under German law, the Heirs have standing to bring this suit in their personal capacity. (Declaration of Ulf Bischof (Bischof Declaration) ¶ 5(a), 8, attached hereto as Exhibit 4). In Germany, rights vest immediately upon the death of the decedent. (Bischof Declaration ¶ 5). Accordingly, an heir takes the place of the decedent

---

[20]   *Ptasinska v. U.S. Dep't of State*, No. 07 C 3795, 2007 WL 3241560, at *2 (N.D. Ill. Nov. 1, 2007); *Expeditee LLC v. Entities Listed on Exhibit 1*, No. 21 C 6440, 2022 WL 1556381, at *2 (N.D. Ill. May 17, 2022).

[21]   *Expeditee LLC*, 2022 WL 1556381, at *2.

[22]   *Hishon v. King Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

[23]   *Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F.Supp.2d 992, 1000–01 (N.D. Ill. 2001); *see also Flentye v. Kathrein*, 485 F.Supp.2d 903, 912–13 (N.D. Ill. 2007)(the liberal rules of notice pleading apply to "piercing allegations").

[24]   In addition, Fed. R. Civ. P. 17(a)(3) provides that a court should not dismiss an action for failure to prosecute in the name of the real party in interest, but should allow a reasonable time for the real party in interest to ratify, join, or be substituted into the action. Once the real party in interest is included, the action should proceed as if it had been commenced originally by the real party in interest. *Id.*

immediately upon death. If there is more than one heir, then a "community of heirs" takes the place of the decedent jointly and severally. The heir or "community of heirs" assumes the decedent's obligations and takes over his or her assets without estate administration. (*Id*.)

Each member of the "community of heirs" inherits the decedent's property as a joint heir, that is, each heir owns all of the inherited property (like artworks) completely. (Bischof Declaration ¶ 5(a)). Accordingly, § 2039 of the German Civil Code recognizes the legal capacity of an individual co-heir to demand performance from third parties and bring legal actions concerning claims belonging to an estate in his or her personal and individual capacity. (Bischof Declaration ¶ 8–9). When pursuing such a claim, the individual co-heir acts in his or her own name and not as representative of the other co-heirs (Bischof Declaration ¶ 9), and makes a demand for performance to all members of the community of heirs jointly (Bischof Declaration ¶ 9), since each individual item of personal property (like artworks) that the deceased owned is jointly and fully owned by all heirs. (Bischof Declaration ¶ 5(a)). Accordingly, in this case, plaintiffs have standing to bring suit in their personal and individual capacities.[25]

In light of the foregoing, as members of the community of heirs of Paul von Mendelssohn-Bartholdy, Schoeps and Enhoerning are entitled to bring this action to demand the return of the Painting to all members of Paul's community of heirs. (*See* Declaration of Julius Schoeps (Exhibit G to Bischof Declaration) and Declaration of Britt-Marie Enhoerning (Exhibit H to Bischof Declaration), establishing that each is a member of the "community of heirs" of Paul von Mendelssohn-Bartholdy). Likewise, as a member of Elsa's community of heirs, Kesselstatt is entitled under German law to bring this action to demand the return of the Painting

---

[25]     *See Wilson v. Sundstrand Corp.*, 2002 WL 99745, at *1 (N.D. Ill. Jan. 25, 2002)(holding that the German heirs of German passengers killed in a plane crash possessed the right to sue the manufacturer of allegedly defective aircraft equipment on behalf of the decedents in their individual capacities without the need for the appointment of an administrator or executor for the estates; the court noted that even the defendants' expert conceded that "German law 'does not recognize the concept of a personal representative of a decedent.'"). *See also* Bischof Declaration ¶ 11 and Gozzo Declaration (Exhibit I to Bischof Declaration), establishing that Swedish plaintiff Enhoerning has standing to bring this action under Swedish and German law.

to all members of Elsa's community of heirs. (*See* Declaration of Florence Kesselstatt (Kesselstatt Declaration), Exhibit J to Bischof Declaration) establishing that she is a member of the "community of heirs" of her mother, the late Elsa von Mendelssohn-Bartholdy.

The Heirs, as described above, have standing to sue under Illinois law also.[26]

---

[26]     Illinois law permits the heirs of a decedent to assert claims for the recovery of the decedent's personal property in their individual capacities when no administrator or executor has been appointed and no debts or claims are asserted against the estate. *See Moore v. Brandenberg*, 248 Ill. 232, 236 (1910); 16 Ill. Law and Practice, Descent and Distribution § 33 (Oct. 2022) (and cases cited therein). This principle would enable the Heirs to prosecute this suit in their individual capacities under Illinois law. When Mendelssohn-Bartholdy died in May 1935, no executor or administrator was appointed for his estate, and no claims or debts were lodged against the estate. (Schoeps Declaration ¶ 10). Similarly, when Elsa von Mendelssohn-Bartholdy died in 1986, no executor or administrator was appointed and there were no claims or debts against the estate. (Kesselstatt Declaration ¶ 6). Accordingly, the plaintiffs in this matter have standing under Illinois law to assert claims for the recovery of the decedents' personal property in their individual and personal capacity.

Finally, defendants cite a series of inapposite cases from New York and Washington, DC in a futile effort to undermine the Heirs' standing. *See Schoeps v. Museum of Modern Art*, 594 F.2d 466, 467 (S.D.N.Y. 2009)(attached to FAC as Exhibit 2)(court found that the Mendelssohn Heirs had standing without having a "personal representative" appointed under New York law: "it is difficult to imagine how the Claimants could be appointed representatives of Paul's or Elsa's estates when, according to [defendants' expert witness], no such estates ever existed or would exist under German law"); *Schoeps v. Andrew Lloyd Webber Art Found.*, 884 N.Y.S.2d 396, 400 (2009)(decision cited alternative methods for establishing standing *under New York law* with, for example, the use of an expert witness on foreign inheritance law – as plaintiffs are doing in this case. In any event, the *Webber* case was dismissed without prejudice but was never refiled since the parties reached an amicable settlement outside of court); *Wach v. Byrne, Goldenberg & Hamilton, PLLC*, 910 F.Supp.2d at 173 (Wach claimed to be an heir of Mendelssohn-Bartholdy entitled to share in Heirs' settlements but court dismissed his case. *Id.* Wach then sued in Germany, but the German courts rejected his claims and he exhausted his appeals in 2014). Finally, the National Gallery of Art in Washington, DC returned Pablo Picasso's *Head of a Woman* to the Mendelssohn Heirs in 2020, and the settlement proceeded without controversy regarding the "community of heirs" entitled to ownership of the returned work. Indeed, the "community of heirs" of Paul and Elsa von Mendelssohn-Bartholdy is well-established.

**B. THE FIRST AMENDED COMPLAINT PROPERLY INVOKES FEDERAL SUBJECT MATTER JURISDICTION OVER THE HEIRS' CLAIMS**

**1. The Court Has Federal Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 Based Upon the U.S. Supreme Court Decisions in *Grable & Sons Metal Products, Inc. v. Darue Engineering and Manufacturing*[27] and *Gunn v. Minton*[28]**

This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331 based upon *Grable* and *Gunn*, as set for at length in FAC ¶¶ 112–118, and which Defendants do not dispute. Moreover, the Court's federal question jurisdiction confers supplemental jurisdiction over the Heirs' state law claims under 28 U.S.C. § 1367.

**2. The Court Has Federal Subject Matter Jurisdiction Under 28 U.S.C. § 1331 Because the Claims of the Heirs to Apply Federal Common Law and for an Exercise of the Court's Plenary Equitable Authority Arise Under Federal Law**

**a. The Heirs Enjoy a Valid Claim for Applying Federal Common Law Which Establishes Federal Subject Matter Jurisdiction**

While *Erie v. Tomkins*[29] abrogated most federal common law, federal common law persists in certain discrete enclaves affecting ***exclusively*** federal interests, including foreign affairs and our relations with foreign governments.[30] And lower federal courts acknowledge that

---

[27] 545 U.S. 308 (2005).

[28] 568 U.S. 251 (2013).

[29] 304 U.S. 64, 77–80 (1938).

[30] *See, e.g. Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (counseling that federal common law persists "when necessary to protect uniquely federal interests", and prevails "absent…congressional authorization to formulate rules of decision" in "our relations with foreign nations") (Emphasis and italic supplied). *See also Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004) (declaring that "this Court has thought it was in order to create federal common law rules in interstitial areas of particular federal interest" and "we have … assumed competence to make judicial rules of decision of particular importance to foreign relations") .

10

federal common law applies in foreign relations.[31] Further, U.S. courts have invoked the federal common law of foreign affairs in contexts analogous to the case at bar to ensure that state law remedies – such as for constructive trust – do not impinge upon U.S. foreign policy.[32]

Accordingly, the compelling foreign affairs interest that underlies the Heirs' claims ensure that they enjoy federal common law remedies both to recover *Sunflowers* and to recoup unjust enrichment. The Heirs would enjoy these remedies even more emphatically were the Court to conclude that Illinois state law does not enable the Heirs to prosecute their claims, as otherwise Illinois law impermissibly would frustrate predominant federal objectives.

**b. The Defendants' Challenge to the Heirs' Claim for an Application of Federal Common Law Is Without Merit**

The Defendants challenge the Heirs' contention that federal common law applies – ***if necessary*** – to ensure that the Heirs enjoy viable judicial remedies primarily by contending that the Heirs claims do not impact foreign policy.[33] But the many policy declarations of both Congress and the Executive in the international arena – and delineated at paragraphs 221–35 of the FAC – confirm that the restitution of Nazi-confiscated artworks involves foreign affairs and affects international relations. The HEAR Act is expressly predicated upon this conclusion. Section 2(7) of the HEAR Act explained that because the Ninth's Circuit decision in *Van Saher v. Norton Simon Museum of Art* [34] ruled that the attempt of California to redress the restitution of

---

[31]   *See, e.g., Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1089 (9th Cir. 2009)(federal common law governs foreign affairs); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1233 (11th Cir. 2004)(exception to *Erie* applies to litigation that implicates foreign relations, and federal common law applies); *Mashayekhi v. Iran*, 515 F.Supp. 41 (D.D.C. 1981)(federal interest in the consistent interpretation of a 1955 treaty compelled a federal rule).

[32]   *See Republic of Philippines v. Marcos*, 806 F.2d 344, 354 (2d. Cir. 1986)(hypothecating that "the federal common law …of foreign affairs is so 'powerful,' or important, as to displace a purely state cause of action of constructive trust… because of the necessary implications of such an action for United States foreign relations.")

[33]   *See* Defendants Memorandum at 13, asserting that the Heirs' claims do not impact "international disputes between states or foreign nations."

[34]   *Van Saher v. Norton Simon Museum of Art*, 592 F.3d 954 (9th Cir. 2009).

Holocaust era artworks represented "an unconstitutional infringement of the Federal Government's exclusive authority over ***foreign affairs,*** which includes the resolution of war-related disputes," a federal law was necessary to ensure that "claims to Nazi-confiscated art are adjudicated in accordance with United States policy as expressed in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." (Emphasis and italics supplied.)

The Defendants also wrongfully maintain that because the Act prescribes that it shall not be construed to create a civil claim or cause of action, courts are precluded from applying a federal common law remedy when necessary to achieve the Act's objectives. This argument conflates the test for implying a private statutory right of action under *Cort v. Ash*[35] with the inherent authority of the Court to create federal common law to protect acute U.S. foreign policy interests when state law fails to do so. While the HEAR Act does not imply a discrete cause of action that derives from its text, it references and perpetuates a much broader foreign policy that both Congress and the Executive have formulated and reaffirmed for decades. *See* FAC ¶¶ 221–235. So it is the broader and predominant U.S. foreign policy which the HEAR Act expressly attributes to "the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act and the Terezin Declaration"[36] – and not the Act itself – that authorizes a court to apply federal common law in this area (if necessary) to protect these foreign policy imperatives. And merely that the court in *Zuckerman v. Metropolitan Museum of Art*[37] declined to create a uniform federal common law remedy to accompany the Act does not negate the capability of the Court to apply federal common law in this proceeding should it decide that the discrete law of Illinois affords the Heirs no viable judicial remedies to assert their claims. The

---

[35]   *Cort v. Ash*, 422 U.S. 66 (1975).

[36]   HEAR Act § (2)(7).

[37]   *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 195 (2d. Cir. 2019).

*amici* in *Zuckerman* who proposed this remedy overshot their mark by petitioning the court to create a uniform principle applicable to **all** states without showing how existing state law remedies in each state precluded claimants from recovering Nazi-confiscated artworks.

> **c. The Heirs Enjoy a Valid Claim for an Exercise of the Court's Plenary Equitable Authority Which Also Establishes Federal Subject Matter Jurisdiction**

Article III, Section 2 of the U.S. Constitution confers broad, inherent, and "plenary" equitable authority upon U.S. federal courts to protect federal law and policies – such as the imperative U.S. foreign policy at issue here. Moreover, the scope of this authority will not be limited unless Congress – in a particular statute – explicitly so prescribes.[38]

Article III, Section 2 endows federal courts with authority to adjudicate cases both in law and equity that arise under the U.S. Constitution or under U.S. laws. This provision prescribes in relevant part that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under (the) Constitution, the Laws of the United States, and Treaties made…under their Authority."

The Court interprets this provision as conferring upon the federal judiciary all equitable authority and power that the English Chancery Courts enjoyed in 1789 when the Constitution was ratified.[39] Accordingly – and as one scholar explained – "the power exercised by federal

---

[38] *Porter v. Warner Holding Co*, 328 U.S. 395, 398 (1946) ("Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction….."); *Miller v. French*, 530 U.S. 327, 340 (2000) (the "courts should not construe a statute to displace courts' traditional equitable authority absent the clearest command or inescapable inference to the contrary"); *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 291 (1960).

[39] Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J. 1213, 1213 (2023)("The judicial Power in "Equity" is best understood as vesting the federal courts with the inherent power to grant equitable relief. That power is co-extensive with the remedial authority of the of the Founding Era English Chancellor. Put simply, Article III empowers federal courts to apply the system of equitable remedies administered by the Court of Chancery in 1789 as the baseline of federal equitable power. Thus, absent express congressional action (which is rare), it is Article III itself – not federal statutes – that defines the limits of federal equity"); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 317 (1999)("[w]e have long held that '[t]he 'jurisdiction' thus conferred…is an authority to administer in equity suits the principles of the system of judicial remedies that had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." (Citation omitted).

courts in most equity cases is the ***inherent authority conferred by Article III***, so it is the extent of that power – not any authorized by statute – that delimits the permissible remedies available in federal court."[40] (Emphasis and italics added). And the Court views this authority as especially broad and remedial when enlisted to protect U.S. laws and policies. Federal courts routinely acknowledge that federal common law applies in foreign relations and in contexts such as U.S. foreign policy to return Nazi-confiscated artworks to rightful owners.[41] As the Court reiterated in *Kansas v. Nebraska,*[42] the scope of a federal court's equitable authority and power is especially broad when protecting federal interests and giving "complete effect to public law":

> As we previously have put the point: When federal law is at issue and 'the public interest is involved,' a federal court's equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. *Porter v. Warner Holding Co.*, 328 U.S. 395…(1946) *see Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 552….(1937) ("Courts of equity may, and frequently do, go much further' to give "relief in furtherance of the public interest than they are accustomed to go when only private interests are involved"). In exercising our jurisdiction, we may 'mould each degree to the necessities of the particular case' and 'accord full justice' to all parties. (Citations omitted).

The plenary equitable authority of federal courts includes the foundational remedies of constructive trust and accounting. *See, e.g,* the dissenting opinion of Justice Thomas in *Liu v. Securities and Exchange Commission*,[43] discussing both "constructive trust" which "'compels a defendant 'holding title to property ... to convey it to another on the ground that it would be unjustly enriched if he were permitted to retain it'" (Citation omitted) and accounting – which compels a party to repay profits that belong to a plaintiff "as traditional equitable remedies." As

---

[40]    Gallogly, *supra* note 39 at 1312.

[41]    *See, e.g., Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d at 1089(federal common law governs foreign affairs); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d at 1233(exception to *Erie* applies to litigation that implicates foreign relations, and federal common law applies); *Mashayekhi v. Iran*, 515 F.Supp. 41(federal interest in the consistent interpretation of a 1955 treaty compelled a federal rule).

[42]    *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015).

[43]    *Liu v. Sec. & Exch. Comm'n*, 140 S.Ct. 1936, 1953 (2020).

*Liu* observed, "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names."[44] In awarding equitable relief, the courts consider the moral culpability of the defendant,[45] as well as the imperative to enjoin continuing wrongdoing.[46]

The foregoing confirms that this Court enjoys inherent equitable authority grounded in Article III, Section 2 of the U.S. Constitution to grant the relief for which the Heirs petition. These remedies include: (a) imposing a constructive trust compelling Defendants to return *Sunflowers* to them; (b) ordering an accounting requiring Defendants to disgorge the unjust enrichment that they wrongfully have reaped by commercially exploiting *Sunflowers*; and (c) enjoining the Defendants' conscious and continuing wrongdoing that violates federal proscriptions including against mail fraud (18 U.S.C. § 1341) as well as deceptive and unfair trade practices. (15 U.S.C. § 45).

Defendants maintain that *Kansas v Nebraska*, *supra*, shows merely that plenary equitable authority extends only to disputes "**between States**." (Emphasis original).[47] But the foregoing makes clear that the inherent equitable authority of federal courts is not so limited.

---

[44]   *Id*. at 1942.

[45]   *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S.Ct. 1492, 1494, 1497 (2020)("[w]ithout question… a defendant's state of mind may have a bearing on what relief a plaintiff should receive….This reflects the ordinary… principle that a defendant's mental state is relevant to assigning an appropriate remedy").

[46]   *See, e.g., Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017)(injunction will be entered when plaintiff faces "real and immediate" threat of future injury).

[47]   Defendants' Memorandum at 14, n.6.

**C.   THE FAC ALLEGES MULTIPLE LEGAL BASES FOR NEGATING THE SEPARATE IDENTITY OF EACH CORPORATE DEFENDANT AND *PROVES* THAT DEFENDANTS HAVE COMMINGLED THEIR PRIMARY BRANDING ASSET – *SUNFLOWERS* – TO COMMIT BOTH FRAUD AND CRIMES AND TO FRUSTRATE SIGNAL FEDERAL POLICIES**

**1.   The FAC Invokes Multiple Legal Doctrines that Negate the Discrete Corporate Identity of Each Sompo Corporate Defendant**

The liberal pleading requirements for asserting claims that seek to nullify the separate identities of corporations based upon *alter ego* or piercing the corporate veil theories sufficient to survive a motion to dismiss make clear that the Court should deny the Defendants' motion. As discussed, *supra*, to properly allege a veil piercing or alter ego theory entails only that plaintiffs satisfy the liberal notice pleading requirements of Fed. R. Civ. P. 8(a).

The FAC discusses the applicable law at paragraphs 57–60. As related therein, in *First National City Bank v. Banco Para Commercio Exterior de Cuba,*[48] the Court instructed that the corporate form will be disregarded when: (1) its owners control it so extensively that a relationship of principal and agent is created; (2) when recognizing a separate corporate identity would perpetrate fraud or injustice; and (3) when the "corporate form is interposed to defeat legislative policies."[49]

The FAC ***confirms*** both that the Sompo defendants have employed their discrete corporate forms to perpetrate colossal fraud, as well as to defeat the signal U.S. foreign policy to return Nazi-confiscated artworks to rightful owners – two of the enumerated bases for negating

---

[48]   *First Nat'l City Bank v. Banco Para Commercio Exterior de Cuba*, 462 U.S. 611, 628 (1983).

[49]   As the FAC states at ¶¶ 57-60, the Court consistently has stressed that the corporate form will not be recognized when it is employed to defeat legislative policies. *See, e.g., Anderson v. Abbot*, 321 U.S. 348, 362–363 (1944), observing that "[i]t has often been held that interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim *or only the result of the arrangement."* (Italics supplied). *United States of Am. v. Vitek Supply Corp.*, 151 F.3d 580, 583 (7th Cir. 1998)("it is well settled that the fiction of a corporate entity must be disregarded whenever it has been adopted or used to circumvent the provisions of a statute"); *Illinois Bell Tel. Co., Inc. v. Global Naps Illinois, Inc.*, 551 F.3d 587, 591 (7th Cir. 2008)(observing that "a state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such a law").

the corporate form. The Defendants long have known that *Sunflowers* is a Nazi-confiscated painting [FAC ¶¶ 248–252 and accompanying Exhibits 16; 17–18], but have represented to their stakeholders and to insurance consumers in Illinois and elsewhere – and as "Sompo One" – that in 2021 they conducted a comprehensive enterprise-wide human rights due diligence investigation to ensure that none of their assets or activities were tainted with human rights violations. FAC ¶ 48. The Defendants thereby have perpetrated fraud upon their Illinois stakeholders and insurance consumers, and violated an array of both criminal and civil proscriptions against fraud as well as unfair business practices. FAC ¶ 106. Defendants also, of course, have employed their putatively separate corporate identities in an attempt to frustrate the U.S. foreign policy to return Nazi-confiscated artworks to rightful owners. Indeed, this is the primary thrust of their argument in this proceeding and rationale for their several supporting declarations.

The FAC also alleges that Defendants have ***ratified*** the fraudulent misconduct of their corporate predecessors concerning the Painting by accepting the benefits of their wrongdoing – including, especially the many branding benefits that accrued through the 2001 AIC Exhibition. FAC ¶¶ 75, 76, 95, 119. The comprehensive allegations of the Complaint concerning collaborative complicity, and *de facto* unity of interest and control also sustain legal theories for negating the discrete identities of the Defendants based upon agency and aiding and abetting.

**D.  THE FIRST AMENDED COMPLAINT PROPERLY ASSERTS SPECIFIC JURISDICTION OVER ALL SOMPO CORPORATE DEFENDANTS**

1.  **Constitutional Due Process For Specific Jurisdiction Is Satisfied When: (a) a Foreign Defendant "Purposefully Avails" Itself of the Benefits and Privileges of the Forum; (b) the Claim is Sufficiently "Related To" Those Contacts, and; (c) Asserting Specific Jurisdiction Otherwise Is Reasonable**

As the Court instructed in *Burger King Corp. v. Rudzewicz,*[50] the Due Process Clause "protects an individual's interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties or relations.'"[51] Accordingly, due process requires that a prospective defendant receive a "fair warning" that its conduct in a particular forum may subject it to suit. This requirement "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum….and the litigation results from alleged injuries that "arise out of or relate to those activities."[52] An exercise of specific jurisdiction also must otherwise be reasonable, and so comport with principles of "fair play and substantial justice."[53]

Beginning with the seminal *International Shoe* Co. *v. Washington*[54] – and continuing through its latest guidance in *Ford Motor Company v. Montana Eight Judicial District Court*[55] – the Court consistently has reaffirmed that specific jurisdiction is premised upon a tacit bargain or ***quid pro quo***: in exchange for enjoying the privileges, benefits, and advantages of a forum state a defendant submits to the jurisdiction of that state regarding claims that arise from or relate to those discrete contacts.[56] As the Court explained in *International Shoe Co.*:

---

[50]   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985).

[51]   Citing *Int'l Shoe v. Washington*, 326 U.S. 310, 319 (1945).

[52]   Citing *Keeton v. Hustler Magazine*, 465 U.S. 770, 774 (1984).

[53]   *Burger King Corp. v. Rudzewicz*, 471 U.S. n. 50 at 476–477.

[54]   *Int'l Shoe v. Washington*, 326 U.S. at 326.

[55]   *Ford Motor Co. v. Montana Eight Judicial Dist. Court*, 141 S.Ct. 1017 (2021).

[56]   *See, e.g., J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011)("[w]here a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law'…it submits to the judicial power of an otherwise foreign sovereign

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. ***The exercise of that privilege may give rise to obligations***; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.[57] (Emphasis and italics supplied).

The Court consistently has equated due process in this context with ***reasonable foreseeability***: if the defendant availing itself of the advantages, benefits and privileges of a forum state reasonably should ***foresee*** that its conduct in the state might occasion liability for a claim arising from or connected to those activities, due process is satisfied.[58] And as the Court observed in *Burger King. v. Rudzewicz*, "[t]his purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts."[59] Moreover, "[t]he purposeful direction inquiry 'can appear in different guises.'"[60]

To avail a forum state does ***not*** require that the defendant be physically present within the state.[61] Nor does specific jurisdiction depend upon whether the ***plaintiff*** has cultivated minimum

---

to the extent that power is exercised in connection with the defendant's activities touching on the State") (Citation omitted); *Burger King Corp. v. Rudzewicz*, 471 U.S. at 474; *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[57]    *Int'l Shoe*, 326 U.S. n. 51 at 319.

[58]    *See, e.g.*, *Ford Motor Co.*, 141 S.Ct. at 1025, relating that "[o]ur decision in *International Shoe* founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company 'exercises the privilege of conducting activities within a state" – thus 'enjoy[ing] the benefits and protections of [its]law" – the State may hold the company to account for related misconduct.'…Later decisions have added that our doctrine similarly provides defendants with 'fair warning'- knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign.'" (Citations omitted). *See also World Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297, observing that "it is the defendant's conduct and connection with the forum State such that he should reasonably anticipate being haled into court there gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.; *Burger King Corp. v. Rudzewicz*, 471 U.S. at 474.

[59]    *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475.

[60]    *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (Citation omitted).

[61]    *Burger King Corp. v. Rudzewicz*, 471 U.S. at 462: "[s]o long as a commercial actor's efforts are 'purposefully directed toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction."

19

contacts with the forum.[62] "But plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts."[63] Nor need the plaintiff reside or work in the forum State, or be injured in the forum.[64]

Once a defendant has "purposefully availed" the forum state in a manner sufficient to create "minimum contacts," the claim(s) of the plaintiff must "arise from or relate to" to these contacts in an integral manner. In *Ford Motor Company v. Montana Eighth Judicial District Court*[65], the Court ruled that to satisfy this requirement the conduct of the defendant ***need not cause*** the plaintiff's injury, and specific jurisdiction can attach when the claims of the plaintiff merely "***relate to***" the contacts of the defendant. The Court declared that "[n]one of our precedents have suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do…[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation - *i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct."[66] As discussed, *infra*, in *uBid, Inc. v. The GoDaddy Group, Inc.,*[67] the Seventh Circuit formulated a test for ascertaining when the claims of a plaintiff "relate" sufficiently to the contacts of the defendant with the forum State to validate an exercise of specific jurisdiction that follows the approach of the Third Circuit in *O'Connor v. Sandy Lane Hotel, Co., Ltd.*[68] This approach adheres closely to Supreme Court's consistent characterization

---

[62]    *See, e.g.*, *Keeton v. Hustler Magazine*, 465 U.S. at 779 ("[t]he fact that petitioner has very limited contacts with (the forum State) does not defeat jurisdiction, since a plaintiff is not required to have 'minimum contacts' with the forum State before the State is permitted to assert personnel jurisdiction over a nonresident defendant").

[63]    *Id.*

[64]    *See Walden v. Fiore*, 571 U.S. 277, 291 (2014) ("where a plaintiff was injured is relevant only to the extent that "the defendant's conduct connects him to the forum in a meaningful way").

[65]    *Ford Motor Co. v. Montana Eight Judicial Dist. Court*, 141 S.Ct. 1017.

[66]    *Id.* at 1026.

[67]    *UBid, Inc. v. The GoDaddy Grp., Inc.*, 623 F.3d 421, 430–31 (7th Cir. 2010).

[68]    *O'Connor v. Sandy Lane Hotel, Co., Ltd.*, 496 F.3d 312, 323 (3rd. Cir. 2007).

of specific jurisdiction as a "tacit bargain," in which as a "*quid pro quo*" for realizing discrete

forum advantages and benefits the plaintiff assents to jurisdiction over claims that arise from or

otherwise are closely connected with these contacts.

Lastly, an exercise of specific jurisdiction must be "reasonable." As the Court explained

in *Burger King*, once a defendant establishes minimum contacts with a forum state, those

contacts may be considered to determine whether asserting jurisdiction would comport with "fair

play and substantial justice." Courts may evaluate **"**the burden on the defendant," "the forum

State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and

effective relief," "the interstate judicial system's interest in obtaining the most efficient

resolution of controversies," and the "shared interest of the several States in furthering

fundamental substantive social policies."[69]

Most important, however, when a defendant has purposefully availed a forum to realize

its discrete benefits and advantages – and the claim(s) of the plaintiff sufficiently "relate to"

those contacts – the defendant must "present a ***compelling case*** that the presence of some other

considerations would render jurisdiction unreasonable. Most such considerations usually may be

accommodated through means short of finding jurisdiction unconstitutional."[70] (Emphasis and

italics supplied). And while the specific jurisdiction inquiry entails prescribed touchstones, it can

never be formulaic. *International Shoe* emphasized that the criteria for ascertaining specific

jurisdiction "cannot be simply mechanical or quantitative," but rather must depend necessarily in

each instance upon the specific character of the defendant's contacts with and conduct in the

---

[69]    Citing *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 292, 100 S.Ct. at 564.

[70]    *Burger King Corp. v. Rudzewicz*, 471 U.S. at 477.

forum State "in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure."[71] The Court consistently has reaffirmed this principle.[72]

As discussed below, the Defendants many continuing contacts with Illinois over the years with the Painting serving both as an emblem of their collective corporate identity as well as an indispensable adjunct to their marketing of insurance through their office on Madison Street in Chicago more than satisfy these requirements.

### 2. Ford Motor Co. Confirms that Specific Jurisdiction Entails Only that the Defendant's Conduct in a Forum State "Relate To" the Plaintiff's Claim and Need Not Cause or "Give Rise To" the Claim

In *Ford Motor Co.*, the Court ruled that specific jurisdiction may be premised upon a defendant's contacts with a forum state that do not ***cause*** or directly occasion the plaintiff's claims, but rather merely "relate to" those claims in a substantial way. In *Ford Motor Co.* the Court rejected the contention of a car manufacturer, Ford Motor Company (Ford), that – and consistent with due process – it could not be sued in Montana concerning accidents that occurred in Montana and Minnesota involving Ford vehicles when it neither designed, manufactured, or sold the vehicles in those states. Ford maintained, therefore, that nothing that it did it either state either caused or gave rise to the plaintiffs' claims.[73] Ford so asserted even though it acknowledged that through its extensive commercial presence it had "purposefully availed" commercial opportunities and privileges in both jurisdictions.[74]

The Court rejected Ford's argument, declaring that its past decisions concerning specific jurisdiction have never required that the conduct of the defendant ***cause*** the plaintiff's injury.[75]

---

[71]   *Int'l Shoe*, 326 U.S. at 319.

[72]   *See e.g.*, *Mallory v. Norfolk Southern Ry.*, 600 U.S. 122, 139 (2023), observing that "*International Shoe* itself eschewed any "mechanical or quantitative" test for specific jurisdiction. *See also Burger King Corp. v. Rudzewicz*, 471 U.S. at 478.

[73]   *Ford Motor Co.*, 141 S.Ct. n. 58 at 1026.

[74]   *Ibid.*

[75]   *Ford Motor Co.*, 141 S.Ct. n. 58 at 1026.

Rather, the Court said, its precedents have asserted jurisdiction when the claims of the plaintiff merely "relate to" the contacts of the defendant with the forum in a meaningful manner. The Court affirmed that specific jurisdiction properly attaches whenever there is there is a strong "relationship among the defendant, the forum, and the litigation**"—**the "essential foundation" of specific jurisdiction.[76]

The Court grounded its conclusion that Ford was subject to specific jurisdiction in Montana based upon the inherently ***reciprocal obligations*** upon which the specific jurisdiction doctrine is premised. The Court observed that "[o]ur decision in *International Shoe* founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company 'exercises the privilege of conducting activities within a state' – 'thus enjoy[ing] the benefits and protections of [its] laws – the State may hold the company to account for related misconduct."[77] The Court also observed that later decisions have affirmed that this doctrine affords defendants reasonable notice and a "'fair warning'" that a particular activity in a state may subject them to jurisdiction there.[78] The Court applied this principle to Ford's extensive commercial activities in Montana as follows:

> In conducting so much business in Montana and Minnesota Ford ***"enjoys the benefits and protections of [their] laws" – the enforcement of contracts, the defense of property, the resulting formation of effective markets.*** *International Shoe*, 326 U.S. at 319….All that assistance to Ford's in state business creates ***reciprocal obligations*** – most relevant here, that the car models Ford so extensively markets in Montana and Minnesota be safe for their citizens to use there. Thus our repeated conclusion: A state court's enforcement of that commitment, enmeshed as it is with Ford's government-protected in state business, can 'hardly be said to be undue.'[79] (Emphasis and italics supplied).

---

[76]   *Id*. at 1028 (Citations omitted).

[77]   *Id.* at 1025.

[78]   *Ibid*.

[79]   *Id*. at 1029-30.

23

### 3. uBid, Inc. v. The GoDaddy Group, Inc.[80] Establishes that the Contacts of a Defendant with Forum State Sufficiently "Relate To" the Claim of a Plaintiff When these Contacts Pertain to the "Quid Pro Quo" Bargain that Defendants Tacitly Assume When They Invoke Forum Benefits

The Seventh Circuit has defined the concept of "related to "as premised upon the tacit *quid pro quo* bargain that *Ford Motor Co.* reaffirmed has been the benchmark for gauging specific jurisdiction since *International Shoe*, and which it ***expressly*** applied in asserting specific jurisdiction over Ford. In *uBid, Inc. v. The GoDaddy Group, Inc.*,[81] the court reversed a district court ruling denying specific jurisdiction on a claim that an internet auctioneer – uBid, Inc. (uBid) – brought against a domain registration company, The GoDaddy Group, Inc. (GoDaddy). uBbid's claim asserted that GoDaddy had unlawfully registered domain names "confusingly similar to uBid's trademarks and domain names for the purpose of profiting from uBbid's markers and exploiting web surfers' confusion by selling advertising for those confusingly similar marks."[82] GoDaddy thereby – and with "bad faith intent" – had wrongfully commercially exploited uBid's trademarks.[83]

The district court reasoned that Arizona-based GoDaddy lacked sufficient contacts with Illinois to sustain personal jurisdiction, and so dismissed uBid's complaint.[84] The Seventh Circuit, however, reversed, finding both that GoDaddy had purposefully availed the Illinois market with its national marketing campaign that included many sales in Illinois, and that uBid's claims sufficiently "related to" GoDaddy's contacts with Illinois for due process concerns.

*uBid* invoked *O'Connor v. Sandy Lane Hotel Co.*[85] to find the plaintiff's claims sufficiently "related to" GoDaddy's contacts with Illinois. *O'Connor* asserted specific

---

[80]  *UBid, Inc. v. The GoDaddy Grp., Inc.*, 623 F.3d 421.

[81]  *UBid, Inc. v. The GoDaddy Grp., Inc.*, 623 F.3d 421.

[82]  *Id.* at 423.

[83]  *Id*. at 431.

[84]  *Ibid.*

[85]  *O'Connor v. Sandy Lane Hotel, Co., Ltd.*, 496 F.3d 312.

jurisdiction over a Barbados resort that had heavily solicited a Pennsylvania couple and contracted with them for a vacation on a claim of negligence arising from an injury sustained at the resort.[86] *O'Connor* followed the guidance of *Burger King* in concluding that the "animating principle behind the relatedness requirement is the notion of a tacit quid pro that makes litigation in the forum reasonably foreseeable."[87] *O'Connor* observed that while no mechanical rule governs specific jurisdiction, "in the course of this necessarily fact-sensitive inquiry, the analysis should hew closely to the **reciprocity principle** upon which specific jurisdiction rests…With each purposeful contact by an out- of-state resident, the forum state's laws will extend certain benefits and impose certain obligations. **Specific jurisdiction is the cost of enjoying those benefits.**" (Emphasis and italics supplied).[88]

uBid applied *O'Connor* to assert specific jurisdiction over GoDaddy. Noting the many Illinois customers that it thereby had cultivated by doing business nationally, the court reasoned that as a *quid pro quo* for receiving Illinois forum advantages, uBid tacitly submitted to claims that arose from or were closely related to these commercial contacts. *uBid* explained further that the *O'Connor* rationale tracked closely the Supreme Court's instruction that specific jurisdiction is premised upon this reciprocal relationship, and **not** upon any requirement that the contacts of the defendant **cause** the plaintiff's injury:

> **The precise causal relationship between contacts and claim was not important**: what was required was that the relationship be "intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable." The Third Circuit's approach follows carefully the Supreme Court's guidance on the question of relatedness. See *International Shoe*, 326 U.S. 319… (identifying exchange of protection of laws of forum state for obligation to respond there, and authorizing jurisdiction where the obligations to respond "arise out of or are connected with the activities of the state."[89] (Emphasis and italics supplied).

---

[86]   *UBid, Inc.*, 623 F.3d at 430.

[87]   *O'Connor*, 496 F.3d at 322.

[88]   *Id.* at 323.

[89]   *UBid, Inc.*, 623 F.3d at 430.

Illinois federal district courts frequently apply *uBid* to gauge whether specific jurisdiction attaches in a particular context.[90] As discussed, *infra*, *uBid* confirms that the Heirs can assert specific jurisdiction over the Defendants for their claims that both "arise from" and "relate to" the Defendants' protracted and tortious commercial exploitation of the Painting in Illinois.

4. **Defendants and their Corporate Predecessors Have Purposefully Availed Multiple Illinois Forum Benefits and Incurred Inherently Reciprocal Obligations in Two Discrete Contexts**

Through their extensive contacts with Illinois both in displaying the Painting at the 2001 Exhibition and later perpetually employing it on the Sompo Holdings website as a primary branding and marketing adjunct to its office on Madison Street in Chicago, the Defendants have realized many commercial benefits. (*See* FAC ¶¶ 246–255, 258–60, which enumerate the extensive contacts that the Defendants' corporate predecessor Yasuda proactively cultivated with the Illinois forum.) As discussed below, these benefits occasioned reciprocal duties which

---

[90]     District courts within the Seventh Circuit regularly apply *uBid* and its rationale that specific jurisdiction is premised upon a tacit *quid pro quo* and necessarily reciprocal obligations that make litigation reasonably foreseeable. *See, e.g., Chicago Transit Retiree Health Care Trust v. Dilworth Paxon, LLP*, No. 19-cv-07570, 2020 WL 6393006, at *5 (N.D. Ill. 2020), asserting specific jurisdiction over a foreign defendant promoting a bond fraud scheme and observing that *uBid* "is not rooted in any mechanical test but instead focuses upon foreseeability."; *C.H. Johnson Consulting, Inc. v. Roosevelt Rds. Naval Station Lands & Facilities Redevelopment Auth.*, No. 1:12-cv-08759, 2013 WL 5926062, at *6 (N.D. Ill. 2013), stating that "[m]ore may be considered for a resolution on the merits, but the contacts (necessary for specific jurisdiction) need only be relevant to the dispute."; *In Re Syngenta Mass Tort Actions*, No. 3:16-cv-00255-DRH, 2017 WL 2117728, at *4 (S.D. Ill. 2017), applying u*Bid* to assert specific jurisdiction and citing *Keeton v. Hustler Magazine*, 465 U.S. at 779 for the proposition that "personal jurisdiction is supported when cause of action arises out of the very activity being conducted in the forum state."; *O'Neal v. Bumbo Int'l Trust*, 16 F. Supp.3d 952, 962 (S.D. Ind. 2014), invoking *uBid* to sustain specific jurisdiction over a foreign corporation that employed distributor that it knew would sell its products in Indiana; *KAJ Foods, LLC v. Berkshire Refrigerated Warehousing, LLC*, No. 16-cv-672-wmc, 2017 WL 2602328, at *4 (W.D. Wisc. 2017), applying *uBid* to assert specific jurisdiction over claims that arose from a foreign defendant's business relationship with a Wisconsin company and quoting *uBid* for the proposition that "[t]he Seventh Circuit favors a rational approach to this 'tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *Lukas Mktg. v. Prince Georges Cmty. Coll.*, No. 1:13–cv–04062, 2013 WL 5818592, at *7 (N.D. Ill. 2013), denying the motion of a Maryland defendant to dismiss a claim for breach of contract based upon a putative lack of personal jurisdiction and observing that *uBid* justifies personal jurisdiction "'where the defendants contacts gave the defendant fair warning that the very business it sought in [the forum] might injure [a forum] resident."

Defendants have breached in an omnibus manner. Because these duties pertain ***directly*** to the Heirs' claims to recover the Painting and for unjust enrichment and make the Heirs' claims reasonably ***foreseeable***, specific jurisdiction properly attaches over Defendants.

> **a. By Displaying *Sunflowers* at the 2001 Chicago Exhibition the Defendants Arrogated Multiple Discrete Illinois Forum Benefits that Occasioned Reciprocal Duties**

By bringing the Painting to the U.S. and displaying it at the Exhibition the Defendants received many discrete benefits. These include the commercial benefits that *Ford Motor Co*. identified Ford as enjoying through its extensive commercial activities in Montana: "the benefits and protections of [their] laws" – the enforcement of contracts, the defense of property, the resulting formation of effective markets ."[91]

But displaying the Painting at the Exhibition conferred additional benefits upon Defendants. These included: 1) generating immense publicity about both the Painting and Yasuda, and celebrating Yasuda's ownership and exclusive control of this iconic masterpiece[92]; 2) furthering their long-standing corporate agenda – and rationale for acquiring *Sunflowers* – to enhance their brand by equating their collective corporate identity with the Painting maximally; 3) burnishing the provenance of the Painting by including it in a prestigious international exhibition hosted by world famous cultural institution AIC in collaboration with the esteemed van Gogh Museum in Amsterdam; 4) benefitting from archetypal branding enabling the Defendants to borrow the distinctive character traits of van Gogh as a paradigmatically creative artist and the inviting warmth of *Sunflowers* and investing these traits in Yasuda before attentive Illinois, U.S. and international audiences (*see* Spangenberg Declaration at ¶¶ 8–33); and 5) receiving from the van Gogh Museum in Amsterdam – and as a *quid pro quo* for displaying the Painting in Chicago – its commitment to loan two van Gogh artworks to Yasuda for an exhibition in Tokyo the following year. *See, e.g.,* FAC Exhibit 1, 17 and 18.

---

[91]  *Ford Motor Co.*, 141 S.Ct. at 1039–40.

[92]  *See* Byrne Declaration, Exhibits C and D for news stories relating to the Exhibition.

These copious Illinois benefits, however, spawned reciprocal obligations that Defendants

uniformly violated which paragraph 106 of the First Amended Complaint enumerates.[93]

> **b.** **By Perpetually Exploiting the Painting on the Sompo Holdings Website as a *Marketing Adjunct* to Their "Brick and Mortar" Chicago Office and Through the *Wall Street Journal* Article of October 31, 2022 the Defendants *Continue* to Realize Commercial and Marketing Benefits in the Illinois Forum that Foster Reciprocal Responsibilities**

The Defendants' current and perpetual website exploitation of *Sunflowers* and the *WSJ*

article of October 31, 2022 represent continuing commercial contacts with Illinois by which

Defendants drive business to their office on Madison Street in Chicago. When a company

employs a "national business model" as have Defendants, and conducts substantial business in

Illinois, merely that its website is accessible elsewhere does not mitigate the conclusion that such

---

[93]    These breaches of reciprocal obligations include violating: (a) the National Stolen Property Act, 18 U.S.C. § 2314, by importing *Sunflowers* into the U.S. and Illinois while knowing that the Painting was a casualty of Nazi policies; (b) 18 U.S.C. § 1001, proscribing filing a false report with a federal agency on a matter within the scope of its subject matter jurisdiction by colluding with AIC to fraudulently conceal on A.I.C.'s application for immunity from judicial seizure under 22 U.S.C. § 2459 (Immunity from Judicial Seizure) that Paul von Mendelssohn Bartholdy likely owned the Painting during the Nazi era and that the Painting was a probable casualty of Nazi policies; (c) 22 U.S.C. § 2459 (Immunity from Judicial Seizure), for the reasons set forth above; (d) 18 U.S.C. § 1341, proscribing mail fraud by – upon information and belief – using the U.S. mails to promote the Exhibition and collaborating, colluding, and conspiring with AIC for this purpose; (e) 18 U.S.C. § 1343, proscribing wire fraud by – upon information and belief – using the U.S. wires to promote the Exhibition and collaborating, colluding, and conspiring with AIC for this purpose; (f) 15 U.S.C. § 45 proscribing deceptive trade and unfair business practices by commercially exploiting the Painting in Chicago during the Exhibition from September 2001 to January 2002 by affirmatively and fraudulently concealing from patrons of the Exhibition as well as the from the Illinois and U.S. public the Painting's Nazi taint; (g) substantive U.S. domestic and foreign policies concerning identifying and restituting Nazi-confiscated artworks like the Painting as the HEAR Act, Holocaust Victims Redress Act, the Washington Principles and the Terezin Declaration prescribe; (h) the affirmative duty that Illinois state law imposes to assist the Mendelssohn Heirs in recovering the Painting; (i) the affirmative duty that Illinois state law imposes to refrain from commercially exploiting the Painting; (j) fraudulently concealing from the Mendelssohn Heirs their claim to recover the Painting under the law of prescription in Japan; (k) violating the Illinois Consumer Protection Act (815 ILCS 505/1); (l) violating the Illinois state law proscribing mail fraud (720 ILCS 5/17-24(b); (m) violating the Illinois state law proscribing wire fraud (720 ILCS 5/17–24(a);(n) conspiring with A.I.C. in breach of Illinois civil and criminal law to violate each of the foregoing.

company conducts business in Illinois sufficient to assert specific jurisdiction.[94] Accordingly, the Defendants thereby **continue** to realize the many Illinois forum state benefits as discussed, *supra* – including especially the advantages of archetypal branding (FAC ¶¶ 86, 258; Spangenberg Declaration at ¶¶ 1, 11, 35, 38) – and to owe, correspondingly, the same reciprocal obligations.

Because the Heirs' claims relate closely to the Defendants' many breaches of duty – and emanate from the very commercial conduct that enables them to realize so many tangible benefits – specific jurisdiction attaches on this second basis as well.

### 5. The Heirs' Claims Are Integrally "Related to" the Defendants' Contacts with Illinois Within the Meaning of Both Ford and uBid

The Heirs' claims relate integrally to the Defendants' contacts with Illinois within the meaning of both *Ford* and *uBid*, as their claims pertain closely to the Defendants' omnibus repudiation of the **reciprocal obligations** that they occasioned in cultivating the many commercial and marketing benefits in Illinois. In *Ford Motor Co.*, the Court declared that the reciprocal obligations that Ford incurred in marketing its cars extensively in Montana and enjoying the "'benefits and protections of [their] laws' – the enforcement of contracts, the defense of property, the resulting formation of effective markets" included "that the car models Ford so extensively markets in Montana and Minnesota be safe for their citizens to use there."[95]

Correspondingly – and as a *quid pro quo* for the many benefits and commercial opportunities that Defendants have realized and *continue* to enjoy both from displaying the Painting at the 2001 Exhibition and employing it on their corporate website to recruit business for their Chicago office – the Defendants owed reciprocal obligations to the Heirs as well as to both U.S. and Illinois residents as enumerated above. These included duties to help the Heirs recover the Painting and to refrain from commercially exploiting it, and duties to both Illinois

---

[94]    *See, e.g.*, *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 402 (7th Cir. 2020); *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 758–9 (7th Cir. 2010); *uBid, Inc.*, 623 F.3d at 427; *Kukovec v. The Estee Lauder Cos.*, No. 22 CV 1988, 2022 WL 16744196, at *4 (N.D. Ill. 2022).

[95]    *Ford Motor Co.*, 141 S.Ct. at 1039–40.

and U.S. residents to ensure that their use of the Painting in Illinois did not violate either U.S. or Illinois criminal and civil statutes or emphatic U.S. foreign policy to return Nazi-confiscated artworks to rightful owners. So just as Ford owed a duty to make its cars safe for forum State passengers, so, too, are the Defendants liable in Illinois for breaching multiple obligations that they tacitly assumed when they brought the Painting to Illinois to commercially exploit, and which they continue to exploit by employing the Painting – and its subliminal archetypal imagery – to sell insurance in Illinois.[96]

The equitable maxim that precludes wrongdoers from taking advantage of their misdeeds reinforces that Defendants are subject to specific jurisdiction for the Heirs' claims by accentuating the reciprocal obligations that Defendants owed for enjoying the many benefits of the Illinois forum.[97] Most notably, only by violating the federal criminal proscription against filing a false report with a federal agency (18 U.S.C. § 1001) could Defendants receive a Certificate of Non-Judicial Seizure (22 U.S.C. § 2459) that would enable them to import *Sunflowers* into the U.S. while allaying their ***express concern*** that the Painting would be seized as Nazi contraband. (FAC ¶¶ 247–48). And only by fraudulently concealing from the Heirs their claim to recover the Painting under the then viable Japanese law of prescription, and breaching their duties to the Defendants both to help them recover the Painting and to refrain from commercially exploiting it – as well as by violating, *inter alia*, the National Stolen Property Act, (18 U.S.C. § 2314–5), 18 U.S.C. § 1001 and both the federal mail fraud (18 U.S.C. § 1341) and wire fraud proscription (18 U.S.C. § 1343) - could Defendants reap the many commercial and public relations benefits that the Illinois forum afforded. *So the equitable maxim precluding wrongdoers from benefitting from their wrongs crystallizes how Defendants have reaped Illinois forum State benefits only by breaching inherently reciprocal obligations.*

---

[96]   *Id.* at 1030.

[97]   *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)(wrongdoer should not enjoy fruits of his transgression); *see also Int'l Shoe*, 326 U.S. at 319.

Moreover, Defendants profit from their past wrongdoing by employing the Painting on their website to sell insurance in Illinois. The many wrongs that the Defendants committed to display the Painting at the 2001 Exhibition enhanced the celebrity of the Painting, as well as promoted the Defendants' goal in acquiring *Sunflowers* to identify their company with the Painting. These public relations benefits accrued to the Painting *permanently*, and so the Defendants capitalize upon the illicitly enhanced notoriety of the Painting today by employing it on their website to sell insurance in Illinois through, *inter alia*, archetypal branding. Accordingly, the many wrongs that Defendants committed in displaying the Painting in Chicago in 2001 are necessarily *equitably conjoined* with their misuse of the Painting in marketing today.

Further, by committing multiple and continuing torts and crimes in augmenting the provenance of *Sunflowers* and enhancing the identity of the Painting with their corporations, the Defendants have enabled specific jurisdiction to be established under an alternative prong of the Illinois long arm statute, § 2–209(a)(2), which prescribes jurisdiction arising from or related to the commission of a tortious act in Illinois. *These tortious acts enable specific jurisdiction over Defendants without regard to the character or adequacy of other contacts*.

Finally, the Defendants misplace reliance upon *Eli Barzilai v. Israel Museum*[98] and *Graf v. Leslie Hindman Auctioneers, Inc.*[99] in arguing that the 2001 AIC Exhibition is "not sufficiently linked" to the Heirs' claims.[100]

---

[98]   2022 WL 16856131 (N.Y. Sup. Ct. Nov. 10, 2022).

[99]   342 F. Supp.3d 819 (N.D. Ill. 2018).

[100]   In *Eli Barzilai* the court dismissed a claim that an ancestor (Barzilai) of a Jewish lawyer (Marnum) brought against the Israel Museum (Museum) in New York asserting a claim to recover an artwork (Artwork) that the Museum had displayed briefly in New York in 1988-89. *Id.* at 2. The Artwork putatively had been stolen from Marnum's apartment in Germany after the Nazi government came to power, but the theft was unrelated to Nazi confiscatory policies against Jews. In 1984 the plaintiff's aunt – and daughter of Marnum - had agreed that the Museum could retain the Artwork if it merely related while exhibiting it that the Artwork belonged to Marnum during the Nazi era. Barzilai sued the Museum in New York to recover the Artwork when the Museum putatively reneged on its promise to include Marnum's name in the Artwork's display provenance.

The court dismissed Barzilai's claims based upon New York state long arm provisions asserting personal jurisdiction for transacting business in New York and committing tortious acts in New York. (Importantly, the court did not decide the jurisdictional question based upon a statute asserting personal to

31

The foregoing repudiate Defendants' argument that because they initially did not convert *Sunflowers* in Illinois – but rather in England or Japan – the Heirs' Illinois state law claims alleging conversion, replevin, trover and unjust enrichment (Counts I-IV of the FAC) must be dismissed. (Defendants' Memorandum at 18–21). *Ford* and *uBid* confirm that the conduct of a defendant upon which specific jurisdiction is predicated need not cause or "give rise to" a plaintiff's claim, but merely need only "relate to" such claim as discussed. That Defendants exercised unlawful dominion and control over the Painting and commercially exploited it to reap unjust enrichment both at the 2001 Exhibition and perpetually since then on their website more than satisfies this requirement.

---

the maximal extent that the Due Process clause permits.) The court found that Barzilai's claims had "almost no connection to New York, and the complaint seems to be merely an attempt to take advantage of the HEAR Act of 2016, which unlikely applies.*" Id.* at 7.

By contrast the Heirs claims seek to recover an artwork that unequivocally was a casualty of Nazi policies, and about which Defendants have been consciously aware since at least 2001. Moreover, Defendants' tortious possession and misuse of the Painting in Illinois and at the Exhibition has spawned numerous torts and crimes as enumerated in paragraph 106 of the FAC, which represented violations of the reciprocal obligations that their display of the Painting in Chicago occasioned. So Defendants' reliance upon *Eli Barzilai* is misguided.

Defendants benefit no better from *Graff*. In *Graff*, the court dismissed for lack of personal jurisdiction a claim against an Arizona pawn shop (Biltmore) based upon its having consigned to an Illinois auctioneer (Hindman) several paintings after a Texas patron defaulted on her loan. The patron's husband (Graff) - who claimed to own the paintings and alleged that his wife had pledged them as collateral without his permission - sued both Biltmore and Hindman for conversion in Illinois, alleging that in employing Hindman to act as its agent in Illinois Biltmore was transacting business in Illinois sufficient to satisfy the Due Process requirements for specific jurisdiction. 342 F. Supp.3d at 825–26. Finding the issue to be "close," the court nonetheless dismissed Graff's claim against the Arizona auctioneer Biltmore, emphasizing that the "wrongful conduct for which Graff seeks…remedies" occurred in Arizona and not Illinois (*id.*), and that Biltmore had no reason to know either its initial acquisition or subsequent consignment of the disputed paintings to Hindman violated Graff's ownership or possessory rights*. Id.* at 826.

Many distinctions differentiate *Graff* from the case at bar. As a threshold matter, Graff is a pre-*Ford Motor Co*. decision that grounds specific jurisdiction upon a now discredited requirement that the conduct causing the plaintiff's injury occur in the forum State. So by invoking *Graff* Defendants appear stuck in a jurisdictional "time warp": *Ford Motor Co*. makes clear that the claims of Graff would establish specific jurisdiction were they merely "related to" his dispute with Biltmore and Hindman. The court also stressed that Biltmore was reasonably unaware of Graff's claim to the disputed paintings when consigning them to Hindman. Nor did Biltmore have an office in Illinois through which it regularly transacted business, nor was it using the consigned paintings as a corporate emblem to attract business in Illinois. Nor were the paintings at issue Nazi-confiscated, thereby invoking U.S. foreign policy concerns.

Lastly, the mere passage of time since the 2001 Exhibition does not attenuate specific jurisdiction. The HEAR Act expressly makes judicially relevant to claims seeking to recover Nazi-confiscated artworks events occurring as early as January 1, 1933 (when Hitler seized power),[101] and Defendants reckless acquisition of the Painting in 1987 establishes their legal status as ***conscious wrongdoers***. So Defendants extensive malfeasance with the Painting in Illinois in 2001 necessarily is also relevant to the Heirs' claims especially since Defendants wrongdoing in 2001 is both factually and equitably conjoined with their current and perpetually wrongful commercial exploitation of the Painting.

### 6. Asserting Specific Jurisdiction Over Defendants for the Heirs' Claims Comports with "Fair Play and Substantial Justice" and is Reasonable

Each of the several "reasonableness" criteria for establishing specific jurisdiction reinforces specific jurisdiction over Defendants.

### a. Requiring the Sompo Defendants to Defend the Heirs' Claims in Illinois Imposes No Unreasonable Burden Upon Them as They Have Cultivated a National U.S. Business Model and Litigate Regularly in U.S. Courts

As the Court counseled in *Burger King v. Rudzewicz*, the "Due Process Clause may not readily be yielded as a shield to avoid interstate obligations that have been voluntarily assumed."[102] Moreover, because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, 'it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.' (Citation omitted).[103]

---

[101]  HEAR Act § 4 (3).

[102]  *Burger King Corp. v. Rudzewicz*, 471 U.S. at 474.

[103]  *Ibid*.; *See also Curry v. Revolution Labs., LLC*, 949 F.3d at 402 ("[t]here is no unfairness in requiring [a defendant] to defend [a] lawsuit in the courts of a state where, through the very activity giving rise to the suit it continues to gain so much").

33

Requiring Defendants to litigate in Illinois will not be unfair for two additional reasons. First, when the Defendants' corporate predecessor Yasuda brought *Sunflowers* to the AIC Exhibition in 2001 in Chicago Yasuda sent representatives from all Yasuda entities at attend the ceremonies. *See* FAC Exhibit 7. Now, however – when the Heirs assert claims against Defendants that both arise from and relate to their wrongdoing in Illinois, they plead impermissible hardship and inconvenience. Defendants' extensive corporate presence at the 2001 Exhibition discredits their objection. Finally, the Defendants litigate extensively in U.S courts, so responding to the Heirs' claim in this Court poses no undue hardship.[104]

### b. Illinois Has an Acute Governmental Interest Under Both Illinois and Federal Law in Adjudicating this Controversy

The multiple torts and crimes that Defendants committed in Illinois commercially exploiting the Painting and enumerated at paragraph 106 of the FAC give Illinois – as a forum state – a predominant interest in adjudicating the Heirs' claims. As the Court declared in *Keeton v. Hustler Magazine, Inc.,*[105] "[a] state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory**.** This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor will be liable for damages which are the proximate result of his tort." The Court observed in addition that "'[f]alse statements of fact harm both the subject of the falsehood and the readers of the statement**.**'" (Citation omitted).[106] That Defendants have committed – and continue to commit – colossal fraud in Illinois through their perpetual bad faith exploitation of the Painting gives Illinois a compelling governmental interest in adjudicating this controversy.

---

[104]    In fact, defendant Sompo Japan Insurance Inc. (Sompo Japan) has litigated as a plaintiff multiple times in U.S. courts. For example, Sompo Japan filed suit in the Northern District of Illinois on July 20, 2022 in *Sompo Japan Insurance Inc. v. Ceva Freight, LLC*, Case No. 1:22-cv-03763. Sompo Holdings and Sompo International have also litigated in Illinois. *See, e.g., Feis Equities, LLC v. Sompo Int'l Holdings*, 2020 Ill.App. 191072, 178 N.E.3d 650 (2020).

[105]    *Keeton v. Hustler Magazine*, 465 U.S. at 776.

[106]    *Id.* at 776.

      **c.** **The Heirs Have an Especial Interest in Securing a Fair and Efficient Remedy for the Defendants' Wrongful Retention and Commercial Exploitation of What They Long Have *Known* Is a Nazi-Tainted Painting**

As the Court related in *Asahi Metal Industry Co. v. Superior Court of California*, *Solano County*,[107] "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."

The discrete character of this proceeding – based upon the compelling U.S. foreign policy to return Nazi-confiscated artworks to rightful owners – amplifies the reasonable interests of the Heirs in securing a fair and effective remedy to recover the Painting and for related unjust enrichment. Through the Washington Principles, the Holocaust Victims Redress Act, the Terezin Declaration and the HEAR Act, both Congress and the President have proactively encouraged Holocaust victims and their heirs to invest time, money and associated opportunity costs to investigate, develop and prosecute claims for the restitution of Nazi-confiscated artworks. And Section 2 (6) of the HEAR Act so acknowledges.[108] The intent of the HEAR Act is to confer viable judicial remedies upon those seeking the return of Nazi-confiscated artworks "to ensure" that their claims are adjudicated in accordance with U.S. policy.[109]

The Heirs have accepted the invitation of Congress and the President (and at great cost) to develop their claims, and so have an enhanced stake in obtaining a remedy in a forum State where – and based upon the extensive, proactive contacts of the Defendants with the Painting – specific jurisdiction ***unequivocally*** can be asserted.

---

[107]    *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 114 (1987).

[108]    This provision states that "[t]hose seeking recovery of Nazi-confiscated art must painstakingly piece together their case from a fragmentary historical record ravaged by persecution, war, and genocide. This costly process often cannot be done within the time constraints imposed by existing law."

[109]    HEAR Act § 2(7).

### d. The Interest of the Interstate Judicial System in Resolving this Controversy Supports Specific Jurisdiction

As noted, the Defendants have developed a "national business model" that includes offices in 17 major cities throughout the U.S. and a website exploiting the Painting that is accessible nationally.[110] And on October 31, 2022 the Defendants ran a full-page ad in the *Wall Street Journal* soliciting U.S. investors. The fraud that Defendants perpetrate on their website employing the archetypal imagery of the Painting to gain commercial traction gives every state in which the Defendants conduct or solicit business an acute governmental interest in holding Defendants judicially accountable for their malfeasance, and for effectuating the equitable remedies that the Heirs seek in this litigation. These include enjoining Defendants immediately from continuing to violate U.S. foreign policy, and from committing further crimes and torts.[111]

### e. The Shared Interest of the Several States and *Nations* in Furthering Fundamental Substantive Policies Prioritizing the Restitution of Nazi-Confiscated Artworks *Entails* that the Court Assert Specific Jurisdiction over Defendants

Defendants tellingly evade this criterion, as it discredits even the pretense that asserting jurisdiction over them for their protracted malfeasance with the Painting in Illinois is unreasonable. This criterion considers the interests of other nations as well as U.S. states.[112]

The 30 nations in which Sompo entities putatively operate have governmental interests in precluding Sompo from continuing to defraud their insurance markets and consumers. The Sompo website relates that "Sompo has an extensive global footprint with nearly 80,000

---

[110]     FAC ¶ 33, 40, 97.

[111]     FAC Prayer for Relief ¶ (d).

[112]     *See Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. at 115 (observing that the above referenced "reasonableness" criterion "calls for a court to consider the…policies of other *nations* whose interests are affected…."). (Italics in original).

employees in 228 cities in 30 countries…"[113] The equitable relief for which the Heirs' petition seeking to enjoin Defendants from continuing to misuse *Sunflowers* in their marketing will promote these nations' policies proscribing commercial fraud and consumer deception.

More relevant still are the interests of the eight Terezin Declaration signatories in which Sompo International operates – Bermuda, Germany, Italy, Luxembourg, Spain, Switzerland, the United States and the United Kingdom – in ensuring that the substantive policies of the Declaration that claims for the recovery of Nazi – confiscated artworks are resolved fairly, expeditiously, and on their substantive merits are effectuated.[114] As noted, the Terezin Declaration commits each signatory to "***ensure*** that their legal systems or alternative processes, while taking into account their legal differences, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by the parties."[115] (Emphasis and italics supplied). As noted, the Just Act underscores the U.S. commitment by requiring the Secretary of State to report upon the progress of Terezin signatories in fulfilling their pledges. And in the Foreword to the Just Act Report of March 20, 2020 Secretary of State Michael R. Pompeo asserts pride in the "State Department's ongoing efforts to encourage countries to meet the goals and commitments they undertook when they endorsed the Terezin Declaration..."[116] Accordingly, just as the U.S. has a diplomatic interest that its 45 fellow Terezin Declaration signatory nations honor their pledges to ***ensure*** that their respective legal systems facilitate the return of Nazi-confiscated artworks, so, too, do these fellow signatory nations have a reciprocal interest that the U.S. Government and its judicial system comply with this commitment.

---

[113]    FAC ¶ 25.

[114]    FAC ¶ 32.

[115]    Terezin Declaration, "Nazi-Confiscated and Looted Art," ¶ 2.

[116]    *See* Byrne Declaration, Exhibit F, for a copy of Secretary of State Pompeo's Foreword.

This last "reasonableness" factor for asserting specific jurisdiction takes on special significance as it also represents U.S. foreign policy that as a matter of federal Constitutional law preempts any and all state law that obstructs its goals.

       **7.   Defendants Spuriously Maintain that Because They Have Not Targeted Illinois Exclusively the Court Somehow Lacks Specific Jurisdiction Over Their Claims**

           **a.   That Defendants' Regularly Conduct Business in Illinois with an Office in Chicago and a Website Accessible Nationally Satisfies the Requirements for Specific Jurisdiction**

Whenever defendants conduct substantial business in Illinois – and regardless whether they have an "on the ground" commercial presence in Illinois as do Defendants – and also maintain a nationally accessible website (as do Defendants), the Seventh Circuit consistently rejects arguments that specific jurisdiction does not attach because defendants did not target Illinois *specifically*.[117]

Similarly, the Defendants conduct business nationally but – unlike the defendants in the foregoing cases – **have an office** in Illinois through which they service the Illinois insurance market and which establishes decisive commercial contacts with Illinois. And – most importantly – the Defendants employ *Sunflowers* on their website to cultivate business both nationally and in Illinois. The Spangenberg Declaration concludes that by employing an archetypal branding strategy "*Sunflowers* – rather than having nothing to do with Sompo's marketing of insurance in Illinois – **plays a pivotal role in both developing its corporate identity and ensuring commercial success in Illinois and other market(s) in which Sompo does business.**" (Emphasis and italics

---

[117]    *See, e.g. Curry v. Revolution Labs., LLC*, 949 F.3d at 399(asserting jurisdiction over a foreign defendant doing substantial business in Illinois through a nationally accessible website because the defendant "reasonably could foresee that its product would be sold" in Illinois, and concluding that the defendant "'has purposefully exploited the Illinois market.'" The court chided the defendant for "want[ing] to have its cake eat it too: it wants the benefit of a nationwide business model with none of the exposure"). *See also uBid, Inc.*, 623 F.3d 421(discussed comprehensively, *supra*; *Illinois v. Hemi Grp., LLC*, 622 F.3d at 760(asserting specific jurisdiction over a defendant with an expansive online business that reached consumers in Illinois, but did not target Illinois consumers exclusively).

added). Accordingly, merely that the Defendants do not target Illinois *specifically* does not permit them to evade specific jurisdiction in Illinois for claims relating to their tortious possession and commercial exploitation of *Sunflowers*.

### b. Defendants Improperly Fractionalize Each Discrete Element that Comprises How They Commercially Exploit the Painting in Illinois

Defendants seek to isolate discrete elements of the factual predicate for the Heirs' assertion of specific jurisdiction and maintain that each in isolation does not confer specific jurisdiction over their claims. Defendants assert that neither: (1) selling insurance in Illinois; (2) advertising internationally on websites accessible throughout the world; (3) using the image of *Sunflowers* in a corporate brand viewable in Illinois; or (4) in isolation merely "contracting" with the AIC to exhibit *Sunflowers* in Illinois are adequate to confer specific jurisdiction. Defendants' argument is spurious, as it ignores that the Heirs ground specific jurisdiction on the totality of the above conduct and much more with *Sunflowers* in each instance playing an integral role – as related extensively, *supra*, confirming that specific jurisdiction attaches in this proceeding based upon *Ford Motor Co.* and *uBid*.

Defendants' attempt to induce the Court to consider each of these contrived and non-germane elements in isolation is not unlike defending a prosecution for bank robbery by arguing that it violates no law to: (1) drive a car into a bank parking lot; (2) walk into a bank; (3) approach the bank teller; (4) talk with a bank teller; and (5) to do all of the above with a concealed and loaded firearm (provided the actor has an appropriate permit.) But it is a crime to use the gun to rob the bank.

Correspondingly, specific jurisdiction does not attach merely because the Defendants: (1) sell insurance in the United States; (2) advertise internationally; (3) simply employ the image of *Sunflowers* as a corporate brand (without, however, exercising unlawful dominion and control over the Painting or tortiously asserting ownership of the Painting in violation of the ownership rights of the Heirs); or (4) in isolation, "contract" with the AIC to exhibit the Painting. Specific

jurisdiction does attach, however– and for the many reasons discussed – when the Defendants have employed the Painting integrally in their marketing of insurance in Illinois (as the Spangenberg Declaration confirms), while repudiating their reciprocal responsibilities for enjoying Illinois forum State benefits by violating the multitude of criminal and civil statutes, U.S. foreign policy, and legal duties owed the Heirs as enumerated in paragraph 106 of the FAC.

> **c.    The Defendants' Contention that the Court Lacks Specific Jurisdiction Because the Image of *Sunflowers* is in the "Public Domain" is Fatuous and Ignores Both the Legal and Factual Foundations of the Heirs' Claims**

Defendants spuriously maintain that because the "U.S. Copy Right Act" (Act) places the *Sunflowers* image in the public domain that they are free to exploit the Painting in whatever manner that they desire. But nothing in the Act authorizes Defendants to assert that they ***own*** *Sunflowers* or to ***exercise unauthorized dominion and control*** over the Painting in flagrant and perpetual derogation of the Heirs' superior ownership and possessory rights. And it is by asserting public dominion and control over the Painting and putatively owning the Painting that enables the Defendants to employ it successfully as the emblem of the collective corporate identity and brand, and to use it effectively ***to sell insurance.***[118]

---

[118]    Common sense confirms this conclusion. If Defendants could have realized the same marketing and branding benefits merely by employing the image of *Sunflowers* rather than acquiring physical possession of the Painting and putatively owning it, why would they have invested nearly $40 million of corporate funds in 1987 to break a contemporaneous auction record to buy it? Could Yasuda have achieved the same effect merely by announcing publicly that it views its own as the *Sunflowers* painting? Would Yasuda have received what it acknowledges was nearly $160 million in public relations value with such an announcement? ***Of course not***.

No, the key to Defendants' ability to employ *Sunflowers* in branding and marketing is exercising exclusive control over the Painting, representing that they own it, and denying that the Painting is afflicted with human rights taint. As archetypal branding authority Katie Quinn Spangenberg asserts, the "Defendants could not achieve nearly the equivalent marketing and branding effect merely by identifying themselves publicly with the image of a painting that they neither owned or controlled." Spangenberg Declaration ¶ 38 And it is the Defendants' ***professed ownership and exclusive control of the Painting - and concomitant denial that the Painting is afflicted with Nazi taint*** – that lies at the heart of the Heirs' claims for conversion, restitution, and unjust enrichment.

### 8. The First Amended Complaint Properly Asserts Specific Jurisdiction Over Defendants Under 735 ILCS § 5/2–209(a)(2) Prescribing Jurisdiction Over a Non-Resident For Committing a "Tortious Act" In Illinois

#### a. Specific Jurisdiction Attaches for Multiple Tortious Acts that Defendants Committed by Misusing the Painting to Sell Insurance in Illinois

Paragraph 116 of the FAC enumerates the many tortious acts that Defendants committed in Illinois by employing the Painting integrally to sell insurance. For the many reasons discussed, *supra*, the Heirs' claims "relate to" these torts, which affords an additional discrete basis for asserting specific jurisdiction over Defendants.

#### b. Specific Jurisdiction Attaches as a Result of Defendants' Breach of Their Duties to Help the Heirs Recover *Sunflowers* and to Refrain from Commercially Exploiting It

FAC Counts VI and VII assert that Defendants breached duties, respectively, to help the Heirs recover the Painting and to refrain from commercially exploiting it as acknowledged in *Taylor v Meirick,*[119] and informed by *Gladstone v. Hillel*.[120] *Taylor* asserted – in a copyright infringement claim – the general tort principle grounded in *Second Restatement of Torts* § 322, Comment c (1965) that "[a] tortfeasor has a duty to assist his victim. The initial injury creates a duty of aid and the breach of the duty is an independent tort."[121] *Gladstone* applied this principle expressly "to the tort of conversion," invoking the corollary duty of tortfeasors to avoid further harm to their victims, and characterizing this obligation as "congruent with other venerable equitable principles."[122] *Taylor* and *Gladstone* repudiate the Defendants' argument that these duties are limited to statutory torts.[123]

---

[119]  *Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir. 1983)

[120]  *Gladstone v. Hillel*, 203 Cal.App.3d 977, 989 (1988).

[121]  *Taylor*, 712 F.2d at 1117.

[122]  *Gladstone*, 203 Cal.App.3d at 989.

[123]  Defendants' Memorandum at 22.

**E.   THE DOCTRINE OF *FORUM NON CONVENIENS* PRECLUDES TRANSFERRING THIS PROCEEDING TO JAPAN AS DEFENDANTS REQUEST**

**1.   That the Claims of the Heirs to Recover Sunflowers Would Be Time-Barred in Japan Precludes Applying Forum Non Conveniens**

The doctrine of *forum non conveniens* is "exceptional," represents a "drastic" exercise of judicial discretion, and so must be used "sparingly.[124] Moreover, defendants carry a "heavy" burden in establishing *forum non conveniens,* "because if the doctrine is successfully invoked, the result is not a transfer to another court but a dismissal, and the plaintiff will not be able to refile his case in any other court if the statute of limitations has run."[125] So defendants must demonstrate an adequate alternative forum.[126] And a forum is inadequate when it "does not permit litigation of the dispute."[127]

The Seventh Circuit has ruled that a forum is inadequate as matter of law if the plaintiff's suit would be time-barred there, and "so a dismissal on *forum non conveniens* grounds should be denied unless the defendant agrees to waive the statute of limitations in that forum and the waiver would be enforced there."[128] Courts within the Seventh Circuit consistently have declined to apply *forum non conveniens* when – as in the case at bar – defendants have failed to carry their "heavy burden" of demonstrating that if the plaintiff's claim is time-barred in the foreign forum, the defendant has agreed to waive the applicable statute of limitations and the foreign forum would accept such waiver.[129]

---

[124]   *Deb v. SIRVA, Inc.*, 832 F.3d 800, 805–6 (7th Cir. 2016); *Ledesma v. Marriott Int'l, Inc.*, No. 18-CV-3947, 2021 WL 2953145, at *1 (N.D. Ill. July 14, 2021).

[125]   *Deb*, 832 F.3d at 806.

[126]   *Deb*, 832 F.3d at 806; *Ledesma v. Marriott Int'l, Inc.*, 2021 WL 2953145, at *1

[127]   *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981).

[128]   *Chang v. Baxter Healthcare Corp., et.al.*, 599 F.3d 728, 736 (7th Cir. 2010).

[129]   *See, e.g.*, *Ledesma v. Marriott Int'l, Inc.*, 2021 WL 2953145, at *2(observing that the defendant had failed "to shoulder the heavy burden that his proposed alternative forum is adequate" and so concluding "based upon the materials before it that the Civil Court is not an adequate forum"); *TGI Sys. Corp. v. Jens Giessler & Neumannn & Muller GMBH & Co. KG, Defendant*, No. 15 C 4341, 2016 WL 878264, at *7

The Defendants have failed to meet their "heavy burden" of proving that Japan is an adequate alternative forum. The Declaration of Hon. Hiroyuki Kanno (hereinafter "Kanno Declaration"), p. 20,[130] relates that under Japanese law the doctrine of acquisitive prescription conferred good title upon Defendants after 20 years of their purchase of *Sunflowers* (or in 2017), even if they acquired and possessed the Painting in bad faith. Accordingly, Japanese law time bars the Heirs' claim. And because Defendants have failed to offer to waive this prescriptive period – or to demonstrate that a court in Japan would accept such waiver – for the reasons related in the foregoing judicial decisions Defendants have failed to meet their burden for invoking forum *non conveniens*.

### 2. Even Assuming Japan Were an Adequate Forum the Balance of Relevant Private and Public Interests Would Preclude Applying *Forum Non-Conveniens*

The balance of relevant private and public interests also disfavors a Japanese forum even assuming, *arguendo*, such forum afforded the Heirs a viable remedy to adjudicate their claims.[131]

---

(N.D. Ill. Mar. 8, 2016)(denying motion to dismiss based upon *forum non-conveniens* when defendants failed to address whether foreign statute of limitations would bar plaintiff's claim or whether the foreign forum would enforce a statute of limitations waiver); *YCB Int'l Inc. v. UFC Trading Co.*, No. 09 C 7221, 2010 WL 2928069, at *4 (N.D. Il. July 21, 2010)(denying a motion to dismiss based upon *forum non conveniens* when the defendant failed to demonstrate that a foreign statute of limitations would not bar plaintiff's claim). *See also Lyons v. Hyatt Hotels Corp., et.al.*, No. 3:21-CV-126 DRL-MGG, 2021 WL 5015128, at *3 (N. D. Ind. Oct. 19, 2021)(denying a motion to dismiss based upon *forum non conveniens* when, *inter alia*, no defendant "agreed to waive the statute of limitations issue").

[130]    The Kanno Declaration is attached as Exhibit E to Defendants' April 27, 2023 Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens*.

[131]    The private interests that "make trial of a case easy, expeditious and inexpensive" (*TGI Sys. Corp.*, 2016 WL 878264, at *8 make Illinois a superior forum to Japan. For example all of the evidence surrounding the Defendants' tortious and criminal misuse of the Painting in Illinois – and upon which the Heirs' claims are based – is in Illinois or the U.S. Additionally, most of the events giving rise to the Heirs' claims occurred in Illinois. Moreover – and as demonstrated, the Defendants have a substantial commercial presence in Illinois, and litigate frequently throughout the U.S.

Compelling public interests also support an Illinois forum. These include, of course, foremost the overarching interest upon which the HEAR Act is grounded that those seeking the return of Nazi-confiscated artworks – like the Heirs – have viable judicial remedies to recover Nazi-confiscated artworks. And, of course, both the U.S. and Illinois have potent governmental interests in redressing the Defendants' persistent and continuing wrongdoing concerning the Painting.

## V. CONCLUSION

For the foregoing reasons and those set forth in the FAC, the Court should deny Defendant's Motion to Dismiss.

Respectfully submitted,

JULIUS H. SCHOEPS, BRITT-MARIE ENHOERNING, and FLORENCE VON KESSELSTATT

Dated: January 2, 2024

By: /s/ Thomas J. Hamilton

One of their attorneys

Thomas J. Hamilton (admitted *pro hac vice*)
John J. Byrne, Jr. (admitted *pro hac vice)*
**BYRNE, GOLDENBERG &**
**HAMILTON, PLLC**
1025 Connecticut Avenue, N.W., Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9779
E-mail: jjb@bghpllc.com
        tj.ham@cox.net

Marty J. Schwartz
**SCHAIN BANKS**
70 W. Madison St., Ste. 5400
Chicago, IL 60602
Telephone: (312) 345-5700
E-mail: mschwartz@schainbanks.com