**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JULIUS H. SCHOEPS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:22-cv-07013 |
| SOMPO HOLDINGS, INC., *et al.*, | ) ) | |
| Defendants. | ) ) | Honorable Judge Jeremy C. Daniel |
|  | ) ) ) ) | |

**PLAINTIFF MENDELSSOHN HEIRS' MOTION (A) TO FILE A SURREPLY WITH SUPPORTING DOCUMENTS THAT (B) EXCEEDS 15 PAGES OF TEXT; OR, IN THE ALTERNATIVE, (C) TO STRIKE DEFENDANTS' NEW ARGUMENTS AND PERMIT PLAINTIFFS TO FILE NEWLY AVAILABLE EVIDENCE**

Plaintiffs Julius H. Schoeps, Britt-Marie Enhoerning, and Florence von Kesselstatt (hereinafter collectively "Plaintiffs" or "Heirs"), by and through their undersigned counsel and pursuant to Fed.R.Civ.P. 12, hereby move this Court for leave to file the accompanying Surreply of Plaintiff Mendelssohn Heirs (hereinafter "Surreply," a copy of which is attached as Exhibit A) and supporting Declaration of John J. Byrne, Jr. with annexed exhibits (hereinafter "Byrne Declaration," a copy of which is attached as Exhibit B). The attached Surreply and Byrne Declaration are necessary because Defendants Sompo Holdings, Inc., Sompo International Holdings, Ltd, Sompo Fine Arts Foundation, and Sompo Museum of Art (hereinafter collectively "Defendants") have raised three entirely new and potentially dispositive arguments – discussed

below – in their February 2, 2024 Defendants' Reply in Support of Their Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens* (D.E. 68; hereinafter "Reply"). Plaintiffs request that the Court exercise its discretion to permit Plaintiffs to file the Surreply and supporting documents in order to enable them to respond to Defendants' new arguments, and thereby to avoid the unconscionable prejudice that otherwise would result from Defendants' misconduct. Moreover, the petitioned Surreply is essential to ensure that the Court has before it all of the relevant facts and applicable law necessary to adjudicate Defendants' new arguments on their substantive merits.

Pursuant to Local Rule 7.1, Plaintiffs also move the Court for leave to file a Surreply that exceeds the prescribed 15-page limit for briefs. As noted, Defendants have raised three new and potentially dispositive issues in their Reply, and Plaintiffs require more than 15 pages to develop the relevant facts and applicable law that will enable the Court to adjudicate these issues on their substantive merits.

In the alternative, Plaintiffs move to strike Defendants' new arguments. In this event, the Heirs also seek the Court's permission to file new evidence (attached to the Byrne Declaration) that is highly probative of potentially determinative arguments in this proceeding and that became available to Plaintiffs only after February 2, 2024.

In support of this Motion, Plaintiffs state as follows:

2

1. On May 31, 2023, Plaintiffs filed their First Amended Complaint for Restitution and Unjust Enrichment. (D.E. 39; hereinafter "FAC")

2. On November 1, 2023, Defendants filed Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens* (D.E. 57; hereinafter "Motion"), with Notice of Motion (D.E. 59) and supporting Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens* (D.E. 58; hereinafter "Memorandum").

3. On January 3, 2024, Plaintiffs filed Plaintiffs' Memorandum in Opposition to Defendants' Motion To Dismiss (D.E. 67; hereinafter "Opposition") responding to the arguments asserted in Defendants' Motion (D.E. 57) and Memorandum (D.E. 58).

4. On February 2, 2024, Defendants filed their Reply. (D.E. 68). The Reply asserts three new and potentially controlling legal arguments that the Defendants did not include in the Motion or Memorandum, as follows:

   a. First, Defendants argue that the HEAR Act revives only claims for "Nazi-stolen art," and not sales – like Paul von Mendelssohn-Bartholdy's sale of *Sunflowers* – that occurred between private individuals "because of" Nazi persecution and duress. Accordingly, Defendants maintain that Plaintiffs'

3

claims are barred by the otherwise applicable Illinois statute of limitations. (Reply Brief, p. 23 n. 35).

b. Second, Defendants also assert for the first time that even assuming *arguendo* that the HEAR Act applies to artworks such as the Painting that were lost because of Nazi duress, § 5(e) of the Act would exclude the Heirs' claims from coverage under the HEAR Act because the Heirs putatively "knew about a possible cause of action after 1999, could have brought a timely claim, but waited more than six years to bring a claim."  (*Id.*)

c. Third, Defendants allege – and again for the first time – that the Heirs' purported manipulative mishandling of their claim to recover *Sunflowers* somehow excuses Defendants from satisfying the threshold requirement for invoking the doctrine of *forum non conveniens.* In the instant case this requirement entails either that the Defendants demonstrate that Japan affords an adequate alternative forum that will adjudicate the Heirs' several claims on their substantive merits, or – and if a Japanese statute of limitations bars the Heirs' claims – that Defendants agree to waive the applicable limitation period and demonstrate that a Japanese court would accept such waiver.  Defendants, however, maintain that they are excused from meeting these threshold requirements based upon false allegations that the Heirs were somehow aware

4

that they had a viable judicial remedy to recover *Sunflowers* before the 20-year

period for prescription under the law of Japan expired in 2007, but failed to

bring suit so that they could take advantage of a putatively contemporaneously

viable U.S. federal or state limitation period. (Reply at 22-23).

5. In addition to the foregoing, significant additional relevant evidence concerning key

issues in this dispute has become available only after the Defendants filed their Reply on

February 2, 2024, and as follows:

    a. First, new evidence confirms that defendant Sompo International in fact

      conducts business in Chicago – notwithstanding Defendants' continuing

      assertions to the contrary. Several press reports dated February 8 and 9,

      2024 relate that "Sompo International" was more than doubling its office

      space in Chicago. (*See* Byrne Declaration ¶¶ 12c-12d, Exhibits 9, 10).

      Also, in a follow up investigation, the Heirs discovered that Sompo

      International is now advertising to hire new employees in Chicago.

      (*See* Byrne Declaration ¶¶ 12e-12f, Exhibits 11, 12).

    b. Second – and since Defendants filed their Surreply on February 2, 2024

      – the U.S. government has reaffirmed its intention that artworks like the

      Painting that Nazi victims relinquished in forced sales to private parties

      rather than to the Nazi government be returned to rightful owners. On

5

March 5, 2024 the U.S. State Department released the long-awaited "Best Practices for Restitution of Nazi-Confiscated Art" (hereinafter "Best Practices") at an event in Washington, D.C. on March 5, 2024 co-sponsored by the U.S. State Department entitled the "25th Anniversary of the Washington Principles on Nazi-Confiscated Art: Best Practices and the Way Forward." (*See* Byrne Declaration ¶ 13; a copy of the Best Practices is attached as Exhibit 13 to the Byrne Declaration). The Best Practices confirm and explicate U.S. policy concerning Nazi-confiscated artworks, including that that the term "Nazi-confiscated" refers to "sales under duress, during the Holocaust era ... [and] the sale of art and cultural property by a persecuted person during the Holocaust era between 1933-45 can be considered equivalent to an involuntary transfer of property based on the circumstances of the sale."

6. In light of the foregoing, Plaintiffs request that the Court exercise its discretion[1] to permit them to file the accompanying Surreply and supporting documents in order to receive a fair and reasonable opportunity to respond to Defendants' potentially dispositive new

---

[1] *See, e.g., In re Hicks*, 582 B.R. 6, 10–11 (Bankr. N.D. Ill. 2018), and other cases cited in footnote 5 of the accompanying Memorandum.

6

arguments. *See, e.g. General Insurance Company of America v. Clark Mali Corp*,[2] "(t)o assure that the opponent of the motion is not deprived of a meaningful opportunity to respond to the arguments in support of the motion – which is the inevitable result of withholding arguments until the reply brief – a court ***must*** either invoke the waiver doctrine or allow the filing of a sur-reply.") (Emphasis and italics added). In addition, Plaintiffs request that the Court approve its request to exceed the 15-page limit for briefs prescribed in Local Rule 7.1 so they can adequately address the new arguments Defendants raised in the Reply. In the alternative, Plaintiffs request that the Court strike Defendants' new arguments and permit Plaintiffs to file the newly available evidence attached to the Byrne Declaration. When a party misuses its reply brief to raise new arguments or theories for the first time, courts consistently have granted motions to strike such arguments.[3]

7. Plaintiffs adopt and incorporate the accompanying Surreply (Exhibit A hereto) and Byrne Declaration with exhibits (Exhibit B hereto) as though fully set forth herein.

---

[2] No. 08 C 2787, 2010 WL 807433, at *4 (N.D. Ill. Mar. 10, 2010).
[3] *See, e.g.*, *Trudeau v. Lanoue*, No. 04 C 7165, 2006 WL 516579, at *2 (N.D. Ill. Mar. 2, 2006); *BCBSM, Inc. v. Walgreen Co.*, No. 1:20-CV-01362, 2023 WL 4872381, at *3 (N.D. Ill. Jan. 4, 2023).

8. On March 27, 2024, counsel for Plaintiffs, Thomas Hamilton and John Byrne, spoke with Defendants' lead counsel, Daniel Graham, regarding this motion. Defendants' counsel does not agree to this motion and will object to the relief sought herein.

9. Counsel for Plaintiffs and Defendants agree on the following proposed briefing schedule:

(1) Defendants will file an opposition to this motion within 21 days of when this motion is filed, that is, by April 17, 2024; and

(2) the Heirs will file a Reply to Defendants' Opposition within 10 days of its filing, that is, by April 27, 2024.

WHEREFORE, and for all of the foregoing reasons, the Heirs respectfully request that this Court enter an Order: (a) permitting Plaintiffs to file the accompanying Surreply and Byrne Declaration with exhibits; (b) approving Plaintiffs' request to file a Surreply in excess of 15 pages; or, in the alternative (c) striking the new arguments contained in the Reply and permitting Plaintiffs to file the newly available evidence attached to the Byrne Declaration; (d) approve the briefing schedule set forth in paragraph 9 above; and (e) granting such other relief as this Court deems just and appropriate.

Dated:  March 27, 2024.

Respectfully submitted,

PLAINTIFFS JULIUS H. SCHOEPS,
BRITT-MARIE ENHOERNING, and
FLORENCE VON KESSELSTATT

By:    /s/   Thomas J.  Hamilton
            One of their attorneys

Thomas J. Hamilton
John J. Byrne, Jr.
**BYRNE GOLDENBERG & HAMILTON
PLLC**
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9779
E-mail:
 jjb@bghpllc.com
 tj.ham@cox.net

Marty J. Schwartz
**SCHAIN, BANKS, KENNY & SCHWARTZ, LTD.**
70 West Madison Street
Suite 5400
Chicago, Illinois 60602
Telephone: (312) 345-5700
E-mail:
mschwartz@schainbanks.com

# EXHIBIT  A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JULIUS H. SCHOEPS, BRITT-MARIE ENHOERNING, and FLORENCE VON KESSELSTATT, *Plaintiffs,* | |
| v. | Case No. 1:22-cv-07013 |
| SOMPO HOLDINGS, INC., SOMPO INTERNATIONAL HOLDINGS LTD., SOMPO FINE ART FOUNDATION, and SOMPO MUSEUM OF ART, *Defendants.* | Honorable Jeremy C. Daniel |

---

**SURREPLY OF PLAINTIFF MENDELSSOHN HEIRS**

---

Thomas J. Hamilton (admitted pro hac vice)
John J. Byrne, Jr. (admitted pro hac vice)
**BYRNE, GOLDENBERG & HAMILTON, PLLC**
1025 Connecticut Avenue, N.W., Suite 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9779
E-mail: jjb@bghpllc.com
        tj.ham@cox.net

Marty J. Schwartz
**SCHAIN BANKS KENNY & SCHWARTZ, LTD.**
70 W. Madison St., Ste. 5400
Chicago, IL 60602
Telephone: (312) 345-5700
E-mail: mschwartz@schainbanks.com

**TABLE OF CONTENTS**

---

Page

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... iv

SURREPLY OF PLAINTIFF MENDELSSOHN HEIRS ........................................... 1

I.    INTRODUCTION AND SUMMARY OF THE HEIRS' POSITION ........................... 1

II.    STATEMENT OF FACTS ........................................................................... 4

III.    ARGUMENT ................................................................................................ 7

    A.    The HEAR Act Does Not Preclude the Heirs' Claims .................................. 7

        1.    The Hear Act Encompasses "Forced Sales" Resulting from Nazi
Duress – Such as Compelled Mendelssohn-Bartholdy to Relinquish
the Painting to the Rosenberg Galerie in 1934 – and Not Merely
Artworks that the Nazi Government "Stole" ........................................... 8

            a.    The plain and unambiguous language of the HEAR Act
conclusively shows the Act revives the Heirs' claims ....................... 8

            b.    The HEAR Act's use of the term "because of" prescribes the
familiar tort principle of "but for" causation .................................. 10

            c.    Additional authorities confirm that the HEAR Act is intended to
revive claims for art sold under Nazi duress .................................... 11

        2.    The Heir's Claim to Recover the Painting is Timely Under the HEAR Act ......... 15

        3.    Rather than Falling Outside the HEAR Act's Coverage, the Heirs'
Claim Instead Represents Precisely the Type of Claim that the HEAR
Act Was Designed to Revive ................................................................. 20

    B.    No Putative Exception to the Threshold Requirement of the *Forum Non
Conveniens* Doctrine that a Petitioner Demonstrate an Adequate
Alternative Forum Applies to this Proceeding ........................................... 22

        1.    As an Initial Matter this Proceeding Does Not "Belong" in Japan as
Defendants Baselessly Contend ........................................................... 22

        2.    The Heirs Did Not Purposefully Permit the Relevant 20 Year
Japanese Prescriptive Period to Expire in Order to Take Advantage of
a [Non-Extant] Contemporaneously Viable U.S. Statute of Limitations ............. 23

i

3.  The Reply Makes the Inability of the Defendants to Demonstrate that Japan is an Adequate Alternative Forum for Adjudicating the Heirs' Claim All the More Conspicuous ...........................................................................25

4.  That U.S. Law – and the Signal U.S. Domestic and Foreign Policies that Govern the Heirs' Claims –Makes a Dismissal Based Upon the *Forum Non Conveniens* Doctrine All the More Unconscionable ........................26

    a.  A Threshold Choice of Law Analysis Helps Crystalize the Overarching Governmental Interests of the U.S. in this Controversy and that a Dismissal Based Upon *Forum Non Conveniens* Would Sabotage These Interests ...................................................................................26

    b.  That Both Congress and the President Intended that the HEAR Act Apply to the Fullest Extend that the U.S. Constitution Permits Precludes the Court from Applying the Japanese Law of Acquisitive Prescription to the Heirs' Claims ...................................................27

    c.  The Doctrine of Comity – Which Presupposes the "Utmost Good Faith" – Entails that the Court Decline to Entertain an Argument that the Japanese Law of Prescription Expunges the Heirs' Claims ................29

    d.  The Defendants' Fraudulent Concealment of the Heirs' Claim in 2001 to Recover *Sunflowers* under the Japanese Law of Prescription *Equitably Estops* Them from Now Asserting this Defense ..........31

    e.  Applying the Japanese Law of Prescription – in this Discrete Context – Would Impermissibly Violate Foundational Public Policies of Both Illinois and the U.S. ..................................................33

    f.  Choice of Law Principles Pertaining to When a Forum State Will Recognize Title by Prescription under the Law of a Foreign State Preclude Applying the Japanese Law of Prescription to the Heirs' Claims ......34

    g.  General Choice of Law Principles Prescribed in §§ 6 and 145 of the Restatement (Second) Conflict of Laws Direct that U.S. Law – and Not the Japanese Law of Prescription – Govern the Heirs' Claims ................35

        (a) The needs of the interstate and international systems: ...............................36

        (b) The relevant policies of the forum: ............................................................37

        (c) The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue: ..............37

        (d) The protection of justified expectations: ...................................................38

        (e) The basic policies underlying the particular field of law: ..........................39

ii

(f) Certainty, predictability and uniformity of result; .......................................39

(g) Ease in the determination and application of the law to be applied; ...........................................................................................................40

C. All "Private Interest" and "Public Interest" Factors of the *Forum Non Conveniens* Doctrine Disfavor Dismissing this Case .................................................40

1. The Heirs are Entitled to Address the Public and Private Interest Factors of the *Forum Non Conveniens* Doctrine to Ensure that the Defendants Do Not Benefit From Wrongfully Raising a New Argument for the First Time in Their Reply ...........................................40

2. Transferring this Proceeding to Japan Will Expunge the Heirs' Claim Both under the Substantive Law of Japan as Well as by Making the Heirs Meritorious Claim to Recover *Sunflowers* Prohibitively Expensive ..........41

3. All Relevant Private and Public Interest Factors of the *Forum Non Conveniens* Doctrine Preclude Dismissing this Proceeding.................................42

a. The Relevant Private Interest Factors Foreclose Dismissing this Proceeding ..42

(1) The practical problems of making a trial easy, inexpensive, expeditious ...............................................................................................42

(2) Relative Ease of Access to Sources of Proof .................................................43

(3) Availability of Compulsory Process for Attendance of Unwilling Witnesses: ...........................................................................................44

(4) Cost of Obtaining Attendance of Willing Witnesses;....................................45

b. The Relevant Public Interest Factors Preclude Dismissing this Case ..............45

(1) The Avoidance of Unnecessary Problems in Conflicts of Laws or in the Application of Foreign Law .................................................................45

(2) Administrative Difficulties of Burdening Court............................................45

(3) Jury Duty When Forum Has No Relation to Claim ....................................46

(4) Local Interest in Having Localized Controversies Decided at Home ..........46

D. The Defendants Spuriously Maintain that Defendant Sompo International in Chicago Somehow Is *Not* a Party to this Proceeding .....................46

IV. CONCLUSION ...........................................................................................................48

iii

## TABLE OF AUTHORITIES

Page

**Cases:**

*Archangel Diamond Corp. Liquidating Trust*
    812 F.3d 799 (10th Cir. 2016) ........................................................ 26

*BedRoc Ltd., LLC v. United States*
    541 U.S. 176 (2004) ........................................................................ 8

*Bostock v. Clayton Cnty., Georgia*
    590 U.S. 644 (2020) ........................................................................ 10

*Burke v. Amedisys, Inc.*
    No. 17-cv-9232
    2022 WL 3226797 (N.D. Ill. Aug. 10, 2022) ................................ 11

*Cent. States, Southeast & Southwest Areas Pension Fund v. One Stop, Inc.*
    No. 03 C 4414
    2007 WL 7705585 (N.D. Ill. July 18, 2007) ................................ 47

*Champagnie v. W.E. O'Neil Constr.*
    77 Ill.App.3d 136 (1979) ............................................................... 34

*Chang v. Baxter Healthcare Corp.*
    599 F.3d 728 (7th Cir. 2010) ........................................................ 23

*CitiMortgage, Inc. v. Parille*
    2016 Ill.App.2d 150286 (2016) .................................................... 17

*Crosby v. Nat'l Foreign Trade Council*
    530 U.S. 363 (2000) ...................................................................... 29

*Detroit Inst. of Art v. Ullin*
    No. 06-10333
    2007 WL 1016996 (E.D. Mich. Mar. 31, 2007) .......................... 9

*Detroit Inst. of Arts v. Ullin*
    No. 06–10333
    2007 WL 1016996 (E.D. Mich. Mar. 31, 2007) .......................... 20

*Encino Motorcars, LLC v. Navarro*
    584 U.S. 79 (2018) ........................................................................ 9

*George v. McDonough*
    569 U.S. 740 (2022) ...................................................................... 15

*Gladstone v. Hillel*
    203 Cal.App.3d 977 (1988) .......................................................... 44

*Got Docs LLC v. Kingsbridge Holdings, LLC*
    No. 19 CV 6155
    2023 WL 8527525 (N.D. Ill. Dec. 8, 2023) ................................ 47

iv

*Gross v. FBL Fin. Servs., Inc.*
  557 U.S. 167 (2009) ................................................................. 11

*Guarantee Trust Life Ins. Co. v. Kribbs*
  2016 Ill.App. 160672 (2016) .................................................. 17

*Gulf Oil Corp. v. Gilbert*
  330 U.S. 501 (1947) ................................................................. 42

*Haskins v. Midwest Air Traffic Control Serv., Inc.*
  No. 12 CV 4584
  2016 WL 3653531 (N.D. Ill. 2016) ...................................... 33

*Hermitage Corp. v. Contr. Adj. Co.*
  166 Ill.2d 72 (1995) ........................................................ 17, 19

*Hilton v. Guyot*
  159 U.S. 113 (1895) ................................................................. 30

*Hitt v. Stephens*
  285 Ill.App.3d 713 (1997) ...................................................... 17

*Illinois v. CSL Plasma, Inc.*
  635 F. Supp.3d 645 (N.D. Ill. 2022) .................................... 10

*In re Emerald Casino, Inc.*
  622 B.R. 44 (Bankr. N.D. Ill. 2020) ..................................... 31

*In re Ford Motor Co.*
  344 F.3d 648 (7th Cir. 2002) ................................................. 42

*Jackson Jordan v. Leydig*
  158 Ill.2d 240 (1994) ..................................................... 17, 19

*Kennedy v. United States*
  965 F.2d 413 (7th Cir. 1992) ................................................. 31

*Lopez-Betancourt v. Loyola Univ. Chicago Stritch Sch. of Med.*
  No. 16-CV-11565
  2019 WL 4166867 (N.D. Ill. Sept. 3, 2019) ................... 17, 19

*Lyons v. Turner Constr. Co.*
  195 Ill.App.3d 36 (1990) ........................................................ 34

*McGirt v. Oklahoma*
  140 S.Ct. 2452 (2020) ............................................................ 30

*Meeker v. Summers*
  70 Ill.App.3d 528 (1979) ........................................................ 18

*Needham v. Phillips Petroleum Co. of Norway*
  719 F.2d 1481 (10th Cir. 1983) ............................................. 26

*Nelson v. Sotheby's Inc.*
  115 F.Supp.2d 925 (N.D. Ill. 2000) ................................ 17, 19

*Piper Aircraft Co. v. Reyno*
  454 U.S. 235 (1981) ........................................................................... 42

*Portmann v. United States*
  674 F.2d 1155 (7th Cir. 1982) ........................................................... 31

*Rollins v. Ellwood*
  141 Ill.2d 244 (1990) ......................................................................... 33

*Schoeberlein v. Purdue Univ.*
  544 N.E.2d 283 (Ill. 1989) ................................................................ 33

*Schoeps v. Museum of Modern Art*
  594 F.Supp.2d 461 (S.D.N.Y. 2009) ..................................... 9, 13, 24

*Sebelius v. Cloer*
  569 U.S. 369 (2013) ............................................................................. 8

*Shropshear v. Corp. Counsel of the City of Chicago*
  275 F.3d 593 (7th Cir. 2001) ............................................................. 32

*Smith v. Wilson*
  705 F.3d 674 (7th Cir. 2013) ............................................................. 11

*Socha v. Boughton*
  763 F.3d 674 (7th Cir. 2014) ............................................................. 31

*Societe Nat'l Industielle Aerospatial v. United States Dist. Court for the Southern Dist. of Iowa*
  482 U.S. 522 (1987) ........................................................................... 30

*Spinozzi v. ITT Sheraton Corp.*
  174 F.3d 842 (7th Cir. 1999) ............................................................. 33

*Taylor v. Meirick*
  712 F.2d 1112 (7th Cir. 1983) ........................................................... 44

*The Arrogante Barcelones*
  20 U.S. 496 (1822) ............................................................................. 30

*United States v. Hansen*
  599 U.S. 762 (2023) ........................................................................... 15

*United States v. Luce*
  873 F.3d 999 (2017) ........................................................................... 11

*Unitednet, Ltd. v. Tata Commc'ns Am., Inc.*
  No. 1:21-cv-01081-KWR-JFR
  2023 WL 2665578 (D.N.M. March 28, 2023) ................................. 26

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*
  570 U.S. 338 (2013) ........................................................................... 11

*Wintersteen v. Nat'l Cooperage & Woodenware Co.*
  197 N.E. 578 (Ill. 1935) .................................................................... 33

*Woodstock/Kenosha Health Ctr. v. Schweiker*
   713 F.2d 285 (7th Cir. 1983) .................................................................... 31

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952) ............................................................................... 29

**Statutes:**

18 U.S.C. § 1001 .......................................................................................... 25

18 U.S.C. § 2314 .......................................................................................... 25

18 U.S.C. § 2315 .......................................................................................... 25

22 U.S.C. 2549 ............................................................................................ 44

Ill. Comp. Stat. § 5/13–205 ............................................................. 2, 3, 24

**Court Rules:**

Fed. R. Civ. P. 12 ........................................................................................... 1

**Other:**

12 Fed. Reg. 7983 (1947) ............................................................................ 14

Eugene R. Anderson & Nadia V. Holober, *Preventing Inconsistencies in Litigation*
   *With a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial*
   *Estoppel, Equitable Estoppel, Quasi Estoppel, "Mend the Hold," "Fraud on the*
   *Court," and Judicial and Evidentiary Admissions*, 4 Conn. Ins. L. J. 589 (1998) .............. 47

Pub. L. 114-308, 130 Stat. 1524 (2016) ....................................................... 1

Restatement (Second) Conflict of Laws § 90 (1971) ................................... 33

Restatement (Second) Conflicts of Laws § 246 (1971) ............................... 34

Restatement (Second) Conflicts of Laws § 247 (1971) ............................... 34

Restatement (Second) of Conflict of Laws § 6 (1971) ........................... 27, 35

Restatement (Second) of Conflicts of Law § 145 (1971) ............................ 36

Restatement (Second) of the Law of Foreign Relations § 9 (1965) ............ 30

W. Page Keeton et.al. *Prosser and Keeton on Torts* § 41 (5th ed. 1984) .............. 11

**Surreply of Plaintiff Mendelssohn Heirs**

## I. INTRODUCTION AND SUMMARY OF THE HEIRS' POSITION

The Plaintiff Mendelssohn Heirs (Heirs) respectfully submit this Surreply to address three new arguments that Defendants raised for the first time in the Defendants' Reply in Support of Their Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens* (Reply; D.E. 68). The Defendants embedded two of these three arguments in footnote 35 at page 23 of their Reply and the third at pages 22–23. These new arguments accuse the Heirs of serious malfeasance which, if not rebutted, would foreclose their rights to assert their claims, and which entail that the Heirs proffer substantial new evidence as well as legal arguments to establish – and irrefutably – that these arguments lack merit.

The petitioned Surreply repudiates Defendants new arguments that: (1) the Holocaust Expropriated Art Recovery Act of 2016[1] (HEAR Act or Act) – prescribing a preemptive federal and uniform statute of limitations for judicial claims seeking to recover Nazi-confiscated artworks like the Painting – does not apply to the Heirs' claim to recover *Sunflowers* because the Painting was not "stolen" or directly seized by the Nazi government; (2) that § 5(e) of the Act forecloses the Heirs' claim because they putatively knew about their claim in 1999 and enjoyed a viable judicial remedy to reclaim the Painting but failed to prosecute this action for six years thereafter; and (3) the Defendants are excused from establishing the threshold requirement for invoking the doctrine of *forum non conveniens* that Japan affords an adequate alternative forum that will adjudicate the Heirs' claims on their substantive merits because the Heirs knowingly permitted the 20 year Japanese prescriptive period to expire to take advantage of a putatively contemporaneously viable limitation period either in Illinois or the U.S.

---

[1]  Pub. L. 114-308, 130 Stat. 1524 (2016).

1

The Heirs also submit this Surreply to bring to the attention of the Court new materials that are highly probative of the parties' claims and defenses in this proceeding and that became available only after the Defendants' filed their Reply on February 2, 2024. These materials discredit Defendant's contention that Defendant Sompo International does not conduct business in Chicago. They also reaffirm the seminal and consistent policy of the U.S. government to return to rightful owners not merely artworks that the Nazi government "stole" directly from Nazi victims, as Defendants maintain, but also artworks like the Painting that victims of Nazi persecution like Mendelssohn Bartholdy relinquished to third parties in "forced sales" or "sales under duress" resulting from Nazi policies and concomitant coercion.

Each of the Defendant's new arguments lack merit. First, the Heirs' claims fall squarely within the intended scope of the HEAR Act. Both the express terms of the HEAR Act – along with is legislative history as well as historical materials that necessarily inform its meaning – confirm that the Act extends the applicable statute of limitations not only for claims to recover artworks that the Nazi government directly seized or "stole" (as Defendants argue), but also for the recovery of artworks like the Painting that victims of Nazi duress like Mendelssohn-Bartholdy surrendered in forced sales or "sales under duress" to third parties like Paul Rosenberg of Galerie Rosenberg. These sales resulted from Nazi policies to exclude Jews from the economy of Germany, and the concomitant economic, political, social, and cultural coercion that the Nazis government employed to achieve this objective.

Second, § 5(e) of the Act does not exclude the Heirs' claim from coverage because they supposedly enjoyed a viable judicial remedy to recover the Painting in 1999 which they failed to prosecute for the next six years. To the contrary, in 1999 the five-year limitation period that Ill. Comp. Stat. 5/13–205 prescribes for claims to recover personal property like the Painting – and the concomitant and demanding Illinois discovery rule that imputes constructive notice of a claim to parties if they receive even a "whiff" of possible wrongdoing – foreclosed the Heirs'

claim by 1940 at the latest. In fact, Congress enacted the HEAR Act ***expressly*** to revive claims like the Heirs' which otherwise applicable state statutes of limitation like Ill. Comp. Stat. 5/ 13–205 long have time-barred.

Finally, the Defendants are not excused from demonstrating that Japan affords the Heirs an adequate alternative forum that will adjudicate their claims to recover the Painting and for unjust enrichment on their substantive merits. The Heirs did not purposefully allow a judicially viable claim to recover the Painting under the prescriptive law of Japan to expire in order to take advantage of a putative and contemporaneously viable and longer limitation period in Illinois or the U.S., which showing might excuse Defendants from this requirement. To the contrary, in 2007 – when Defendants obtained title to the Painting under the Japanese law of prescription – the Heirs were not aware of their claim to recover *Sunflowers* because in 2001 when the Defendants brought the Painting to Chicago for a major international exhibition of Van Gogh paintings hosted by the Chicago Art Institute (AIC) they fraudulently concealed from the Heirs' their contemporaneously viable claim to recover the Painting under Japanese law. Only in 2008 – and after the Defendants had obtained title to the Painting by prescription in Japan the previous year – did the Heirs learn that they enjoyed a claim to recover the Painting if ever a statute of limitation should afford them a viable judicial remedy. Moreover, in 2008 the Heirs had no viable judicial remedy to reclaim the Painting either in Illinois or elsewhere in the U.S.

So it is ironic that after ***fraudulently concealing*** the Heirs' judicial claim in Japan to recover the Painting, the Defendants should now argue that the failure of the Heirs to assert a timely claim under the prescriptive law of Japan justifies transferring their claim to Japan where it now will be time-barred as a matter of law.

The irrefutable inability of the Defendants to satisfy the threshold requirement for invoking the doctrine of *forum non conveniens* by demonstrating that Japan offers an adequate alternative forum that will adjudicate the Heirs' claims on their substantive merits entails that the Court deny their motion to dismiss this proceeding.

3

While the Heirs regret the length of this Surreply, in the final analysis the Defendants must accept responsibility. For by injecting covertly new and potentially dispositive arguments in their Reply that threaten the Heirs with material prejudice and that require them to proffer substantial new evidence as well as relevant law in order to provide the Court with an adequate factual as well as legal foundation to adjudicate these arguments, the Defendants have left the Heirs no recourse but to ensure that Defendants do not benefit from their misconduct, and that the Heirs sustain no prejudice. Accordingly, the Surreply and accompanying Declaration of John J. Byrne, Jr. with appended exhibits (Declaration) provide the Court with the relevant facts and law necessary to resolve these new arguments on their substantive merits.

Accordingly – and based upon both the Heirs' initial Memorandum and the petitioned Surreply – the Court should deny Defendants' motion to dismiss this proceeding. The Court thereby will help preclude the Defendants from continuing to take advantage in this proceeding of their many past and continuing wrongs. By raising surreptitiously in their Reply three conspicuously non-meritorious new arguments that require the Heirs to invest extensive resources to rebut, the Defendants are continuing to employ their chosen strategy for litigating this case. This strategy envisions employing the extensive unjust enrichment that Defendants have tortiously reaped – and continue to wrongfully garner – from commercially exploiting what they long have ***known*** is a Nazi-confiscated painting to frustrate and obstruct the Heirs' meritorious claim to recover it.

Foundational principles of equity counsel that the Court not countenance this misconduct.

## II.   STATEMENT OF FACTS

The Heirs incorporate by reference the Statement of Facts contained in the accompanying Memorandum of Law in Support of Plaintiff Mendelssohn Heirs' Motion (A) to File a Surreply with Supporting Documents That (B) Exceeds 15 Pages of Text; or, in the Alternative, (C) to Strike Defendants' New Arguments and Permit Plaintiffs to File Newly Available Evidence (Memorandum).

4

In addition, the Heirs relate the following:

The FAC confirms that Elsa was fully cognizant that the Nazis were persecuting her husband relentlessly and systematically, and that she participated integrally in a defensive plan to mitigate the effects of escalating Nazi persecution and predation and to preserve and protect as much property as possible.[2] Elsa knew: (1) that intensifying Nazi persecution had compelled the couple to move from their downtown Berlin mansion on *Alsenstrasse* (Alsen Street) to a modest garden home in a secluded part of Berlin in or around September 1933 to mitigate perpetual Nazi surveillance;[3] (2) that Paul purchased a Bavarian farm house in her name in the Fall of 1934 to transfer a portion of his wealth to an asset that appeared to be owned by an "Aryan;"[4] and (3) that she had entered into a Contract of Inheritance with Paul in February 1935 that falsely recited that he had gifted his entire art modern collection to her when they married in 1927, knowing that this recital sought to create the fictitious appearance that Paul's art collection was "Aryan" owned since before the Nazis assumed power in January 1933.[5] Elsa also compiled an inventory of the residual artworks that she owned after Paul died (hereinafter "Elsa's List"), further confirming that she was aware that Nazi persecution had compelled Paul to relinquish many of his prized artworks from 1933 until his death in May 1935.[6] For example, *Sunflowers* (hereinafter "*Sunflowers*" or "Painting") hung on the wall at the couple's country estate in Börnicke (located in Brandenburg, Germany, and hereafter referred to as "*Boernicke).'"[7] Clearly, Elsa would have noticed when it was taken down from the wall and transferred to Galerie Rosenberg (hereinafter

---

[2]   FAC ¶¶ 184-199.

[3]   FAC ¶ 152.

[4]   FAC ¶¶ 189-191.

[5]   FAC ¶ 22.

[6]   *See* Declaration of John J. Byrne, Jr. (hereinafter "Byrne Declaration") ¶¶ 11b-11d, Exhibits 4-6.

[7]   *See* Byrne Declaration ¶11a; Exhibit 3.

"Galerie Rosenberg" or "Rosenberg") in or around 1934. In fact, Elsa's List does not include *Sunflowers* – or any of the other van Gogh works that Paul sold at Galerie Rosenberg – so it is beyond question that Elsa knew that Nazi persecution compelled Paul to sell these works.[8]

In addition, the FAC alleges that Yasuda Fire & Marine Insurance Company (the predecessor of defendant Sompo Japan Insurance Inc., ( hereinafter "Sompo Japan") recklessly acquired *Sunflowers* in 1987 at Christie's auction in in London. Sompo Japan failed to investigate the inherently suspicious provenance of the Painting (which contained the name of a prominent Nazi victim and modern art collector Paul von Mendelssohn-Bartholdy), as well as ignored Christie's express disclaimer of title to prospective buyers with its injunction that they investigate independently the background of materials offered for sale.)[9] As the FAC sets forth, however, because *Sunflowers* offered spectacular branding and marketing benefits, Sompo Japan was determined to acquire it regardless of cost and irrespective of a conspicuous Nazi-tainted provenance.[10]

The FAC further alleges that Sompo Japan colluded with the Art Institute of Chicago (hereinafter "AIC") in 2001 to fraudulently, tortiously, and criminally conceal *Sunflowers'* Nazi provenance so that the Painting could be exhibited at AIC in Chicago at the "Van Gogh and Gauguin: Studio of the South" exhibition in 2001–2002 (Exhibition) without concern that the government would seize the artwork as Nazi-confiscated, or that the Heirs would file a civil suit for to recover it.[11] In fact, Sompo Japan and AIC filed a false report with the U.S. State Department to protect *Sunflowers* from government seizure, as well as to conceal from the Heirs their rightful ownership of the Painting – which constituted a tortious violation of their affirmative duty under Illinois law to help the Heirs recover the Painting.[12]

---

[8]   Byrne Declaration ¶ 11c, Exhibits 5-6.

[9]   *See, e.g.*, FAC ¶¶ 5, 236-240.

[10]   *See, e.g.*, FAC ¶¶ 5, 236-240.

[11]   *See, e.g.,* FAC ¶¶ 6, 33, 72.

[12]   FAC ¶¶ 72, 75, 250, 253.

In addition, the FAC alleges multiple legal bases for negating the discrete corporate identities of the several Sompo Defendants which enable the Heirs to assert specific jurisdiction over them collectively including: (1) alter ego based upon domineering control by a corporate parent of its subsidiaries; (2) commingling corporate assets to collectively perpetrate fraud and injustice, and; (3) wrongfully employing the corporate form to evade federal statutes and policies.[13] In addition, the FAC alleges that the Defendants have employed the Painting to exploit the sophisticated marketing and branding technique of archetypal branding to influence the subliminal subconscious of Illinois insurance consumers.[14]

### III. ARGUMENT

#### A. The HEAR Act Does Not Preclude the Heirs' Claims

For the first time – and buried in footnote 35 of their Reply – the Defendants proffer two reasons why the HEAR Act putatively bars the Heirs' claims. First, that "forced sales" induced by Nazi duress and coercion in paradigmatic violation of the international law of human rights such as that which compelled Mendelssohn-Bartholdy to relinquish the Painting in 1934 are somehow not ***within the scope*** of HEAR Act (Act) coverage. Rather – the Defendants maintain – the HEAR Act revitalizes only claims for the recovery of artworks that the Nazi government "stole."[15] So the HEAR Act does not revive the Heirs' claim to recover the Painting.

Second, the Defendants also contend that because the Heirs were aware that they had a viable judicial remedy to recove*r Sunflowers* in 1999 which they failed to prosecute for six years, the exception to the HEAR Act prescribed in §5(e) precludes their claims.

Both contentions lack merit.

---

[13]   FAC ¶¶ 57-60.

[14]   *See, e.g.,* FAC ¶¶ 86, 257-6.

[15]   Reply, p. 23, n.35.

1. **The Hear Act Encompasses "Forced Sales" Resulting from Nazi Duress – Such as Compelled Mendelssohn-Bartholdy to Relinquish the Painting to the Rosenberg Galerie in 1934 – and Not Merely Artworks that the Nazi Government "Stole"**

   a. **The plain and unambiguous language of the HEAR Act conclusively shows the Act revives the Heirs' claims**

Defendants assert for the first time in their Reply that the HEAR Act does not apply to the Heirs' claims:

> Plaintiffs' argument assumes the HEAR Act (cited repeatedly in the FAC) applies and will resurrect Plaintiffs' claims. However, the HEAR Act applies to Nazi-stolen art, not to artwork sold to another individual in France.[16]

Defendants' argument conflicts with the express language of the HEAR Act. The Supreme Court often has instructed that if the operative language of a particular statute is unambiguous, it must be interpreted according to its plain terms. *See, e.g., Sebelius v. Cloer.*[17] The HEAR Act contains no language limiting its coverage to "***Nazi-stolen***" art. In fact, the HEAR Act's language is purposefully broad, and encompasses all art lost "***because of***" Nazi persecution, and without regard to where or to whom the Nazi victim sold the controverted item.

Section 5 of the HEAR Act prescribes in applicable part as follows:

SEC. 5. STATUTE OF LIMITATIONS.

(a) In General.--Notwithstanding any other provision of Federal or State law or any defense at law relating to the passage of time, and except as otherwise provided in this section,[18] a civil claim or cause of action against a defendant to recover ***any artwork*** or other property that was ***lost*** during the covered period ***because of*** Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of—

(1) the identity and location of the artwork or other property; and

---

[16]   Reply, p. 23 n. 35.

[17]   569 U.S. 369, 376 (2013); *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)(our inquiry begins with the statutory text, and ends there as well if the text is unambiguous).

[18]   None of the exceptions specified in Section 5 applies, as discussed, *infra*.

(2) a possessory interest of the claimant in the artwork or other property.

(Emphasis and italics supplied). As the FAC asserts, Mendelssohn-Bartholdy lost the Painting "***because of***" Nazi persecution.[19] "Because of" means: "by reason of; on account of."[20] In fact, in a case based on the same essential facts as this claim, a court in New York ruled specifically that the Mendelssohn heirs have adduced competent evidence that Mendelssohn-Bartholdy lost his paintings only "***because of***" Nazi persecution, and therefore denied the defendant museums' motion for summary judgment. *See Schoeps v. Museum of Modern Art.*[21] In light of the foregoing, there can be no doubt that Paul von Mendelssohn-Bartholdy lost the Painting "because of Nazi persecution" (HEAR Act § 5), and this action clearly comes within the intended scope of the HEAR Act.

In addition, Defendants' baseless assertion that the HEAR Act would not apply to an artwork "sold to another individual in France" conflicts with the HEAR Act's "Findings" section, where *Detroit Institute of Art v. Ullin*[22] – like the case at bar, involving a private sale by a persecuted German Jew in Nazi Germany to a private party in a neighboring country who had no Nazi connections – is cited in a discussion of unsuccessful judicial actions seeking to recover "Nazi-confiscated art."[23] So there can be no doubt that the Act revives the Heirs' claims.

---

[19]   *See* FAC ¶¶ 4, 127-199; FAC Exhibit 2; see also HEAR § 5(a).

[20]   Terms not defined in a statute are given their ordinary meaning. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018)(consulting dictionaries for undefined meaning of "salesman"). Three common dictionaries define "because of" in practically identical terms: "by reason of; on account of." Oxford English Dictionary (2014) ("By reason of, on account of"); Merriam-Webster (2014) ("by reason of: on account of"); American Heritage Dictionary (2014) ("On account of; by reason of").

[21]   594 F.Supp.2d 461, 466 (S.D.N.Y. 2009)(a copy of this decision is attached to the FAC as Exhibit 2).

[22]   No. 06-10333, 2007 WL 1016996, at *1 (E.D. Mich. Mar. 31, 2007).

[23]   HEAR Act § 2(6)("Findings").

> **b.** **The HEAR Act's use of the term "because of" prescribes the familiar tort principle of "but for" causation**

Several considerations – including dispositively the plain language of the HEAR Act (Act) itself discussed above – confirm that the Act revitalizes claims for the recovery of artworks like the Painting that were casualties of "forced sales" or "sales under duress" induced by Nazi persecution, and regardless where or to whom the sale occurred. As noted above, it is axiomatic that in interpreting a statute a court first must consult its plain language, and if the meaning of a provision is clear, then the court enforces that meaning and inquires no further. Moreover, courts accord words their dictionary meanings. As this Court instructed recently in *Illinois v. CSL Plasma, Inc. et al.,*[24] the Seventh Circuit consistently has adhered to these principles:

> Courts interpret a statute by first looking to its plain language….If a statute's plain meaning is unambiguous, the 'inquiry ends there'…, and the Court enforces 'the plain meaning of the language enacted by Congress…Absent contrary definitions within the (statute) itself, the Court accords words and phrases their ordinary dictionary meanings…. (Citations omitted).

And as the Supreme Court explained in *Bostock v. Clayton County, Georgia,*[25] the purpose of according a statute its plain meaning is to ensure that courts will interpret statutes to achieve the purpose that the legislature intended, and not to further potential concealed motives.

As noted above, the plain operative language of the HEAR Act does not limit recovery to only those artworks that the Nazi government "stole" – as Defendants maintain – but rather revitalizes claims for the recovery of all artworks lost as mere ***consequence*** of paradigmatically wrongful Nazi persecution, and without regard to where or to whom the Nazi victim sold the disputed item.[26]

---

[24]  635 F. Supp.3d 645, 650–51 (N.D. Ill. 2022).

[25]  590 U.S. 644, 673 (2020).

[26]  *See* Section 5 of the HEAR Act (quoted in full in the immediately preceding section).

The "plain meaning" postulate of statutory interpretation confirms that the emphasized language "because of" prescribes the familiar tort principle of "but for" causation.[27] In *Gross v. FBL Financial Services, Inc.,*[28] the Court invoked three standard American dictionaries to define the term "because of" as meaning "by reason of" or "on account of," and equated this definition with "but for" tort causation. *See also University of Texas Southwestern Medical Center v. Nassar.*[29] And the Seventh Circuit has acknowledged that *Gross* interprets the term "because of" to mean "but for causation."[30]

Accordingly, the HEAR Act applies to the Heirs' claims since Paul von Mendelssohn-Bartholdy clearly would not have sold *Sunflowers* – or any of his art – "but for" Nazi persecution.[31]

### c. Additional authorities confirm that the HEAR Act is intended to revive claims for art sold under Nazi duress

Additional authorities corroborate that the statutory and commonly understood phrase "because of" expresses both the intent of the HEAR Act as well as consistent U.S. policy to return to rightful owners all artworks sold under duress during the Nazi era (1933–1945) regardless to whom or where the artwork was sold. First, the Terezin Declaration of 2009 – signed by the U.S. as well as 45 other nations affected by Nazi coercive policies regarding art

---

[27]   A familiar treatise explains "but for" causation as follows: "[t] he defendants conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event if the event would have occurred without it." W. Page Keeton et.al. *Prosser and Keeton on Torts* § 41 (5th ed. 1984).

[28]   557 U.S. 167, 176 (2009).

[29]   570 U.S. 338, 364 (2013).

[30]   *See, e.g., United States v. Luce*, 873 F.3d 999, 1012 n. 39 (2017)(relating that "[w]e note that the Supreme Court has interpreted the phrase "because of" as requiring but for causation in other circumstances);" *Smith v. Wilson*, 705 F.3d 674, 680 (7th Cir. 2013)(observing that "[t]he *Gross* Court construed the words "because of" as colloquial shorthand for "but for causation…"); *see also Burke v. Amedisys, Inc.*, No. 17-cv-9232, 2022 WL 3226797, at *13 (N.D. Ill. Aug. 10, 2022) (stating that "[t]he Supreme Court has clarified that the phrase "because of" requires 'but for' causation", and "has reached that conclusion in a steady stream of case law").

[31]   *See* FAC ¶¶ 4, 127-199.

and cultural property – expressly prescribes an intention to return to rightful owners artworks relinquished (as was the Painting) in forced sales and sales under duress. Section 3 of the HEAR Act identifies the Terezin Declaration as prescribing U.S. policy to return Nazi tainted artworks to rightful owners, and relates that the very purpose of the HEAR Act is to "ensure" this result.[32] As a preamble to its injunction that artworks lost as a consequence of Nazi wrongdoing should be returned to rightful owners, the Terezin Declaration includes materials surrendered as a consequence of forced sales and sales under duress as follows:

**NAZI CONFISCATED AND LOOTED ART**

Recognizing that art and cultural property of victims of the Holocaust (Shoah) and other victims of Nazi persecution was confiscated, sequestered and spoliated, by the Nazis, the Fascists and their collaborators through various means including theft, coercion and confiscation*, and on grounds of relinquishment as well as forced sales and sales under duress*, during the Holocaust era between 1933–1945 …

(Emphasis and italics supplied).

The *Best Practices for the Washington Conference Principles on Nazi-Confiscated Art* (Best Practices) that the State Department issued on March 5, 2024 in Washington, D.C.[33] reaffirm and expressly define the terms "Nazi-confiscated" and "Nazi- looted" almost identically. Paragraph B of the Best Practices prescribes as follows:

"Nazi-confiscated" and "Nazi-looted" refer to what was looted, confiscated, sequestered, and spoliated, by the Nazis, the Fascists and their collaborators

---

[32]   Section 3 of the HEAR Act prescribes as follows:

**SEC. 3. PURPOSES.**

The purposes of this Act are the following:

(1) To **ensure** that laws governing claims to Nazi-confiscated art and other property ***further United States policy*** as set forth in the Washington Conference Principles on Nazi Confiscated Art, the Holocaust Victims Redress Act, and the ***Terezin Declaration***. (Emphasis and italics supplied).

[33]   The accompanying Memorandum describes the origin and purpose of the *Best Practices* at pages 7-8; *see also* Byrne Declaration, Exhibit 13.

through various means including but not limited to theft, coercion, and confiscation, and on grounds of relinquishment, as well as forced sales and sales under duress, during the Holocaust era between 1933–1945.

And as paragraph 4 of the FAC asserts, *Schoeps v. Museum of Modern Art*[34] has validated the legal basis for the Heirs' claim to recover *Sunflowers*, including that Mendelssohn-Bartholdy forfeited this Painting as a consequence of Nazi policies and coercion:

> Claimants have adduced competent evidence that Paul never intended to transfer any of his paintings and he was forced to transfer them only because of threats and economic pressures by the Nazi government. Summary judgment is therefore not appropriate.

These most recent statements of U.S. policy prescribing the restitution of Nazi-era artworks – which the HEAR Act expressly was enacted to ensure – cohere with the first efforts of the U.S. and its allies to return to Nazi victims and their heirs property relinquished to third parties like Galerie Rosenberg as a consequence of Nazi policies and concomitant coercion and duress. In January 1943, the Allied Governments collectively issued the Inter-Allied Declaration Against Acts of Dispossession Committed in Territories Under Enemy Occupation or Control (hereinafter the "London Declaration"), asserting their right to invalidate any transaction made in Nazi-controlled areas that is a dispossession, even when "they purport to be voluntarily

---

[34]  594 F.Supp.2d at 466.

effected."[35] In 1947 the U.S. government promulgated Military Government Law No. 59[36] which applied to restitution proceedings conducted after the War in the area of U.S. control of Germany. MGL No. 59 defined "confiscated property" subject to restitution as being transferred under duress,[37] and also established a rebuttable **_presumption_** that any property transferred by a victim of Nazi persecution after the Nazis assumed power in Germany on January 30, 1933 until the war against Germany ended on May 8, 1945 to any third party was wrongfully confiscated and subject to restitution.[38] These provisions in tandem confirm that from inception U.S. policy to restore to rightful owners property surrendered as consequence of Nazi persecution – and the

---

[35]    London Declaration of January 5, 1943. Forced Transfers of Property in Enemy-Controlled Territory, 1943, in 3 Dep't of State, Treaties and Other International Agreements of the United States of America 1776–1949, p. 754 (C. Bevans 1969) asserted a sweeping intent to nullify as necessary any and all transfers of property deemed to be involuntary and as follows:

[The Governments making this Declaration] [h]ereby issue a formal warning to all concerned, and in particular to persons in neutral countries, that they intend to do their utmost to defeat the methods of dispossession practiced by the Governments with which they are at war against the countries and peoples who have been so wantonly assaulted and despoiled. Accordingly, the Governments making this Declaration and the French National Committee reserve all their rights to declare invalid **_any_** transfers of, or dealings with, property, rights and interests of any description whatsoever which are, or have been, situated in the territories which have come under the occupation or control, direct or indirect of the Governments with which they are at war, or which belong, or have belonged to persons (including juridical persons) resident in such territories, This warning applies whether such transfers of dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected. (Emphasis and italics added).

[36]    12 Fed. Reg. 7983 (1947).

[37]    **Part II**

**CONFISCATED PROPERTY**

**Article 3**

**Acts of Confiscation**

1. Property shall be considered confiscated within the provisions of this Law if the person entitled thereto has been deprived of it despite a well-founded legal expectancy of acquisition, as the result of:

(a) A transaction contra bones mores, threats or duress, or an unlawful taking or any other tort

….

[38]    **ARTICLE 3**

**Presumption of Confiscation**

1. It shall be presumed in favor of any claimant that the following transaction entered into between 30 January 1933 and 8 May 1945 constitute acts of confiscation within the meaning of Article 2:

(a) Any transferor relinquishment of property made during a period of persecution by any person who was directly exposed to persecutory measures on any of the grounds set forth in Article II;

14

term "Nazi Confiscated" itself – contemplated materials sold under duress regardless of the identity of the buyer or where the item was sold. By expressly invoking the Terezin Declaration and its reference to "Nazi-Confiscated" art in the HEAR Act as prescribing U.S. foreign policy concerning the restitution of Nazi-confiscated art, Congress necessarily intended to borrow the consistent meaning this term has conveyed in U.S. foreign policy concerning this subject and in MGL No. 59.[39]

## 2. The Heir's Claim to Recover the Painting is Timely Under the HEAR Act

The HEAR Act prescribed a six-year statute of limitations beginning on December 16, 2016 (the date the HEAR Act was enacted) for the Heirs to file their claim, since before then the Heirs "had knowledge of the elements of their claim" but their "civil claim or cause of action" was barred by the Illinois statute of limitations (Ill. Comp. Stat. 5/13–205).[40] The Heirs filed their timely initial Complaint for Restitution and Unjust Enrichment (D.E. 1) on December 13, 2022, within the HEAR Act's six-year statute of limitation.

In an attempt to invoke an exception to the HEAR Act – Sec. 5(e) – which would preclude the Heirs' claim, Defendants assert for ***the first time*** and in footnote number 35 of the Reply that the Heirs had a judicially viable claim to recover *Sunflowers* after January 1, 1999 but failed to prosecute it in a timely manner. The Defendants state:

> "The HEAR Act does not revive causes of action where the potential claimant knew about a possible cause of action after 1999, could have brought a timely claim, but waited more than six years to bring a claim" (citation omitted) .... the

---

(b) Any transfer or relinquishment of property made by a person who belonged to a class of persons which on any of the grounds set forth in Article 1 was to be eliminated in its entirety from the cultural and economic life of Germany by measures taken by the State or the NSDAP.

[39]   *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 774 (2023)("when Congress 'borrows terms of art in which are accumulated the legal tradition of and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word.'")(Citation omitted); *George v. McDonough*, 569 U.S. 740, 746 (2022)("[w]here Congress employs a terms of art "obviously transplanted from another legal source,' it 'brings the old soil with it.'") (Citations omitted).

[40]   *See* HEAR Act § 5(c)(1)(A)-(B).

> HEAR Act's exception will not extend expired statutes of limitation to those [Mendelssohn Heirs] who knew of the existence of *Sunflowers* in the Decedents possession but failed to prosecute timely claims.[41]

Section 5(e) would preclude the Heirs' claim if they in fact had a judicially viable claim to recover *Sunflowers* on or after January 1, 1999, knew that they had such claim, and allowed 6 years to lapse without prosecuting it.[42] But the Heirs never had a judicially viable claim to recover *Sunflowers* – a claim that an applicable statute of limitations did not bar – on or after January1, 1999 as Section 5(e) requires. The relevant Illinois 5 year statute of limitations that governs the Heirs' claim to recover *Sunflowers* (Ill. Comp. Stat. 5/13–205) – and the concomitant and demanding Illinois discovery rule that determines when judicial claims to recover personal property such as the Painting "accrue" under this provision to commence the running of the this limitation period – confirm ***as a matter of law*** that the claim of the Heirs and their predecessors to recover *Sunflowers* accrued in 1934 or 1935 when Paul sold the Painting under Nazi duress to the Rosenberg Galerie.[43] So their claim was time-barred by 1940 at the latest.[44] So ***never*** after January 1, 1999 did the Heirs have knowledge of the location of *Sunflowers* and a possessory interest in the Painting during which time a federal or state statute of limitations did not bar their claim as Section 5(e) requires to except the Heirs' claim from the coverage of the HEAR Act. Indeed, the Heirs did not become aware of their possessory interest in *Sunflowers* until 2008, at which time they conclusively determined that their claim long had been time-barred.[45]

---

[41]  Reply at 23 n. 35.

[42]  HEAR Act §5(e) prescribes in relevant part that it will not apply when: (1) the claimant or a predecessor-in- interest of the claimant had knowledge of the identity of an artwork and a possessory interest in such artwork and; (2) the claimant failed to prosecute such claim within six years of obtaining such knowledge during which period either a Federal or State statute of limitations did not bar this claim.

[43]  Byrne Declaration ¶¶ 7, 11.

[44]  Byrne Declaration ¶¶ 7, 11.

[45]  *See* Byrne Declaration ¶¶ 4-8.

Illinois prescribes a five-year statute of limitations for conversion, replevin, and unjust enrichment, which are legal claims under Illinois law. *See* Ill. Comp. Stat. 5/13–205; *Guarantee Tr. Life Ins. Co. v. Kribbs*[46] (five-year statute of limitations for conversion); *Hitt v. Stephens*[47] (five-year statute of limitations for replevin); *CitiMortgage, Inc. v. Parille*[48] (five-year statute of limitations for restitution based on unjust enrichment).

In general, in Illinois "statutes of limitation begin to run as soon as a person suffers injury." *Nelson v. Sotheby's Inc.*[49]; *Hermitage Corp. v. Contractors Adjustment Co.*[50] However, "Illinois courts have adopted a discovery rule to delay the commencement of the statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Id.; see also Jackson Jordan, Inc. v. Leydig Voit & Mayer.*[51] In fact, "a companion rule to the discovery rule places a burden on plaintiffs to investigate should they ***get a whiff*** that wrongdoing exists."[52] (Emphasis and italics added). Moreover, the "discovery rule does not permit the victim of an alleged wrong to postpone the running of the statute of limitations by willfully closing his eyes, ostrich-like, to a known probability that he has been injured, even if he is not certain." *Lopez-Betancourt v. Loyola Univ. Chicago Stritch School of Medicine*[53] (Emphasis and italics added). As the House Report for the HEAR Act relates, courts throughout the U.S. consistently have invoked the failure of Nazi victims and their heirs to

---

[46]    2016 Ill.App. 160672 (2016), ¶ 23, 68 N.E.3d 1046, 1053 (2016).

[47]    285 Ill.App.3d 713, 716 (1997), 675 N.E.2d 275, 277 (1997).

[48]    2016 Ill.App.2d 150286 (2016), ¶ 40, 49 N.E.3d 869, 883 (2016).

[49]    *Nelson v. Sotheby's Inc.*, 115 F.Supp.2d 925, 929–30 (N.D. Ill. 2000).

[50]    166 Ill.2d 72, 77 (1995), 209 Ill.Dec. 684, 651 N.E.2d 1132 (Ill.1995).

[51]    158 Ill.2d 240 (1994), 198 Ill.Dec. 786, 633 N.E.2d 627, 631 (1994).

[52]    *Id.*

[53]    No. 16-CV-11565, 2019 WL 4166867, at *5 (N.D. Ill. Sept. 3, 2019).

investigate potential claims for the restitution of Nazi-confiscated artworks as the basis for time-barring judicial actions for the recovery of these materials.[54] Indeed, Congress enacted the HEAR Act expressly to redress this preclusion.[55]

In addition, and as the House Report points out, the discovery rule imputes a victim's knowledge to later heirs – and this is the law in Illinois as well.[56]

The foregoing principles long have time-barred any judicial remedy of the Heirs to recover the Painting. The FAC confirms that Elsa was fully aware that the Nazis were persecuting her husband relentlessly and systematically, and that she participated integrally in a defensive plan to mitigate the effects of escalating Nazi persecution and predation and to preserve and protect as much property as possible.[57] Beyond doubt Elsa knew: (1) that intensifying Nazi persecution had compelled the couple to move from their downtown Berlin mansion on *Alsenstrasse* (Alsen Street) to a modest garden home in a secluded part of Berlin in or around September 1933 to mitigate perpetual Nazi surveillance;[58] (2) that Paul purchased a Bavarian farm house in her name in the Fall of 1934 to transfer a portion of his wealth to an asset that appeared to be owned by an "Aryan;"[59] and (3) that she had entered into a Contract of Inheritance with Paul in February 1935 that falsely recited that he had gifted his entire art modern collection to her when they married in 1927, knowing that this recital sought to create the fictitious appearance that Paul's art collection was "Aryan" owned since before the Nazis assumed power in January 1933.[60] Elsa also compiled an inventory of the residual artworks that she owned after Paul died (hereinafter "Elsa's List"), further confirming that she was aware that

---

[54]  *See, e.g.,* House Report, n. 22.

[55]  House Report § I (Background and Purpose).

[56]  *Id. See also Meeker v. Summers*, 70 Ill.App.3d 528, 529 (1979), 388 N.E.2d 920, 921 (1979)("If a former owner has a right to recover personal property but fails to initiate a replevin action within 5 years after that right accrues, the statute of limitations bars any later action").

[57]  FAC ¶¶ 184-199.

[58]  FAC ¶ 152.

[59]  FAC ¶¶ 189-191.

[60]  FAC ¶ 22.

Nazi persecution had compelled her husband to relinquish many of his prized artworks from 1933 until his death in May 1935.[61] For example, *Sunflowers* hung on the wall at the couple's country estate at *Boernicke*.[62] Doubtless Elsa would have noticed when Paul removed the Painting from the wall and transferred it to Galerie Rosenberg in or around 1934. In fact, Elsa's List does not include *Sunflowers* – or any of the other van Gogh works that Paul sold at Galerie Rosenberg – so it is beyond dispute that Elsa knew that Nazi persecution compelled Paul to sell these materials.[63]

The foregoing confirms that Elsa was on ***actual*** – rather than merely constructive – notice that the Painting sold the Painting under Nazi duress in or around 1934.[64] Accordingly, the Illinois discovery rule then imposed an affirmative obligation upon her to investigate this loss diligently in order to suspend the running of the relevant limitation period. *Nelson v. Sotheby's Inc.;*[65] *Hermitage Corp. v. Contractors Adjustment Co.;*[66] *Jackson Jordan, Inc. v. Leydig Voit & Mayer.*[67] Elsa's failure at this juncture, however, to pursue diligently her claim to recover the Painting resulted in the claim soon being time-barred.[68] So by 1940 – at the latest – the judicial claim of Elsa ***and her legal successors*** (the Heirs) to recover the Painting was time-barred under the applicable Illinois five-year statute of limitations and under the concomitant Illinois discovery rule.[69]

Because the Heirs' claim was time-barred by 1940 at the latest, beyond doubt the six year HEAR Act statute of limitations began to run on December 16, 2016 when the Act became law.

---

[61]   Byrne Declaration ¶¶ 11b-11d, Exhibits 4-6.

[62]   *See* Byrne Declaration ¶11a; Exhibit 3.

[63]   Byrne Declaration ¶ 11c, Exhibits 5-6.

[64]   *See* Byrne Declaration, ¶ 11.

[65]   115 F.Supp.2d at 929–30.

[66]   166 Ill.2d at 77, 209 Ill.Dec. 684, 651 N.E.2d 1132 (Ill.1995).

[67]   158 Ill.2d 240, 198 Ill.Dec. 786, 633 N.E.2d 627, 631 (1994).

[68]   Elsa did no investigation up to the time of her death in 1986 to locate or make claims for any of the lost art (Byrne Declaration § 11(e)), but instead "willfully [closed her] eyes, ostrich-like, to a known probability that she had been injured." *Lopez-Betancourt*, 2019 WL 4166867, at *5.

[69]   *See Meeker v. Summers, supra*, p. 18 n.56, 70 Ill.App.3d at 529, 388 N.E.2d at 921.

Finally, the Heirs' claim likewise cannot be untimely under HEAR Act §5(e), since this exception only applies if plaintiffs had a timely claim at some point between January 1, 1999 and December 16, 2016 (the date the HEAR Act became law). Clearly, the Heirs had no such claim.

> **3.** **Rather than Falling Outside the HEAR Act's Coverage, the Heirs' Claim Instead Represents Precisely the Type of Claim that the HEAR Act Was Designed to Revive**

The HEAR Act Findings determine that state statute of limitations have imposed significant procedural obstacles upon claimants like the Heirs.[70] The Act relates that these statutes typically barred claims unfairly, and notes that some Nazi victims – like the Heirs in this case – "the claims expired before World War II even ended"[71] (citing *Detroit Institute of Arts v. Ullin*[72]). Moreover, the Act asserts further that "the unique and horrific circumstances of World War II and the Holocaust make statutes of limitations especially burdensome to the victims and their heirs," since those seeking the recovery of Nazi-confiscated art must "painstakingly piece together their cases from a fragmentary historical record ravaged by persecution, war, and genocide" such that the "costly process" often cannot be done within the time constraints imposed by existing law."[73]

To rectify the foregoing unfairness, the HEAR Act identifies its purposes (Purposes, Section 3), as ensuring that "laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration."[74] And to ensure that claims like the Heirs "are not unfairly barred by statutes of limitations but are resolved in a just and fair manner."[75]

---

[70]     HEAR Act, Findings, Section 2, ¶ (6).

[71]     HEAR Act, Findings, Section 2, ¶ (6).

[72]     No. 06–10333, 2007 WL 1016996 (E.D. Mich. Mar. 31, 2007).

[73]     HEAR Act, Findings, Section 2, ¶ (6).

[74]     *Id*.

[75]     *Id*.

Congress passed the HEAR Act specifically to revive claims like the Heirs' in this proceeding. As noted, the Act cited *Ullin* which – like the Heirs' claim – involved a Nazi victim whose claim was barred before World War II ended in order to illustrate the inherent inequity and injustice of applying normative state statutes of limitations to judicial claims seeking to recover Nazi-confiscated artworks like the Painting.[76] Moreover, as is evident from the FAC, the Heirs' claim is based upon extensive, expensive, and time-consuming research made even more burdensome by "a fragmentary historical record ravaged by persecution, war, and genocide."[77]

Importantly, the Act has worked precisely as intended for the Mendelssohn Heirs. As noted in the Byrne Declaration, in 2020 the National Gallery of Art (hereinafter "NGA") in Washington, D.C. returned Pablo Picasso's *Head of a Woman* to the Mendelssohn Heirs, based upon the same essential factual basis as this case. The Heirs' claim in that matter – like their claim here – was made possible only by the HEAR Act. In fact, the Mendelssohn Heirs originally had demanded the return of *Head of a Woman* in 2006, but abandoned their effort because the applicable District of Columbia statute of limitations time-barred their claim. The Heirs' renewed demand letter to the NGA of September 11, 2017 acknowledged that they had foregone their 2006 demand for the return of *Head of a Woman* because their judicial claim was time-barred, but that the HEAR Act had revived their claim and made it timely.[78] After reviewing the evidence, the NGA returned *Head of a Woman* to the Heirs in 2020.

In sum, the HEAR Act was specifically intended to help claimants like the Heirs in this proceeding to receive a fair opportunity on the merits to recover their property in accordance with U.S. policy.

---

[76]    Indeed, as set forth in the Byrne Declaration ¶ 8, the case of *Schoeps v. MoMA* (a copy of which is attached as Exhibit 2 to the FAC) was the only case filed against a U.S. museum for the return of Nazi era art to progress past a motion to dismiss or summary judgment until the HEAR Act was enacted.

[77]    HEAR Act, Findings, Section 2, ¶ (6).

[78]    *See* Byrne Declaration, ¶ 9 and Exhibit 2.

21

### B. No Putative Exception to the Threshold Requirement of the *Forum Non Conveniens* Doctrine that a Petitioner Demonstrate an Adequate Alternative Forum Applies to this Proceeding

The Reply also argues that a putative exception to the HEAR Act excuses the Defendants' failure and inability to satisfy the threshold requirement for invoking the doctrine of *forum non conveniens* that Japan affords an adequate alternative forum in which the Heirs' claims can be litigated upon their substantive merits.[79] But as demonstrated, *infra* – and as Defendants' expert concedes – the Heirs have no viable judicial remedy to reclaim *Sunflowers* in Japan as the Japanese law of prescription conferred title upon the Defendants in 2007. ***Moreover, the prohibitive cost to the Heirs of litigating their claim in Japan would make a dismissal of this case based upon the doctrine of forum non conveniens tantamount to a dismissal with prejudice.***

### 1. As an Initial Matter this Proceeding Does Not "Belong" in Japan as Defendants Baselessly Contend

As a threshold matter – and for several imperative reasons – this proceeding does not "belong" in Japan as Defendants repeatedly insist.[80] In the final analysis, because the Heirs have no viable judicial remedy in Japan to recover *Sunflowers* then as a matter of law Japan is ***not*** an adequate alternative forum. Moreover – and as discussed comprehensively – transferring the Heirs' claims to Japan will sabotage the acute governmental interests of both the U.S. and its fellow Terezin Declaration signatory nations by permitting the Defendants to continue to defraud the insurance markets in these states by commercially exploiting what they know to be a Nazi-confiscated painting. So dismissing this proceeding based upon the doctrine of *forum non conveniens* will violate the foundational equitable maxim that precludes wrongdoers from taking advantage of their own malfeasance.

---

[79]   Reply at 22-23.

[80]   *See, e.g.*, Reply at 1.

22

Most certainly the Heirs have in no way conceded that Japan is an "adequate" forum as Defendants assert.[81]

### 2. The Heirs Did Not Purposefully Permit the Relevant 20 Year Japanese Prescriptive Period to Expire in Order to Take Advantage of a [Non-Extant] Contemporaneously Viable U.S. Statute of Limitations

The Reply mistakenly contends that *Chang v. Baxter Healthcare Corp.*,[82] exempts them from the threshold requirement for invoking the *forum non conveniens* doctrine[83]which entails either that they: (1) demonstrate that Japan affords an adequate and alterative forum in which the Heirs' several claims can be adjudicated upon their substantive merits, or, alternatively: (2) agree to waive the 20 year Japanese prescriptive period and prove that a Japanese court would accept such waiver.[84] *Chang* acknowledged a narrow exception to this requirement when plaintiffs strategically permit a viable limitation period in an alternative forum to expire in order to file suit in a preferred forum "(with the longer limitations period) and arguing that the alternative forum is inadequate."[85]

Defendants' contentions are false and wholly without merit. First, as discussed *supra*, Plaintiffs claims have been time-barred since 1940 at the latest.[86] Second, and as discussed at length in the Byrne Declaration, the Heirs were not aware of their claim to recover *Sunflowers* before the Defendants obtained title to the Painting under the Japanese law of acquisitive

---

[81]    Reply at 21.

[82]    599 F.3d 728, 736 (7th Cir. 2010).

[83]    Reply at 22-23.

[84]    Because Sompo Japanese Insurance Inc. purchased the Painting at Christie's in London in 1987, the Japanese law of acquisitive prescription would have expired in 20 years from that date, that is, 2007. *See* Kanno Dec. at VI.A.

[85]    599 F.3d at 736.

[86]    *See also* Byrne Declaration, ¶ 11.

prescription in 2007, and so could not have tactically foregone filing a claim to recover *Sunflowers* in Japan in order to take advantage of a purportedly viable contemporaneous federal or state statute of limitations as Defendants contend.[87]

The Heirs learned of their potential claim for *Sunflowers* only in 2008, that is, one year **after** Defendants had acquired ownership of the Painting under the Japanese law of acquisitive prescription.[88] Before 2008, the Heirs had determined that Mendelssohn-Bartholdy had owned the Painting at some juncture, but were unable to ascertain when he or his wife Elsa sold it, *i.e.*, whether Paul sold the work before he died in 1935 in Nazi Germany or whether his widow Elsa sold it after World War II.[89] In 2008, the Heirs subpoenaed the 1930's Paris records of Galerie Rosenberg (hereinafter "Galerie") – which were located in New York City in 2008 – in *Schoeps v. MoMA*[90] (*see* copy of this decision, attached to the FAC as Exhibit 2).[91] At this juncture – 2008 – after reviewing the relevant Galerie records, Plaintiffs could finally determine that Paul sold *Sunflowers* in or around 1934. Accordingly, in 2008, the Heirs first learned that Paul had sold the Painting under Nazi duress and that they were the true owners.[92]

As the Byrne Declaration relates, the Heirs determined in 2008 that their claim for recovery of the Painting in Illinois was barred by the Illinois statute of limitations,[93] and their claim only became judicially viable when the HEAR Act was enacted in 2016.[94] So the Heirs in no way strategically delayed filing a claim in Japan before the 20-year prescriptive period

---

[87] Byrne Declaration ¶ 4.

[88] Byrne Declaration, ¶ 6.

[89] Byrne Declaration, ¶ 5.

[90] 594 F.Supp.2d 461.

[91] Byrne Declaration, ¶ 6.

[92] Byrne Declaration, ¶ 6.

[93] *See* Byrne Declaration ¶¶ 7-10; Ill. Comp. Stat. 5/13 205.

[94] In 2020, the National Gallery of Art (NGA) in Washington, D.C. returned Pablo Picasso's *Head of a Woman* to the Heirs based upon the same basic facts as this case. (*See* Byrne Declaration ¶ 9-10. As the Heirs noted in their 2017 NGA demand letter, they had abandoned their 2006 request for the return of *Head of a Woman* since they knew it was time-barred, but were renewing their claim because the HEAR Act made it timely.

expired in 2007 to take advantage of a putatively longer limitation period in some preferred forum. *In fact, in 2008 no such alternative and contemporaneously viable statute of limitation existed.*

Ironically, the Defendants proactively precluded the Heirs from learning about their claim to recover *Sunflowers* while the Japanese prescriptive period was still viable when in 2001 they brought the Painting to the Van Gogh exhibition in Chicago and elided Mendelssohn-Bartholdy's name from the provenance in violation of an affirmative duty that they owed the Heirs under Illinois law to help them recover the Painting. The Defendants also filed a false report with the Department of State that would permit them to display the Painting in Chicago without fear that the U.S. government would seize it as Nazi contraband. The FAC alleges that in 2001 the Defendants *fraudulently concealed* the Heirs' claim to the Painting when – in knowing violation of both the National Stolen Property Act[95] as well as the proscription against filing a false report with a federal agency[96] – they brought the Painting to the Exhibition to commercially exploit and to further their branding and marketing imperative to identify *Sunflowers* maximally with their collective corporate identity.[97]

### 3. The Reply Makes the Inability of the Defendants to Demonstrate that Japan is an Adequate Alternative Forum for Adjudicating the Heirs' Claim All the More Conspicuous

The Reply represents the *second* time that Defendants have failed to satisfy the threshold requirement for invoking the doctrine of *forum non conveniens*, and to demonstrate that Japan affords an adequate alternative forum in which the several claims of the Heirs can be litigated on their substantive merits. The Defendants obtained title to the Painting in 2007 under the

---

[95]   18 U.S.C. §§ 2314-15.

[96]   18 U.S.C. § 1001.

[97]   *See, e.g.*, FAC at ¶¶ 33, 106; Byrne Declaration, ¶ 5.

prescriptive law of Japan based upon 20 years of their bad faith possession, aided by their fraudulent concealment of the Heir's claim in 2001. Defendants cannot waive this prescription, and no Japanese court would enforce such waiver.

That Defendants now concede that they cannot satisfy this stricture– and instead invoke a putative exception to this threshold requirement that they cannot fulfill (as discussed in the preceding section) – requires the Court as a matter of law to deny Defendants' motion to dismiss this proceeding based upon *forum non conveniens*.

> **4. That U.S. Law – and the Signal U.S. Domestic and Foreign Policies that Govern the Heirs' Claims –Makes a Dismissal Based Upon the *Forum Non Conveniens* Doctrine All the More Unconscionable**

> **a. A Threshold Choice of Law Analysis Helps Crystalize the Overarching Governmental Interests of the U.S. in this Controversy and that a Dismissal Based Upon *Forum Non Conveniens* Would Sabotage These Interests**

When addressing a petitioned dismissal on grounds of *forum non conveniens*, the Tenth Circuit makes two – rather than a single – threshold inquiries.[98] Initially, the Tenth Circuit – as does the Seventh – questions whether the defendant has identified an adequate alternative forum in which the plaintiff's claims can be adjudicated fairly and on their substantive merits.[99] But the Tenth Circuit also inquires preliminarily whether U.S. law applies to the dispute, and if it does, then the proceeding cannot be dismissed based upon *forum non conveniens*. As the court instructed in *Needham v Phillips Petroleum Company of Norway,*[100] "[i]n order to apply the

---

[98]    *Archangel Diamond Corp. Liquidating Trust*, 812 F.3d 799, 804 (10th Cir. 2016), instructing that "[f]irst, there must be an 'adequate alternative forum where the defendant is amenable to process'…Second, 'the court must confirm that foreign law is applicable … because *forum non conveniens* is improper if foreign law is not applicable and domestic law controls….'"; *see also, e.g., Unitednet, Ltd. v. Tata Commc'ns Am., Inc.*, No. 1:21-cv-01081-KWR-JFR, 2023 WL 2665578, at *5 (D.N.M. March 28, 2023).

[99]    *Ibid*.

[100]   719 F.2d 1481, 1483–84 (10th Cir. 1983).

doctrine of *forum non conveniens*, the trial court must conduct a choice of law analysis in order to determine whether American or foreign law governs. If American law is applicable to the case, the *forum non conveniens* doctrine is inapplicable."

While the Seventh Circuit does not apply this approach, a threshold choice of law determination necessarily helps crystallize the essential public policy foundation of the *forum non conveniens* doctrine: if U.S. law unequivocally applies to the substantive claims and defenses of the parties, then the U.S. has sufficiently compelling governmental interest to retain the case, while entrusting the case to a foreign court all but certainly will sabotage these imperative and predominant governmental interests.

Accordingly, a threshold determination that U.S. law necessarily governs the Heirs' claims in this proceeding and that, moreover, the exceeding bad faith of Defendants estops them from asserting the prescriptive law of Japan in this controversy underscores why the Court must deny their motion to dismiss this proceeding based upon the doctrine of *forum non conveniens*.

> **b. That Both Congress and the President Intended that the HEAR Act Apply to the Fullest Extend that the U.S. Constitution Permits Precludes the Court from Applying the Japanese Law of Acquisitive Prescription to the Heirs' Claims**

Comment b to § 6 of the *Restatement (Second) of Conflict of Laws* (1971) relates that when the legislature has prescribed an intended range for applying a particular statute, courts will follow that directive even when normative choice of law principles would select the law of another state as governing. Comment b states as follows:

b. Intended range of application of statute.

…

Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice of law criteria.

27

The HEAR Act evinces an unequivocal intent that U.S. courts apply it to ***ensure*** that claims for the recovery of Nazi-confiscated artworks like the Painting are resolved fairly and on their substantive merits, and identifies the Terezin Declaration as prescribing relevant U.S. policy in this context. Section 3 of the HEAR Act provides as follows:

> **SEC 3. PURPOSES.**
>
> The purposes of this Act are as follows:
>
> (1) To ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration.
>
> (2) To ensure that claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitation but are resolved in a just and fair manner.

The 2009 Terezin Declaration (Declaration) commits each signatory nation to make certain that their respective legal systems – to the extent possible – entertain claims for the recovery of Nazi-confiscated artworks like the Painting and that these claims are resolved expeditiously and based upon the specific facts and merits of the claim. Moreover, the Declaration also enjoins all signatories – to the extent possible – to resolve all conflicts of law questions in favor of adjudicating claims for the recovery of Nazi-confiscated artworks. Paragraph 3 of the heading **"Nazi-Confiscated and Looted Art"** prescribes as follows:

> 3. Keeping in mind the Washington Conference Principles on Nazi-Confiscated Art, and considering the experience acquired since the Washington Conference, we urge all stakeholders to ***ensure*** that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and ***to make certain*** that claims to recover such art are resolved expeditiously and based on the facts and merits of the claim and all the relevant documents submitted by the parties. ***Governments should consider all relevant issues when applying various***

28

> ***legal provisions that may impede the restitution of art and cultural property***, in
> order to achieve just and fair solutions, as well as alternative dispute resolution,
> where appropriate under law.(Emphasis and italics supplied).

Conjunctively these provisions confirm the unequivocal policies of both political branches of the
U.S. responsible for conducting foreign policy – the President and Congress – that U.S. courts
should facilitate claims for the recovery of Nazi-confiscated artworks like the Painting to the
maximum extent that the U.S. Constitution permits and resolve these claims expeditiously, fairly,
and based upon their substantive merits.[101] Congress and the President then have stated jointly an
intended range for applying the HEAR Act within the meaning of comment b. to § 6. And the
intended scope of the HEAR Act – and articulated so clearly – would preclude the Court from
applying the Japanese law of acquisitive proscription to the Heirs' claims, even assuming,
*arguendo*, that the relevant discrete choice of law inquiries otherwise directed that Japanese law
apply (which they most certainly do not), as subsection g below confirms.

### c. The Doctrine of Comity – Which Presupposes the "Utmost Good Faith" – Entails that the Court Decline to Entertain an Argument that the Japanese Law of Prescription Expunges the Heirs' Claims

Any claim of Defendants for applying the Japanese law of prescription in this proceeding
is grounded exclusively upon the doctrine of international comity. International law in no way
obligates any state to give effect to the laws that another states prescribes and enforces – such as

---

[101]    Because both Congress and the President express this policy unequivocally, it occupies the status of
"zone one" foreign policy within the tripartite scheme that Justice Jackson famously formulated in
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952). The Supreme Court – as well as
other authorities – have made clear that when both Congress and the President agree upon a particular
foreign policy, that policy preempts – as a matter of federal Constitutional law – any state law or policy
that conflicts with or impairs this objective. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S.
363, 374–81 (2000).

the Japanese law of prescription in this proceeding – if such refusal is merely reasonable.[102] And because comity entails that the Defendants act in good faith, it precludes the Court from entertaining any argument that the Japanese law of prescription bars the Heirs' claims.

The Supreme Court long ago made clear that the doctrine of comity represents neither an obligation nor a mere courtesy, but rather duly recognizes the legitimate interests that a foreign nation may have in applying its law in a particular context. As the Court instructed in *Hilot v. Guyot*[103] comity is:

> neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other person who are under the protection of its laws.

And the Court has said that international choice of law decisions – such as presented in the case at bar – from inception have been linked to comity.[104] Most importantly, the Court long ago made clear that comity "is founded on the supposition of ***utmost good faith***, and there must be a perfect reciprocity in order to support it."[105] (Emphasis and italics added.) The Court has continued to equate comity with good faith.[106]

---

[102]     Section 9 of the *Restatement (Second) of the Law of Foreign Relations* (1965) prescribes as follows:

A state is not required by international law to give effect to a rule prescribed or enforced by another state that has jurisdiction to prescribe or enforce, so long as its refusal to give effect is not arbitrary according of rules of the conflict of laws of states that have reasonably developed legal systems.

[103]     159 U.S. 113, 163–64 (1895).

[104]     *See, e.g. Societe Nat'l Industielle Aerospatial v. United States Dist. Court for the Southern Dist. of Iowa*, 482 U.S. 522, 555 (1987), instructing that "[a] s the choice of law analysis, which from ***the very beginning has been linked to international comity,*** the threshold question in comity analysis is whether there is in fact a true conflict between domestic and foreign law." (Emphasis and italics added).

[105]     *The Arrogante Barcelones*, 20 U.S. 496, 512 (1822).

[106]     *See, e.g. McGirt v. Oklahoma*, 140 S.Ct. 2452, 2481 (2020), alluding to "the spirit of good faith, 'comity and cooperative sovereignty'."(Citation omitted)

The extensive and extreme bad faith and perpetual fraud of Defendants in mishandling the Painting in Illinois and throughout the U.S. – discussed at length – repudiate any argument that the Defendants otherwise might have for invoking the doctrine of comity as a basis for their claim of acquisitive prescription under the law of Japan.

> **d.    The Defendants' Fraudulent Concealment of the Heirs' Claim in 2001 to Recover *Sunflowers* under the Japanese Law of Prescription *Equitably Estops* Them from Now Asserting this Defense**

The Defendants are equitably estopped from asserting the Japanese law of prescription as a defense to the Heirs' claims because in 2001 they fraudulently concealed their right to pursue a judicial remedy to recover the Painting in Japan, and the Japanese prescriptive period since has run, thereby permanently foreclosing this opportunity. As the Seventh Circuit explained in *Portmann v. United States*[107]:

> The doctrine of equitable estoppel precludes a litigant from asserting a claim or defense which might otherwise be available to him against another party who has detrimentally altered her position in reliance on the former's misrepresentations or *failure to disclose some material fact*. *See* 3 J. Pomeroy *Equity Jurisprudence* § 804 at 189 (5th ed. 1941; Note, *Equitable Estoppel of the Government*, 47 Brooklyn L. Rev. 423, 424 (1981). (Emphasis and italics added)

In *In re: Emerald Casino Inc*.,[108] the court identified the discrete elements of equitable estoppel as: "(1) misrepresentation or [failure to disclose a material fact] by the party against whom estoppel is asserted; (2) reasonable reliance by the party asserting estoppel; and (3) detriment to the party asserting estoppel." And as the court instructed in *Socha v. Boughton,*[109] "[e]quitable

---

[107]    674 F.2d 1155, 1158 (7th Cir. 1982); *see also Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992)("[e]quitable estoppel is a doctrine which precludes one party form asserting a claim or defense against another party which has detrimentally altered her position in reliance on the former's misrepresentations or failure to disclose a material fact"); *Woodstock/Kenosha Health Ctr. v. Schweiker*, 713 F.2d 285, 289–90 (7th Cir. 1983)(equitable estoppel precludes a party from asserting an otherwise valid claim or defense…").

[108]    622 B.R. 44 (Bankr. N.D. Ill. 2020).

[109]    763 F.3d 674, 683 (7th Cir. 2014).

31

estoppel … applies to a limitations period when a party takes active steps to prevent an adversary from suing on time." Moreover, "[e]quitable estoppel in the limitations period is sometimes … called fraudulent concealment."[110]

The Defendant's misconduct with the Painting in Chicago in 2001 satisfies the discrete elements of equitable estoppel sufficient to preclude them from asserting a defense of acquisitive prescription. First the Defendants – in breach of an affirmative duty to help the Heirs recover the Painting under Illinois law – failed to disclose material facts to them by eliding Mendelssohn-Bartholdy's name from the provenance of the Painting at the 2001 Chicago van Gogh Exhibition.[111] The Defendants also colluded with the Art Institute of Chicago to file a false report with the State Department to obviate the possibility that the federal government might seize the Painting – and on the Heirs' behalf – as Nazi contraband, and to ensure that they could commercially exploit the Painting to realize branding and marketing benefits in the unique forum that Illinois afforded for this opportunity.

Second, the Heirs have "relied" upon the Defendants' concealment of their claim by not bringing a judicial action to recover the Painting under the Japanese law of prescription, which opportunity did not expire until 2007 when the 20-year prescriptive period for obtaining title to property through bad faith possession terminated.

Third, the Defendants' misconduct has prejudiced the Heirs by depriving them of an opportunity to recover the Painting under Japanese law. So having fraudulently concealed the Heirs' claim to recover the *Sunflowers* before the 20-year prescriptive period in Japan had expired – and when the Heirs had a viable judicial remedy in Japan to recover the Painting – the Defendants are now equitably estopped from raising the Japanese prescriptive period as a defense in this proceeding.

---

[110]  *Shropshear v. Corp. Counsel of the City of Chicago*, 275 F.3d 593, 595 (7th Cir. 2001).

[111]  *See* FAC ¶ 73; FAC Exhibit 12.

32

### e. Applying the Japanese Law of Prescription – in this Discrete Context – Would Impermissibly Violate Foundational Public Policies of Both Illinois and the U.S.

The Court also should refuse to apply the Japanese law of prescription in this proceeding because to do so would violate elemental public policies of both Illinois and the U.S. Applying the Japanese law of prescription would occasion unconscionable results, sabotage multiple essential governmental interests of both Illinois and the U.S., thereby impairing the welfare of Illinois and U.S. citizens, while rewarding Defendants for their bad faith and extended malfeasance with the Painting.

It is axiomatic that a U.S. court will not apply foreign law that offends the bedrock public policy of the forum state. As Section 90 of the *Restatement (Second) Conflict of Laws* (1971) prescribes:

### § 90 Action Contrary to Public Policy

No action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum.

While Illinois courts have expressed this "public policy" principle in slightly varying ways, the Defendants extensive and prolonged malfeasance and fraudulent misconduct with the Painting satisfies every substantive concern that inheres in this proscription. *See, e.g.*, *Spinozzi v. ITT Sheraton Corporation,*[112] entailing an "'***evil or repugnant result'*** for the public policy exception to apply."[113] (Citation omitted, and emphasis and italics supplied); *Rollins v. Ellwood,*[114] ("***contrary to public morals, natural justice, or general interest of Illinois citizens***"[115]

---

[112]    174 F.3d 842, 847 (7th Cir. 1999),

[113]    *See also Haskins v. Midwest Air Traffic Control Serv., Inc.*, 2016 WL 3653531 (N.D. Ill. 2016), quoting *Spinozzi*, 174 F.3d at n.11.

[114]    *Rollins v. Ellwood*, 141 Ill.2d 244, 1308 (1990).

[115]    *See also, e.g., Schoeberlein v. Purdue Univ.*, 544 N.E.2d 283, 285 (Ill. 1989)*; Wintersteen v. Nat'l Cooperage & Woodenware Co.*, 197 N.E. 578, 582 (Ill. 1935).

33

(Emphasis and italics supplied); *Champagnie v. W.E. O'Neil Construction Co.*,[116] (" a court should not refuse to apply the law of a foreign state, however unlike its own, unless it is ***contrary to pure morals or abstract justice, or unless the enforcement would be of evil example and harmful to its own people.")* (Emphasis and italics supplied); *Lyons v. Turner Construction Co.*,[117] "violate some '***fundamental principle of justice, some prevalent conception of morals, some deep seated tradition of the commonweal.'"*** (Citation omitted, emphasis and italics supplied).

Applying the Japanese prescriptive period to this proceeding to expunge the Heirs' claim would violate each of these slightly varying formulations. Moreover, applying Japanese law in this proceeding would reward the Defendants' prolonged and extensive bad faith misconduct and fraudulent commercial exploitation of the Painting to the continuing detriment of both Illinois and U.S. citizens, as well as undermine the "zone one" U.S. foreign policy to restore Nazi-confiscated artworks like the Painting to rightful owners such as the Heirs.

### f. Choice of Law Principles Pertaining to When a Forum State Will Recognize Title by Prescription under the Law of a Foreign State Preclude Applying the Japanese Law of Prescription to the Heirs' Claims

While § 246 of the *Restatement (Second) Conflicts of Laws* (1971) entitled "Acquisition by Adverse Possession of Prescription or Interest in Chattel" prescribes that whether a transfer of title by prescription has occurred will be determined by the "local law of the state where the chattel was at the time the transfer is claimed to have taken place," § 247 ("Moving Chattel into Another State: Effect on Title") qualifies this result when the putative owner "deals with" the chattel in another state: [i]nterests in a chattel are not affected by the mere removal of the chattel to another state. ***Such interests, however, may be affected by dealings with the chattel in the***

---

[116]    77 Ill.App.3d 136, 992 (1979).
[117]    195 Ill.App.3d 36, 1065 (1990).

*other state."* (Emphasis and italics supplied). As one commentator related, "[i]f tangible movables are brought to another country, however, the second country applies its law only to *facts that occur after they cross the border."* (Emphasis and italics supplied).

These principles confirm that the Defendants forfeited any otherwise potentially secure claim to title by prescription under Japanese law when they brought the Painting to the Chicago Exhibition in 2001, and "dealt with" the Painting by fraudulently concealing the Heirs' claims to recover it, while defrauding the U.S. government – in conjunction with AIC – into issuing a certificate of non-judicial seizure that would enable the Defendants to commercially exploit the Painting to realize their intended branding and marketing objective, and committing the extensive wrongdoing delineated in the FAC.[118] As discussed above, by dealing with the Painting in Illinois in a pervasively fraudulent, tortious, and criminal manner that impaired not only the interests of the Heirs, but also sabotaged compelling U.S. foreign policy and international diplomatic interests, Defendants are equitably estopped and otherwise precluded from asserting title to the Painting under Japanese law.

g. **General Choice of Law Principles Prescribed in §§ 6 and 145 of the Restatement (Second) Conflict of Laws Direct that U.S. Law – and Not the Japanese Law of Prescription – Govern the Heirs' Claims**

Finally – and even assuming *arguendo* that the foregoing considerations did not preclude applying the Japanese law of prescription in this proceeding – the general principles that govern all choice of law determinations and expressly those concerning torts – counsel the Court to apply U.S. law to the Heirs' claims.[119] As comment b to §145 instructs, "[t]he principles stated in

---

[118]   *See, e.g.,* FAC ¶¶ 72-76; 102-106(a-l).

[119]   Section 6 of the *Restatement (Second) of Conflicts of Law* (1971) states the guiding principles that inform all choice of law decisions as follows:

   **§ 6 Choice of Law Principles**

   (1) A court, subject to constitutional restrictions will follow a statutory directive of its own state on choice of law.

   (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

§ 6 underlie all rules of choice of law" and help evaluate the significance of a particular issue or relationship with a state for choice of law purposes. Moreover, "[t]he factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field,"[120] and "[v]arying weight will be given to a particular factor, or group of factors, in different areas of choice of law."[121]

Each of the discrete criteria that § 6 identifies as properly informing choice of law decisions commends applying U.S. law – and ***not*** the Japanese law of prescription – to the Heirs' claims as follows:

### *(a) The needs of the interstate and international systems:*

Comment d to § 6 instructs that "the most important function of choice- of- law rules is to make the interstate and international systems work well", and "a state should have regard for the needs and policies of other states and of the community of states." That Sompo International does business throughout the U.S with offices in many cities - and thereby violates the laws and public policies of each such state by wrongfully employing the Painting to generate sales - signals an important need of the U.S. interstate system of law. And the Court can address this concern only by adjudicating the Heirs' claims on their substantive merits.

And that the 46 nations that signed the Terezin Declaration share a collective interest in ensuring that claims for the restitution of Nazi-confiscated artworks like the Painting are

---

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 145 of *Restatement (Second) of Conflicts of Law* (1971 prescribing general choice of law rules that apply to torts, affirm that these § 6 factors apply to tort issues.

[120] Comment b to § 145.

[121] Comment c to § 6.

resolved on their substantive merits registers an important need of the international system of law in this context. The Terezin Declaration obligates each signatory nation to ensure – to the maximum extent possible – that its discrete legal system accommodates this objective. Accordingly, applying U.S. law to make certain that the Heirs' claim is resolved on its substantive merits – rather than negated by the Japanese law of prescription – promotes the needs of the international legal system in this context as well.

**(b) The relevant policies of the forum:**

The relevant policies of Illinois – not only the forum state but where the Defendants' committed their misconduct and where the injury was felt – give Illinois the decisive interest in applying Illinois and U.S. law to this controversy. As comment e to § 145 states, the state where misconduct occurs has a dominant interest in supplying the relevant rule of decision pertaining to standards of conduct. Illinois also has a predominant interest in applying its law to this litigation because "persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury."[122] Accordingly, "and subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection…."[123]

**(c) The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue:**

Many U.S. states other than Illinois as well as foreign nations share an interest that Illinois apply its own law as well as U.S. law to this controversy. Comment f to § 6 prescribes that "[i]n determining a question of choice of law the forum should give consideration no only to its own relevant policies…but also to the relevant policies of all other interested states. The

---

[122]    Comment e to § 145.

[123]    *Ibid.*

forum should seek to reach a result that will achieve the best possible accommodation of these policies." As noted, defendant Sompo International operates nationally and maintains "brick and mortar" offices in some 17 U.S. cities. Moreover, Sompo International operates in multiple countries – including the U.S., U.K. (Bermuda), Canada, Germany, Italy, Luxembourg, Spain, and Switzerland – that are signatories to the Terezin Declaration. Applying Illinois and U.S. law to this controversy will promote the foundational governmental interests of other U.S. states as well as Declaration signatory countries. By fraudulently commercially exploiting the Painting in these states and countries, the Defendants similarly violate their bedrock public policies proscribing torts, crimes and consumer deception, as well as the uniform foreign policy pf each of these nations favoring the expeditious return of Nazi-confiscated artworks to rightful owners such as the Heirs.

### *(d) The protection of justified expectations:*

The reasonable protection of justified expectations in this proceeding ***mandates*** that the Court apply U.S. law to the Heirs' claims. Section 2(6) of the HEAR Act acknowledges the extensive resources that those seeking to recover Nazi-confiscated artworks must invest in this goal, and for that reason extends the relevant statute of limitations to permit them to do so: "[t]hose seeking recovery of Nazi-confiscated art must painstakingly piece together their case from a fragmentary historical record ravaged by persecution, war, and genocide. This costly process often cannot be done within the time constraints imposed by existing law."

Unless the Court applies U.S. law to promote the declared objective of the HEAR Act to ensure that the Heirs' claims for the recovery of the Painting and for unjust enrichment are resolved fairly and on their substantive merits, the extensive resources that the Heirs have invested in affirmatively relying upon the promise of the HEAR Act will have been squandered, and their justified expectations in this regard frustrated.

Moreover, applying U.S. law to this controversy also – but somewhat ironically – fulfills the "justified expectations" of the Defendants when in 2001 they proactively concealed from the

Heirs their contemporaneously viable claim to the Painting under the prescriptive law of Japan, and colluded with AIC to falsify a report to the State Department to ensure that the U.S. government would not seize the Painting as Nazi contraband.

**(e) The basic policies underlying the particular field of law:**

The acute interests that states other than Illinois and nations other than the U.S. have in ensuring that the Heirs receive a fair opportunity to have their claims to recover the Painting adjudicated on their substantive merits make clear that this factor also supports applying Illinois and U.S. law to this controversy. As comment *h* to § 6 instructs, "[t]his factor is of particular importance in situations where the policies of the interested states are largely the same" but with slight differences. Then "there is good reason for the court to apply the local law of the state which will best achieve the basic policy, or policies, underlying the particular field of law involved."

The "particular field of law" in this context – as both Congress and the President expressly envision - are legal principles that facilitate the return of Nazi-confiscated artworks to rightful owners, and that ensure that claims for the recovery these materials are resolved on their substantive merits. Applying Illinois and U.S. law to this controversy best achieves the underlying substantive policy that other states and nations share of returning Nazi-confiscated artworks to rightful owners.

**(f) Certainty, predictability and uniformity of result;**

Applying Illinois and U.S. law to this controversy also will promote certainty, predictability, and uniformity of result in the particular field of law that seeks to return Nazi-confiscated artworks to rightful owners. Consonant with the Terezin Declaration - and the concomitant commitment of 46 nations to proactively promote legal principles that resolve claims for the restitution of Nazi –confiscated artworks on their substantive merits, and that

39

facilitate the return of these materials to their rightful owners - applying Illinois and U.S. law in this proceeding will help achieve these results and thereby promote certainty, predictability and uniformity of results among Terezin Declaration signatories.

***(g) Ease in the determination and application of the law to be applied;***

Applying Illinois and U.S. substantive law to this controversy – rather than the law of a foreign nation like Japan or Great Britain – beyond doubt will promote this objective.

**C. All "Private Interest" and "Public Interest" Factors of the *Forum Non Conveniens* Doctrine Disfavor Dismissing this Case**

**1. The Heirs are Entitled to Address the Public and Private Interest Factors of the *Forum Non Conveniens* Doctrine to Ensure that the Defendants Do Not Benefit From Wrongfully Raising a New Argument for the First Time in Their Reply**

In their original Memorandum in Support of Motion to Dismiss, (hereinafter "Defendants' Original Memorandum;" D.E. 58), Defendants argued that Plaintiffs' claim should be dismissed on the alternative grounds of *forum non conveniens* (FNC). The Reply fails to address the fundamental issue that a dismissal on FNC grounds requires a showing that Japan is an "adequate alternative" in that ***either***: (a) the Japanese prescriptive period of 20 years did not time bar the Heirs' claim, ***or***, in the alternative (b) that the Defendants: (1) agreed to waive the prescriptive period; and (2) that a Japanese court would accept this waiver exception.[124]

The Defendants' failure to satisfy the threshold requirements of demonstrating that Japan is an adequate alternative forum caused the Heirs to devote comparatively little space to the private and public interest considerations of the FNC doctrine, since the conspicuous inability of the Defendants to satisfy the threshold imperative for invoking FNC rendered these considerations moot and merely academic.[125]

---

[124]  *See* Defendants' Original Memorandum, p. 39-43.
[125]  Opposition, p. 43.

40

Defendants responded to the Heirs' Opposition in their Reply with desperate "throw in the kitchen sink" assertions regarding FNC, raising multiple new arguments and issues in a strained attempt to establish that Japan is somehow arguably an adequate alternative forum to Illinois.[126] Indeed, Defendants now wrongfully have raised a putative and potential exception to their requirement of showing that Japan is an adequate alternative forum (*see* discussion *supra*), that is, whether they must comply with the FNC requirements concerning timeliness in Japan, and whether the Japanese law of acquisitive prescription would bar Plaintiffs' claims.[127]

Defendants' new and potentially dispositive arguments necessarily make the FNC private and public interest factors correspondingly more important to the Court's consideration of Defendants' motion to dismiss. Accordingly, in the interest of justice and to avoid potential and unconscionable prejudice to the Heirs – and to prevent Defendants from benefitting from their late assertion of these arguments – the Court should permit the Heirs to amplify their discussion of these considerations.

### 2. Transferring this Proceeding to Japan Will Expunge the Heirs' Claim Both under the Substantive Law of Japan as Well as by Making the Heirs Meritorious Claim to Recover *Sunflowers* Prohibitively Expensive

If the Court dismisses this action on *forum non conveniens* grounds in favor of Japan, the controversy will be effectively terminated. First, as noted in the FAC and in Defendants' expert witness (Hon. Kanno) declaration, the Japanese law of acquisitive possession allows even a "bad faith" acquirer of personal property to obtain title after 20 years of open possession with intent to own.[128] The Heirs acknowledge that Defendants purchased *Sunflowers* in 1987, have openly

---

[126] Plaintiffs have been forced to address many of these new issues from Defendants' FNC arguments in this Surreply, such as whether the HEAR Act covers Plaintiffs' claims; whether Plaintiffs' claims are timely under the HEAR Act; and whether Plaintiffs purposely delayed bringing this action before 2007 in order to strategically allow the 20-year Japanese law of acquisitive prescription to give Defendants' title to the Painting (thereby making Japan an inadequate forum). (Reply 21-24).

[127] *See* Reply, p. 22-23.

[128] *See, e.g.,* FAC ¶ 126; Kanno Declaration, p. 21.

possessed and commercially exploited the work to their benefit for approximately 37 years (far more than the required 20-year period), and have therefore acquired title under Japanese law.[129]

In light of the foregoing, Japan is not an adequate alternative forum since the Heirs have no opportunity to recover the artwork in Japan – which is owned by the Defendants under Japanese law – and their claims would be "so clearly inadequate or unsatisfactory that it is no remedy at all." *See, e.g., Piper Aircraft Co. v. Reyno.*[130]

### 3. All Relevant Private and Public Interest Factors of the *Forum Non Conveniens* Doctrine Preclude Dismissing this Proceeding

The plaintiff's choice of forum should rarely be disturbed. *Gulf Oil Corp. v. Gilbert.*[131] The defendant carries the burden of persuading the district court that a lawsuit should be dismissed on *forum non conveniens* grounds. *In re Ford Motor Co., Bridgestone/Firestone N. Am. Tire, LLC.*[132] In determining whether to dismiss a case on FNC grounds, the court must consider the private and public interests involved.[133] In this case, all such factors weigh in favor of retaining jurisdiction in Illinois, as discussed immediately below.

#### a. The Relevant Private Interest Factors Foreclose Dismissing this Proceeding

##### (1) The practical problems of making a trial easy, inexpensive, expeditious

Even assuming, *arguendo*, that the Heirs wished to proceed in a Japanese court notwithstanding the dispositive Japanese law of acquisitive prescription dooming their efforts, the cost of such litigation would be prohibitive, *e.g.*, every court filing, ruling, transcript or order

---

[129]   FAC ¶ 2, 126; Kanno Declaration, p. 21.

[130]   454 U.S. 235, 254 (1981).

[131]   330 U.S. 501, 508 (1947).

[132]   344 F.3d 648, 652 (7th Cir. 2002).

[133]   *Id.*

would have to be translated from Japanese to English; all of the Heirs' evidence supporting their claim – and it is voluminous – would have to be translated into Japanese at a prohibitive expense; the Heirs – many of whom are elderly – would be forced to hire new Japanese counsel unfamiliar with the case rather than retain the American counsel they have employed and worked with for twenty years; travelling to Japan for the Heirs and U.S. counsel for any hearing or matter would involve up to a 24 hour flight at great expense plus hotels, meals, travel, etc. In sum, the cost would be prohibitive.

Accordingly, litigation in Japan would entail immense, prohibitive, and unconscionable expense, as well as great inconvenience. A transfer of the case to Japan rather than making trial of case easy, inexpensive and expeditious – would ***amplify exponentially*** the costs, expense and inconvenience of litigation. Finally, such a transfer would sabotage the "Zone One" U.S. foreign policies upon which HEAR Act is founded.

### (2) Relative Ease of Access to Sources of Proof

The Heirs' claim for the recovery of the Painting is based upon extensive documentary proof – much of it translated from German to English – that the Heirs provided the Defendants in support of their demand for the return of *Sunflowers*. These documents establish, among other things, the panoramic and prolonged Nazi persecution of Mendelssohn-Bartholdy that compelled him to relinquish *Sunflowers*. And Defendants concede that they did not investigate the conspicuously suspicious background of the Painting before buying it at auction in 1987, and in 2001 knew little more about the provenance of the Painting than when they recklessly acquired it. Accordingly all of the materials that the Heirs need to prove their claim to recover the Painting – that Nazi persecution and concomitant duress compelled Paul to surrender *Sunflowers* – as well as that Defendants acquired the Painting in reckless disregard of this fact – is in the U.S. and ***not*** in Japan.

Moreover, all additional evidence that the Heirs may need to establish their claims for unjust enrichment and for an injunction precluding Defendants from continuing to use the Painting to defraud the Illinois and U.S. insurance markets also is in the U.S. and ***not*** Japan.

In addition, all other evidence that may pertain to the Heirs' claims is in the U.S. and not Japan. For example, the Heirs might seek third party discovery from the AIC relating to the 2001–2002 Chicago *Studio of the South* exhibition, and the false application that AIC submitted with the complicity of the Defendants to the U.S.a Department of State under 22 U.S.C. § 2549 (the Immunity From Judicial Seizure Act) to conceal the Painting's Nazi taint in order to ensure that the Painting would not be seized by U.S. authorities;[134] documents relating to the Defendants' unjust enrichment in Illinois, and throughout U.S. in approximately 17 "brick and mortar" offices in the U.S.; and Defendants breach of duty[135] to assist the Heirs in 2001–2002 in Illinois – all involve U.S. documents and discovery requests – as well as U.S. depositions.

In addition, the Heirs have three expert witnesses who are professors at universities in the United States (in California, Washington, and Ohio). None of these witnesses speak Japanese, and the expense of travel and translators would inflict prohibitive costs upon the Heirs.

In contrast, the Kanno Declaration describes a very limited discovery scheme in Japan, which likely would not provide the "ease of access" to documents and information that litigants in U.S. courts enjoy.[136]

      **(3)**     **Availability of Compulsory Process for Attendance of Unwilling Witnesses:**

As noted above, the Heirs require the broad discovery provided by this Court in order to fully develop their claims, *e.g.,* fact witnesses and documents relating to the *Studio of the South* exhibition at the AIC in Chicago in 2001–2002; fact witnesses regarding the removal of Paul von

---

134   *See* FAC ¶ 72.

135   *Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir. 1983); *Gladstone v. Hillel*, 203 Cal.App.3d 977, 989 (1988).

136   *See* Kanno Declaration, p. 13.

Mendelssohn-Bartholdy from the provenance publicly provided for the *Studio of the South* exhibition; witnesses and documents relating to the AIC's false submission – with Sompo Japan's knowledge – to the U.S. State Department to protect *Sunflowers* from seizure; witnesses and documents at Defendants' offices in the U.S. required to prove Defendants' unjust enrichment, etc.

### (4) Cost of Obtaining Attendance of Willing Witnesses;

As noted in the immediately preceding sections, the expense of transporting the Heirs' experts and other witnesses to Japan – along with translation expenses – would be prohibitively expensive.

### b. The Relevant Public Interest Factors Preclude Dismissing this Case

### (1) The Avoidance of Unnecessary Problems in Conflicts of Laws or in the Application of Foreign Law

As discussed, *supra*, relevant Illinois and federal choice of law rules direct – and unequivocally – that the law of Illinois and the U.S. govern this proceeding. Accordingly, Illinois is decisively the proper forum to resolve the Heirs' claims to recover the Painting and for unjust enrichment, as well to enjoin Defendants from continuing to commit torts and crimes in Illinois and throughout the U.S. That the Court is familiar both with the laws of Illinois and the U.S. obviates any unnecessary difficulties in either conflicts of law or in applying foreign law in this proceeding.

### (2) Administrative Difficulties of Burdening Court

Japanese litigation would sabotage signal U.S. foreign and domestic policies favoring a fair hearing on the merits of Holocaust art cases, and would allow Defendants to continue with a

45

course of tortious wrongdoing unchecked perpetually.[137] Further, Japanese litigation would permit the Defendants to wrongfully employ unjust enrichment reaped from misappropriating and wrongfully commercially exploiting *Sunflowers* to thwart what the Defendants know to be a meritorious claim.[138] Accordingly, the interest of the United States and Illinois justifies the Court hearing this case.

### (3)   Jury Duty When Forum Has No Relation to Claim

The Heirs' claims promote both predominant Illinois and U.S. governmental interests and policies as discussed at length[139], which more than justify Illinois civilians serving as jurors in the trial of this matter.

### (4)   Local Interest in Having Localized Controversies Decided at Home

As noted above, both the U.S. and Illinois have vital interests in arresting the Defendants' continuing tortious and criminal wrongdoing, and in implementing the signal U.S. foreign policy upon which the HEAR Act is predicated to ensure that judicial claims for the recovery of Nazi-confiscated artworks like the Painting are resolved upon their substantive merits.

### D.   The Defendants Spuriously Maintain that Defendant Sompo International in Chicago Somehow Is *Not* a Party to this Proceeding

Defendants have contended repeatedly that Sompo International does not do business in Illinois.[140] The Heirs, however, have discovered evidence available only after Defendants filed their Reply on February 2, 2024 which corroborates that Sompo International does business in Illinois. For example, a February 9, 2024 article from the trade journal *The Real Deal* relates that

---

[137]   *See, e.g.,* FAC ¶¶ 7-8.

[138]   *See, e.g.,* FAC ¶ 92.

[139]   *See* Opposition, p. 29-33. *See also* discussion immediately above regarding "Administrative Burdening Court" U.S. and Illinois interests in this matter.

[140]   *See, e.g.,* Reply at page 8, asserting that Sompo International does not conduct business in Illinois.

Sompo International is more than doubling its office space in Chicago, Illinois by leasing space in a new building.[141] The periodical *Costar* featured a similar article on February 8, 2024 regarding Sompo International increasing its office space in Chicago.[142] Moreover, the Heirs' follow-up investigation revealed that Sompo International currently is advertising for new employees in its Chicago, Illinois office on the internet.[143] Sompo's current recruitment of new employees, of course, coheres with Sompo International's website, which identifies its Chicago, Illinois office (303 Madison Street, Chicago, Illinois) under "our [Sompo International] locations."[144] Furthermore, the Heirs have submitted photographs of Sompo International's office in Chicago at 303 Madison Street, with the Sompo logo and the name Sompo International identifying the office suite.[145]

Based upon the foregoing the equitable doctrine of quasi estoppel precludes the Defendants from contending – as they do in their Reply – that Sompo International conducts no business in Chicago. The doctrine of quasi estoppel is the broadest of the several estoppel doctrines, and precludes a party from benefiting from a particular representation, then denying that assertion when defending a claim. As the court instructed recently in *Got Docs LLC v. Kingsbridge Holdings, LLC*, "quasi estoppel 'forbids a party from accepting the benefits of a transaction …and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." (Citation omitted) [146] Most importantly, quasi estoppel does not require that the party asserting this defense rely upon the subject representation.[147] Accordingly, quasi

---

[141]  *See* Byrne Declaration, Exhibit 9.

[142]  *See* Byrne Declaration, Exhibit 10.

[143]  *See* Byrne Declaration, Exhibit 11, 12.

[144]  *See* Byrne Declaration, Exhibit 7.

[145]  *See* Byrne Declaration, Exhibit 8.

[146]  No. 19 CV 6155, 2023 WL 8527525, at *12 (N.D. Ill. Dec. 8, 2023). *See also Cent. States, Southeast & Southwest Areas Pension Fund v. One Stop, Inc.*, No. 03 C 4414, 2007 WL 7705585, at *20 (N.D. Ill. July 18, 2007).

[147]  Eugene R. Anderson & Nadia V. Holober, *Preventing Inconsistencies in Litigation With a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial Estoppel, Equitable Estoppel, Quasi Estoppel, "Mend the Hold," "Fraud on the Court," and Judicial and Evidentiary Admissions*, 4 Conn.

estoppel precludes Defendants from doing business and earning money in Chicago through the auspices of Sompo International, while denying in this proceeding that Sompo International conducts business in Chicago.

## IV.   CONCLUSION

For the foregoing reasons, as well as those set forth in the FAC and the Heirs' January 3, 2024 Opposition, the Heirs request that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

Dated: March 27, 2024                           By:   /s/ Thomas J. Hamilton
                                                      _____

Thomas J. Hamilton
John J. Byrne, Jr.
BYRNE GOLDENBERG &
HAMILTON, PLLC
1025 Connecticut Ave., N.W. Ste. 1012
Washington, D.C. 20036
Telephone: (202) 857-9775
Facsimile: (202) 857-9779
E-mail: jjb@bghpllc.com, tj.ham@cox.net

Marty J. Schwartz
SCHAIN BANKS KENNY &
SCHWARTZ LTD.
70 W. Madison St., Ste. 5400
Chicago, IL 60602
Telephone: (312) 345-5700
E-mail: mschwartz@schainbanks.com

*Attorneys for Plaintiffs*
JULIUS H. SCHOEPS, BRITT-MARIE
ENHOERNING, and FLORENCE VON
KESSELSTATT

---

Ins. L. J. 589, 661 (1998), relating that "the doctrine of quasi estoppel 'was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position." (Citation omitted).

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JULIUS H. SCHOEPS, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-07013 |
| SOMPO HOLDINGS, INC., *et al.,* | ) ) | Honorable Judge Jeremy C. Daniel |
| Defendants. | ) ) ) ) ) | |

## <u>DECLARATION OF JOHN J. BYRNE, JR.</u>

Pursuant to 28 U.S.C. § 1746, John J. Byrne, Jr. declares as follows:

1.   I am a partner in the law firm of Byrne Goldenberg & Hamilton, PLLC.  I was admitted *Pro Hac Vice* in the above action as one of the attorneys for Plaintiffs.

2.   I submit this Declaration in support of the Plaintiffs' (hereinafter "Plaintiffs" or "Heirs") accompanying *Surreply of Plaintiff Mendelssohn Heirs* (hereinafter "Surreply") for two reasons.

   a.   First, the Declaration refutes the Defendants' suggestion that the Heirs were aware of their claim for the return of Vincent van Gogh's *Sunflowers* (hereinafter "*Sunflowers*" or "Painting") before 2007, *i.e.*, before Defendants had acquired ownership of the Painting under the Japanese law of acquisitive prescription by possessing it for twenty years, but deliberately failed to prosecute a claim to recover it in Japan in order to take advantage of a putatively contemporaneously viable U.S. federal or state

statute of limitations. (*See* Defendants' Reply in Support of Their Motion to Dismiss the First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum non Conveniens* (hereinafter "Reply" at p. 23). The Reply (p. 23, n. 35) argues – in sum – that the Heirs' claim is barred under Sec. 5(e) of the Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130, Pub. L. No. 114–308 ("HEAR Act") because they had a timely claim after 1999 which they failed to assert within six years.

    b. Second, this Declaration brings to the attention of the Court new material – that became available only *after* Defendants filed their Reply in this proceeding on February 2, 2024 – that "Sompo International" is conducting business in Chicago by doubling its office space. Indeed, follow up research has revealed that Sompo International also is advertising to recruit new employees in Chicago, as discussed, *infra*. This new information contradicts Defendants' repeated contentions that Sompo International does not do business in Chicago. *See, e.g.*, Reply at 8.

3. On behalf of the Heirs, I have researched the modern art collection of Paul von Mendelssohn-Bartholdy (hereinafter "Mendelssohn-Bartholdy" or "Paul"), a Berlin banker of Jewish descent who sold multiple paintings due to Nazi duress from late 1933 until his death in May 1935.

4. The Heirs were not aware of their claim to recover *Sunflowers* before the Defendants obtained title to the Painting under the Japanese law of acquisitive prescription in 2007, and so did not strategically forego filing a claim to recover *Sunflowers* in Japan in order to take advantage of a putatively and contemporaneously viable federal or state statute of limitations as Defendants contend. In fact, as discussed *infra*, the Mendelssohn heirs determined that no viable federal or state limitations period existed at this juncture (2008) which would have enabled the Heirs to

assert a timely claim to recover the Painting, and the Defendants have failed to identify any such candidate. Moreover, the general absence at this point of a timely judicial remedy for claimants such as the Heirs to recover Nazi-confiscated artworks like the Painting expressly induced both political branches of the U.S. government responsible for conducting U.S. foreign policy – the President and Congress – to enact the HEAR Act.

5.   Importantly, the First Amended Complaint (FAC) alleges that the Defendants ***fraudulently concealed*** the Heirs' claim to the Painting when – in knowing violation of both the National Stolen Property Act 18 (U.S.C. §§ 2314-15 ) as well as the proscription against filing a false report with a federal agency 18 U.S.C. § 1001) – they brought the Painting to the 2001 van Gogh exhibition in Chicago to commercially exploit and to further their goal of identifying *Sunflowers* maximally with their collective corporate identity. (*See, e.g.*, FAC at ¶¶ 33, 106). In fact, the Heirs learned of their potential claim for *Sunflowers* only in 2008, that is, one year ***after*** defendants had acquired ownership of *Sunflowers* under the Japanese law of acquisitive prescription. Before 2008, the Heirs had determined that Mendelssohn-Bartholdy had owned the Painting at some juncture, but were unable to ascertain when Mendelssohn-Bartholdy or his wife Elsa sold the Painting, *i.e.*, whether Paul had sold the work before his death in 1935 or whether his widow Elsa had sold it after World War II ended.

6.   In 2008, the Heirs subpoenaed the 1930's Paris records of Galerie Rosenberg (hereinafter "Galerie") – which were located in New York City in 2008 – in the case of *Schoeps v. MoMA, 594 F.Supp.2d 461 (S.D.N.Y. 2009) (see* copy of this decision, attached to the First Amended Complaint as Exhibit 2, hereinafter referred to as "*Schoeps v. MoMA*"). At this point – 2008 – Plaintiffs could finally determine that Paul sold the work in or around 1934 after reviewing the relevant Galerie records. Accordingly, in 2008, the Heirs first learned that Paul had sold the

3

work under Nazi duress and that they were the true owners.

7. In 2008, the Heirs determined that their claim was time-barred by the relevant Illinois' statutes of limitations, including Ill. Comp. Stat. 5/13 205. (*See, e.g.,* Surreply at 15-20 discussing how the relevant 5-year Illinois statute of limitations and the concomitant demanding Illinois discovery rule foreclosed the Heirs claim to recover *Sunflowers* – and as a matter of law – by 1940 at the latest). Because Paul and Elsa both immediately knew that paradigmatically wrongful Nazi persecution and policies compelled Paul to relinquish the Painting to Rosenberg no later than 1935, their claim to recover the Painting accrued when they transferred it, and so was extinguished in 1940 at the latest. (*Id.*)

8. In fact, before the HEAR Act was enacted in 2016, almost all claims for the return of art lost during the Nazi period were time-barred in every jurisdiction but New York – where cases were generally resolved on laches rather than statute of limitations grounds. Indeed, Congress cited the consistent dismissal of cases seeking to recover artworks lost as a consequence of Nazi persecution as the primary reason for enacting the HEAR Act:

> Victims of Nazi persecution and their Heirs have taken legal action in the United States to recover Nazi-confiscated art. These lawsuits face significant procedural obstacles partly due to State statutes of limitations, which typically bar claims within some limited number of years from either the date of the loss or the date that the claim should have been discovered. In some cases, this means that the claims expired before World War II even ended. (*See, e.g., Detroit Institute of Arts v. Ullin*, No. 06–10333, 2007 WL 1016996 (E.D. Mich. Mar. 31, 2007).)

HEAR Act, Section 2, paragraph 6. *See also* June 25, 2015 "*World Jewish Restitution Organization Report Concerning Current Approaches of United States Museums to Holocaust-Era Art Claims*," p. 32-33, excerpts of which are attached hereto as Exhibit 1, noting that the above-referenced New York case of *Schoeps v. MoMA* matter was the ***only***

case against American museums for the return of Nazi era art to progress past a motion to
dismiss or summary judgment until 2015, the year before the HEAR Act was enacted:

> Of all the decided cases, only [*Schoeps v. MoMA*] progressed past the motion
> to dismiss or summary judgment stage. MoMA ultimately settled with the
> claimants on the morning of the first day of trial, but only after MoMA tried
> – and failed – to have the case dismissed based on the defense of laches on
> the theory that the claimants had delayed too long before asserting their
> claim.

9.   The passage of the HEAR Act in 2016 made timely claims that had previously been time-
barred by statutes of limitations throughout the U.S. including the Heirs' claims in this case.
For example, in 2020, the National Gallery of Art (hereinafter "NGA") in Washington, DC
returned Pablo Picasso's *Head of a Woman* to the Mendelssohn Heirs, based upon the same
essential factual basis as this case.  The Heirs' claim in that matter – like their claim here – was
made possible by the HEAR Act.  In fact, the Mendelssohn Heirs originally had demanded the
return of the *Head of a Woman* in 2006, but abandoned their effort because the applicable
District of Columbia's statute of limitations time-barred their claim.  In the Heirs' September
11, 2017 renewed demand letter to the NGA (hereinafter "NGA Demand Letter"), a copy of
which is attached hereto as Exhibit 2, the Heirs acknowledged that they had foregone their
2006 demand for the return of *Head of a Woman*, but that the HEAR Act had made their claim
timely:

> This letter follows upon an earlier demand for the return of the [*Head of a
> Woman*] that the Heirs submitted in May 2006, but abandoned because their
> judicial claim to recover the [*Head of a Woman*] was time-barred at that time.
> Instead, the Heirs pursued claims in New York to recover other artworks that
> Mendelssohn-Bartholdy lost along with the [*Head of a Woman*], since these
> claims were not time-barred because of New York's rule that the statute of
> limitations does not begin to run until after claimants make a demand and the

possessor of looted art refuses to return it. *See, e.g., Schoeps v. Museum of Modern Art*.

In light of the recently enacted Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130, Pub. L. No. 114–308 ("HEAR Act"), which (as the Memorandum explains) makes the Heirs' claim timely by suspending the running of the otherwise applicable statute of limitations that governs the judicial claim of the Heirs to recover [*Head of a Woman*], the Heirs hereby renew their demand for the return of [*Head of a Woman*].

NGA Demand Letter, p. 2.

10.  Like the Heirs' claim against the NGA for the return of *Head of a Woman*, the HEAR Act

enabled the Heirs to bring this timely claim in Illinois against the defendants for the return of

*Sunflowers*.

11.  To additionally corroborate that the demanding Illinois discovery rule time-barred the Heirs'

claim to recover *Sunflowers* by 1940 at the latest, I submit the following:

a.  According to British journalist and author Martin Bailey, *Sunflowers* hung

on the wall at the country residence of Paul and Elsa (hereinafter

"*Boernicke*" or "*Schloss Boernicke*").  *See* excerpt from January 13, 2023

blog from Martin Bailey, entitled *Van Gogh's Tokyo Sunflowers:  Was it

a Nazi forced sale? And is the painting nor worth 25m?*, attached hereto

as Exhibit 3, which includes a photo of *Sunflowers* hanging on the wall at

*Boernicke circa* 1915, from Joseph Popp, *Bruno Paul* (1916)).  Upon

information and belief, there is no evidence that the Painting was removed

from this position before Paul von Mendelssohn-Bartholdy sold or

consigned it to Rosenberg in 1934.

b.  According to Elsa's niece, Edelgard von Lavergne-Peguilhen (hererin

after "Edelgard"), after Mendelssohn-Bartholdy died in May 1935, his

6

widow Elsa compiled a list of works (hereinafter "Elsa's List") in her possession, perhaps for insurance purposes. (*See* November 18, 2008 Affidavit of Edelgard von Lavergne-Peguilen [hereinafter "Edelgard Affidavit"], attached hereto as Exhibit 4, ¶¶ 40-43. This affidavit was filed in 2008 in the above-referenced case of *Schoeps v. MoMA*). The values for the paintings are provided in Reichmarks, confirming that it was compiled during the Nazi period or, in any event, by June 1948 when the Reichmark was replaced with the Deutschemark as currency. (*See* Exhibits 5 and 6, which are copies of the original typed version of Elsa's List, with Elsa's later annotations on both regarding the status of the works. (*See* Edelgard Affidavit, ¶ 40-44).

   c.   Elsa's List does not include *Sunflowers*. (*See* Exhibits 5 and 6).

   d.   Elsa kept the list with other inheritance documents relating to Paul. (*See* Edelgard Affidavit, ¶ 40, 43).

   e.   Upon information and belief, there is no evidence that Elsa attempted to investigate or recover the artworks that Paul von Mendelssohn-Bartholdy sold under duress in Nazi Germany.

12. I also submit this Declaration to bring to the Court's attention newly available evidence that is inconsistent with Defendants' contention that Sompo International does not do business in Illinois. (*See, e.g.,* Reply at page 8, asserting that Sompo International does not conduct business in Illinois). To this end, I attach the following exhibits which relate that "Sompo International" is conducting business in Illinois from its offices at 303 Madison Street,

Chicago, but that "Sompo International" is now – as reported in the press on February 8 and February 9, 2024 – moving to larger office space (in fact doubling its space) and hiring new employees in Chicago.  Accordingly I attach:

a.  as Exhibit 7 a copy of a webpage from Sompo International's website that identifies their Chicago, Illinois office (303 Madison Street, Chicago, Illinois) under "our [Sompo International] locations."  (This webpage also is attached to the First Amended Complaint as Exhibit 5).

b.  as Exhibit 8 copies of photos of Sompo International's office building (with an address at 303 Madison Street, Chicago, Illinois, *i.e.*, corresponding to the address on its website)  and their actual office inside the building with "SOMPO INTERNATIONAL" and the Sompo logo on the office suite.  (These photos also are attached to the First Amended Complaint as Exhibit 6).

c.  as Exhibit 9 a copy of a February 9, 2024 article from The Real Deal about Sompo International more than doubling its office space in Chicago, Illinois with a recent rental of new office space, which I downloaded in February 2024.

d.  as Exhibit 10 a copy of a February 8, 2024 article from Costar further describing Sompo International's office expansion in Chicago, which I downloaded in February 2024.

e.  as Exhibit 11 a copy of a webpage where Sompo International is advertising jobs at its Chicago, Illinois office (on the Endurance website), using the Sompo logo, which I downloaded in February 2024.

          f.   as Exhibit 12 a copy of webpages where Sompo International is advertising that it is hiring at its Chicago, Illinois office (copies from ziprecruiter.com), which I downloaded in February 2024.

13. I attach as Exhibit 13 a copy of the March 5, 2024 "Best Practices for the Washington Conference Principles" (hereinafter "Best Practices") from the U.S. Department of State website at https://www.state.gov/best-practices-for-the-washington-conference-principles-on-nazi-confiscated-art/. I downloaded this document on March 6, 2024. The United States endorsed the Best Practices at an event on March 5, 2024 co-sponsored by the U.S. State Department entitled the "25th Anniversary of the Washington Principles on Nazi-Confiscated Art: Best Practices and the Way Forward." *See, e.g.*, https://www.state.gov/25th-anniversary-of-the-washington-principles-on-nazi-confiscated-art-best-practices-and-the-way-forward/.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge information and belief.

    Executed in Washington, DC on March 26, 2024.

_____

John J. Byrne, Jr.

# EXHIBIT 1

# WORLD JEWISH RESTITUTION ORGANIZATION

## REPORT CONCERNING CURRENT APPROACHES OF UNITED STATES MUSEUMS TO HOLOCAUST-ERA ART CLAIMS

### JUNE 25, 2015

Executive Summary

The World Jewish Restitution Organization (WJRO) works toward the restitution of property seized during the Holocaust, including the restitution of art stolen by the Nazis. This report demonstrates that major U.S. museums have recently been asserting defenses, such as statute of limitations, to avoid resolving on the facts and merits claims by Holocaust victims and their heirs for the restitution of art looted by the Nazis. Use of these procedural defenses is an attempt to defeat claims for the restitution of art stolen by the Nazis by avoiding any adjudication of the substance of those claims.

This report includes an analysis of cases in federal courts in the United States, in which prominent U.S. museums (Toledo Museum of Art, Detroit Institute of Arts, Museum of Modern Art in New York, Museum of Fine Arts in Boston, and the Fred Jones Jr. Museum of Art at the University of Oklahoma) have asserted these defenses. See Annex I entitled "Legal Analysis Concerning Current Approaches of United States Museums to Holocaust-Era Art Claims" prepared by the law firm of Dickstein Shapiro LLP. Furthermore, the American Alliance of Museums (AAM), the body that develops standards and best practices for the U.S. museum community, has declined to take steps to ensure that museums live up to the standards it has set that member institutions should respond to claims "openly, seriously, responsively, and with

**Annex I**

# Legal Analysis Concerning Current Approaches of United States Museums to Holocaust-Era Art Claims

# Legal Analysis Concerning Current Approaches of United States Museums to Holocaust-Era Art Claims

By: Eric B. Fisher, Colleen Kilfoyle, Woody N. Peterson
Dickstein Shapiro LLP

June 25, 2015

During the Third Reich, the Nazis stole or otherwise misappropriated approximately 650,000 works of art,[16] a looting spree unmatched in history.[17] Returning this plundered art to its rightful owners – the victims of the Nazi regime and their heirs – began immediately after World War II, but the United States' direct involvement in the effort to return artwork to the countries from which it was plundered ended decades ago.[18] Today, nearly seventy years after the end of

---

[16] Jonathan Petropoulos, Professor, Dep't of History, Loyola Coll., Md., Art Looting During the Third Reich: An Overview with Recommendations for Further Research (Dec. 1, 1998), *in* Proceedings of the Washington Conference on Holocaust-Era Assets (1999), at 446, http://fcit.usf.edu/holocaust/resource/assets/heac4.pdf.

[17] Lynn H. Nicholas, Plenary Session on Nazi-Confiscated Art Issues (Dec. 1, 1998), *in* Proceedings of the Washington Conference on Holocaust-Era Assets (1999), at 449, http://fcit.usf.edu/holocaust/resource/assets/heac4.pdf; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 957 (9th Cir. 2010) ("*Von Saher I*") ("During World War II, the Nazis stole hundreds of thousands of artworks from museums and private collections throughout Europe, in what has been termed the 'greatest displacement of art in human history.'" (citation omitted)).

[18] *Von Saher I*, 592 F.3d at 963. In 1945 at the Potsdam Conference, President Truman approved an external restitution process by which the United States returned Nazi-looted property recovered by Allied Forces to the property's country of origin. *Id.* at 961-63. The country of origin, in turn, would return the property to its rightful owner. *Id.* To implement this policy of external restitution, the United States Department of State established the Interdivisional Committee on Reparations, Restitution and Property Rights. Brief of the United States as Amicus Curiae at 2, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 131 S. Ct. 3055 (2011) (No. 09-1254), 2011 WL 2134984, at *2. The Committee carried out the policy until September 1948, when the Committee stopped accepting claims for restitution. *Id.* at *3; *Von Saher I*, 592 F.3d at 963. The American Military Government, which occupied parts of Germany after the war, subsequently established the Jewish Restitution Successor Organization. This organization continued to administer restitution claims in parts of Germany until the 1970s. *See Jewish Restitution Successor Organization (JRSO)*, The Cent. Archives for the Hist. of the Jewish People Jerusalem (CAHJP), http://cahjp.huji.ac.il/content/jewish-restitution-successor-organization-jrso (last visited Apr. 14, 2015); *M1942 Records Concerning the Central Collecting Points ("Ardelia Hall Collection"):*

World War II, the task of reuniting artworks misappropriated by the Nazis with their rightful owners remains unfinished.[19]  Unfortunately, as discussed in this article, it likely will remain unfinished unless disputes over the ownership of such art are decided on the merits by judges and juries on a full record, instead of being denied – without any discovery – based on defenses such as statutes of limitations that are unrelated to the underlying facts and merits of the claims.

In Part I of this article, we survey United States federal court decisions in cases involving efforts by Holocaust victims and their heirs to recover from U.S. museums art that was misappropriated by the Nazis and their collaborators.  In the course of that review, we discuss the American Association of Museum Common Guidelines Concerning the Unlawful Appropriation of Objects During the Nazi Era (the "American Museum Guidelines" or "Guidelines") that many of the museums that were parties to these litigations adopted.[20]  By adopting these Guidelines, the museums agreed, at least in principle, that claims for restitution of art looted by the Nazis should be decided on the merits.  However, examination of the court decisions confirms that museums in practice have consistently resorted to statute of limitations defenses and other tactical maneuvers to thwart resolution of restitution claims on the merits.  As a result of these maneuvers, no United States museum has ever had to convince a court or a jury, on a full record, of the merits of the museum's claim that it is the rightful owner of stolen Nazi art, and no claimants have had the chance to prove to a judge or jury – again on a full record – that the art at issue in fact belongs to them.

---

*Offenbach Archival Depot, 1946-1951* (U.S. Nat'l Archives & Records Admin. 2004), http://www.archives.gov/research/microfilm/m1942.pdf.

[19] Jennifer Anglim Kreder, *The New Battleground of Museum Ethics and Holocaust-Era Claims: Technicalities Trumping Justice or Responsible Stewardship for the Public Trust?*, 88 Or. L. Rev. 37, 38 (2009).

[20] *Standards Regarding the Unlawful Appropriation of Objects During the Nazi Era*, Am. Alliance of Museums,  http://www.aam-us.org/resources/ethics-standards-and-best-practices/collections-stewardship/objects-during-the-nazi-era (last visited Mar. 30, 2015).

In Part II, we analyze the 2010 and 2014 *Von Saher* decisions[21] by the United States Court of Appeals for the Ninth Circuit in California, as well as the Court's 2013 decision in *Cassirer*.[22] In its 2010 *Von Saher I* decision, the Ninth Circuit recognized that resolution of these Holocaust-era restitution claims was an integral part of the federal government's power to make and resolve war; and, on that basis, the Ninth Circuit ruled that the federal government's foreign affairs power under the United States Constitution preempted, and thus invalidated, a California statute aimed at opening the doors of California's courts to claims for the return of Nazi-looted art. The Court's subsequent decision in *Cassirer* found no federal preemption of a 2010 amendment to California's statute of limitations that was of more general applicability and not narrowly focused on claims for Holocaust-era restitution. In *Von Saher II*, the Ninth Circuit held that claims for restitution brought under general statutes of limitations are not barred by the federal foreign affairs doctrine. These three Ninth Circuit decisions, when read against the backdrop of the other cases analyzed in this article in which claims for restitution were denied under state law for reasons unrelated to their merits, suggest strongly that federal legislation is needed to ensure that court disputes with U.S. museums about Nazi-looted art are resolved on the facts and merits of each case.

### PART I

This section reviews six of the seven court actions arising from disputes between victims of Nazi persecution or their heirs and U.S. museums for restitution of artworks looted during

---

[21] *Von Saher I*, 592 F.3d 954; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712 (9th Cir. 2014) ("*Von Saher II*"), *cert. denied*, 135 S. Ct. 1158 (2015).

[22] *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013).

victim of the Holocaust would have had to undertake the impossible task of investigating and then filing a claim in the United States in the middle of World War II.

The First Circuit was not blind to these difficulties. Even on the only-partially-developed factual record before it, the Court acknowledged that "the validity of the transfer [from Reichel to Kallir] 'is not clear-cut.'"[115] Nor was the Court unaware of the dark "sales" history that lies behind some of the priceless art now displayed in United States museums: "Much art was Aryanized, or subjected to forced sales for prices significantly below market value (if any value ever actually materialized for the seller) . . . ."[116] And "some art was sold at infamous 'Jew auctions,' which are now universally recognized as illegal."[117] Finally, because "so many Jews were compelled to forfeit 'flight asset[s]' to pay for their passage out of the Reich, the European art market reflected depressed prices."[118] But thanks to the short Massachusetts statute of limitations, whether the sale from Reichel to Kallir was a forced sale or a legitimate sale never was – and never will be – determined by a judge or jury.

### E.     *Schoeps v. Museum of Modern Art*

Of all the decided cases, only *Schoeps v. Museum of Modern Art*[119] progressed past the motion to dismiss or summary judgment stage. MoMA ultimately settled with the claimants on the morning of the first day of trial, but only after MoMA tried – and failed – to have the case

---

[115] *Id.* at 6.

[116] *Id.* at 6 n.6 (quoting Jennifer Anglim Kreder, *The New Battleground of Museum Ethics and Holocaust-Era Claims: Technicalities Trumping Justice or Responsible Stewardship for Public Trust?*, 88 Or. L. Rev. 37, 49 (2009)) (internal quotation mark omitted).

[117] *Id.* (quoting Kreder, *supra* at 49).

[118] *Id.* alteration in original (quoting Kreder, *supra* at 49-50).

[119] *Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461 (S.D.N.Y. 2009) (*Schoeps II*); *Museum of Modern Art v. Schoeps*, 549 F. Supp. 2d 543 (S.D.N.Y. 2008) (*Schoeps I*).

dismissed based on the defense of laches on the theory that the claimants had delayed too long before asserting their claim.[120]

In *Schoeps*, MoMA and the Guggenheim Foundation sought a declaratory judgment from the federal district court in New York that MoMA owned the Pablo Picasso painting, "Boy Leading a Horse" and Guggenheim owned "Le Moulin de la Galette," also by Picasso.[121] Both pieces had been owned by Paul von Mendelssohn-Bartholdy, a prominent German Jewish banker and art collector.[122] In response to growing anti-Semitic measures taken by the Nazis, Mr. von Mendelssohn-Bartholdy made an allegedly pretextual transfer of the paintings to his second wife, Elsa, who was not Jewish and considered "Aryan."[123] Either Mr. or Ms. von Mendelssohn-Bartholdy eventually sold the paintings to a third-party, purportedly under Nazi duress. In the 1960s, the paintings were donated to MoMA and the Guggenheim Foundation.[124]

In 2007, Mr. von Mendelssohn-Bartholdy's grand-nephew, Julius H. Schoeps, sent letters to each museum stating that he believed that the paintings had been transferred under Nazi duress.[125] After eight months of letter writing, Mr. Schoeps sent letters to both museums demanding the return of the paintings.[126] In response, the museums filed their declaratory judgment action to quiet title on the paintings, asserting that the doctrine of laches barred the

---

[120] *Schoeps v. Museum of Modern Art*, 603 F. Supp. 2d 673, 674 (S.D.N.Y. 2009) (*Schoeps III*).

[121] *Schoeps II*, 594 F. Supp. 2d at 463.

[122] *Id.* at 464.

[123] *Id.* at 464-65.

[124] *Schoeps I*, 549 F. Supp. 2d at 544-45.

[125] *Id.* at 545.

[126] *Id.*

suit.[127]  Mr. Schoeps, joined by Ms. von Mendelssohn-Bartholdys' heirs, then counterclaimed for conversion and replevin.[128]

The museums filed motions for summary judgment, which the Court denied.  The Court found there were triable issues of fact as to (1) whether the transfer to Ms. von Mendelssohn-Bartholdy was designed to protect the paintings in response to Nazi persecution; and (2) even if the transfer was not pretextual, whether the transfer from Mr. or Ms. von Mendelssohn-Bartholdy to the subsequent owner was made under duress.[129]  The court also denied summary judgment to the museums on their laches defense, ruling that the issue required resolution of disputed facts.  Those facts included whether Ms. Von Mendelssohn-Bartholdy knew she had a potential claim to the paintings during her lifetime and whether the museums were barred from invoking the laches by the doctrine of unclean hands because they had reason to know that the paintings had been misappropriated.[130]

In allowing the case to proceed, the district court recognized the many factual and legal complexities of the case.[131]  For example, the court had to decide which law applied.  The court applied New York's interest analysis, and the test required the court to apply German law to the question of whether the sale by Mr. or Ms. von Mendelssohn-Bartholdy in 1935 was made under

---

[127] *Id.*

[128] First Amended Counterclaim, *Schoeps v. Museum of Modern Art*, No. 07 Civ. 11074 (JSR) (S.D.N.Y. June 2, 2008), ECF No. 47.

[129] *Schoeps II*, 594 F. Supp. 2d at 464.

[130] *Id.* at 468.

[131] In a December 30, 2008 order denying the museums' motion for summary judgment, which preceded the eventual published opinion, *Schoeps II*, 594 F. Supp. 2d 461, the court noted that "the combination of the unique historical circumstances that form the backdrop of this case and the absence of living witnesses to most of the events in question" called for "greater liberty . . . [in] the drawing of extended inferences," and therefor precluded summary judgment.  *See* Order at 2, *Schoeps v. Museum of Modern Art*, No. 07 Civ. 11074 (JSR) (S.D.N.Y. Dec. 31, 2008), ECF No. 84.

duress or was otherwise sold pursuant to a sale against public policy.[132]  First, the Court had to determine whether to apply the Military Government Law put in place by the Allies during the postwar occupation of Germany, or the German Civil Code (Bürgerliches Gesetzbuch ("BGB")).[133]  The court ruled that the BGB provisions as to whether a sale could be invalidated due to duress or other such invalidity were controlling.[134]  The court identified the key fact question for the jury as whether Mr. von Mendelssohn-Bartholdy's sale resulted from the "historical circumstances of Nazi economic pressures brought to bear on 'Jewish' persons and property."[135]

These issues never reached the jury or the judge because the case was settled pursuant to an agreement whose terms remain confidential.[136]  Nevertheless, the case stands as the rare case

---

[132] *Schoeps II*, 594 F. Supp. 2d at 465-66.

[133] *Id.*

[134] *Id*.

[135] *Id.* at 466.

[136] *Schoeps III*, 603 F. Supp. 2d at 674-76.  The court consented to the settlement agreement between the parties remaining confidential, but commented that it found "the confidentiality provision of the settlement agreement and the [heirs'] objection to disclosure to be against the public interest and a troubling reversal of the parties' previously stated positions on the issue." *Id.* at 675.  Notably, it was only after "being pressed by the Court" that the museums abandoned their position that the agreement should remain confidential.  The court explained that from the beginning of the case, both sides had portrayed the dispute as of particular interest to the public.  The court went on to point out that "[the museums] have portrayed themselves as institutions dedicated to serving the public by enriching its cultural life . . . and they have characterized the plaintiffs' claims as entirely baseless and, essentially, extortionate . . . . The plaintiffs, for their part, have claimed loudly throughout that they were vindicating a historical injustice." *Id.* at 674-75.

Despite these assertions, the parties decided to include a confidentiality clause in their settlement agreement.  The court found this troubling, because, had the "[m]useums been public agencies of New York State or City, any such provision would have been contrary to the New York Freedom of Information Law . . .  It is hard to see why institutions that proclaim their public status and that seek and receive public support should view themselves as not owing a similar obligation, even if one is not imposed by law." *Id.* at 675.  Given the precedent in the Second Circuit that "strongly endorses the confidentiality of settlement agreements in virtually all cases," the court had no choice but to preserve the confidentiality of the agreement. *Id.* at 676.

that *could* potentially have been decided on its facts and merits because the claimants were able to present enough facts to require the museums' laches defense to be decided by the jury.

### F. *Meyer v. Board of Regents of the University of Oklahoma*

*Meyer v. Board of Regents of the University of Oklahoma*, another court litigation involving a restitution claim for Nazi-looted art, is still pending.[137]  Léone Meyer brought the suit in New York federal court, seeking to recover a painting by Camille Pissarro entitled "Shepherdess Bringing in Sheep" now in a University of Oklahoma museum.[138]  Ms. Meyer, an heir of the owners of a high-end department store in Paris, alleged that Nazis stole the painting from the store during World War II.[139]  The case was dismissed on personal jurisdiction grounds because the museum lacked sufficient contacts with New York.[140]  Although the district court did not address the defense, the University also argued in its motion to dismiss that the claim was time-barred by New York's three-year statute of limitations and Oklahoma's two-year statute of limitations.[141]

Ms. Meyer appealed, and the Second Circuit Court of Appeals directed the district court judge to consider whether the case should be transferred to Oklahoma.[142]  On April 7, 2015, the district court transferred the case to the United States District Court for the Western District of

---

[137] *Meyer v. Bd. of Regents of the Univ. of Okla.*, No. 13 Civ. 3128(CM), 2014 WL 2039654 (S.D.N.Y. May 14, 2014).

[138] *Id.* at *1.

[139] *Id.*

[140] *Id.* at *4.

[141] Memorandum of Law in Support of Motion to Dismiss First Amended Complaint at 21-22, *Meyer*, 2014 WL 2039654 (No. 13 Civ. 03128), 2014 WL 618028, ECF No. 37.

[142] *Meyer v. Bd. of Regents*, 597 F. App'x 27, (2d Cir. 2015).  Under 28 U.S.C. § 1406(a), the district court has discretion to dismiss the case that is commenced in the wrong venue or to transfer it to any appropriate district if it is in the interest of justice.

# EXHIBIT 2

# BYRNE GOLDENBERG & HAMILTON, PLLC

## Attorneys At Law

1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036
1400 14TH Street North, Arlington, Virginia 22209

JOHN J. BYRNE, JR.
ADMITTED DC, MD, NY

LLOYD P. GOLDENBERG
ADMITTED DC, CA

THOMAS J. HAMILTON
ADMITTED DC, MD, VA

STEPHEN H. MYERS (OF COUNSEL)
ADMITTED DC, LA

TELEPHONE: (202) 857-9775
FACSIMILE: (202) 857-9799
E-MAIL: JJB@BGHPLLC.COM
WEBSITE: WWW.BGHPLLC.COM

September 11, 2017

**FEDERAL EXPRESS**

Earl A. Powell III
Director, National Gallery of Art
2000-B South Club Drive
Landover, Maryland 20785

> Re: Demand for restitution of Pablo Picasso drawing
> Entitled *Head of a Woman* (1903), pastel on paper,
> 31 x 29.7 cm. (12 3/16 x 11 11/16 inches); 2001 gift to
> the National Gallery from the Woodner Collection
> foundation number 2001.3.2

Dear Dr. Powell:

We represent the heirs ("Heirs") of the late prominent Jewish Berlin banker Paul von Mendelssohn-Bartholdy ("Mendelssohn-Bartholdy" or "Paul").[1]  By this letter and the accompanying memorandum and exhibits ("Memorandum"), the Heirs demand that the National Gallery of Art ("NGA") restitute to them Pablo Picasso's *Head of a Woman* ("the Drawing" or "*Head of a Woman*"), circa 1903, pastel on paper, 31 x 29.7 cm. (12 3/16 x 11 11/16 inches).

As the Memorandum confirms, Mendelssohn-Bartholdy lost the Drawing in a forced transfer in Nazi Germany in 1934-1935 due exclusively to the inherently wrongful and

---

[1] We will provide the names of the Heirs and the supporting documents proving heirship upon request.  The identity of the Heirs is not in dispute, and the Heirs have filed suit in U.S. courts and have entered into confidential settlement agreements concerning artworks lost by Mendelssohn-Bartholdy at the same time as the work at issue here, that is, Pablo Picasso's *Head of a Woman*.  The confidential settlement agreements were entered into with the Museum of Modern Art ("MoMA"); the Solomon R. Guggenheim Foundation ("Guggenheim"); and the Andrew Lloyd Webber Foundation. *See also Schoeps v. Museum of Modern Art*, 594 F.Supp.2d 461 (S.D.N.Y. 2009) (Heirs' suit filed against MoMA and Guggenheim).

September 11, 2017                                        **Byrne Goldenberg & Hamilton, PLLC**

systematic policies of the Nazi government to eliminate Jews from the economy of Germany based upon their race, and concomitant persecution and duress.

This letter follows upon an earlier demand for the return of the Drawing that the Heirs submitted in May 2006, but abandoned because their judicial claim to recover the Drawing was time-barred at that time. Instead, the Heirs pursued claims in New York to recover other artworks that Mendelssohn-Bartholdy lost along with the Drawing, since these claims were not time-barred because of New York's rule that the statute of limitations does not begin to run until after claimants make a demand and the possessor of looted art refuses to return it. *See, e.g., Schoeps v. Museum of Modern Art.*[2]

In light of the recently enacted Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130, Pub. L. No. 114–308 ("HEAR Act"), which (as the Memorandum explains) makes the Heirs' claim timely by suspending the running of the otherwise applicable statute of limitations that governs the judicial claim of the Heirs to recover the Drawing, the Heirs hereby renew their demand for the return of the Drawing.

Importantly, the Memorandum includes as an exhibit the *Report of Dr. Jonathan Petropoulos in Support of Memorandum Confirming that the Mendelssohn Heirs Are the Lawful Owners of Pablo Picasso's Pastel Drawing Entitled Head of a Woman (circa 1903)* ("Report"). Dr. Petropoulos is acknowledged as a leading authority and expert on Nazi policies and practices to dispossess Jews of art during the period 1933-1945, as well as the role of the international art market in widely disseminating Nazi-confiscated artworks – such as the Drawing. Dr. Petropoulos concludes that:

(1) Nazi policies and persecution caused Mendelssohn-Bartholdy to transfer the Drawing to Thannhauser in 1934-35 (¶ 30);

(2) Worldly, sophisticated American real estate developer, art collector, and convicted tax evader Ian Woodner – who acquired the Drawing at Sotheby's in 1981 – had reasonable notice of the policies that dispossessed Mendelssohn-Bartholdy of the Drawing from the provenance that stated "Paul von Mendelssohn-Bartholdy, Berlin until 1937" (¶ 31); and

(3) "The NGA has been on notice of Nazi policies to dispossess Jews since Congress established it as the nation's art gallery in 1937, and the NGA has no legitimate excuse for having the Drawing in its collection." (¶ 32).

**A. Nazi Persecution – and Nazi Persecution Alone – Deprived Mendelssohn-Bartholdy of the Drawing**

The Memorandum establishes that the Nazi government targeted and relentlessly persecuted Mendelssohn-Bartholdy and his prominent Jewish banking family. Mendelssohn-Bartholdy lost the Painting in late 1934 or early 1935 in a "forced sale" or "sale under duress"

---

[2] 594 F. Supp.2d 461, 466 (S.D.N.Y. 2009)(Heirs' claim brought in New York).

2

September 11, 2017                                          **Byrne Goldenberg & Hamilton, PLLC**

due solely to the encompassing and intensifying policies of the Nazi government to exclude Jews from the economy of Germany and to compel them to relinquish their property. By the time that he consigned the Drawing to Berlin art dealer Justin Thannhauser in or around October 1934, Nazi policies had wreaked economic and professional havoc upon Mendelssohn-Bartholdy, had depleted his annual income and net worth, and sabotaged his financial future. At this juncture Nazi policies also had excluded Mendelssohn-Bartholdy as a member of the Berlin Stock Exchange, as well as from prestigious leadership positions in the banking and financial industries upon which Mendelssohn & Co. depended to maintain its competitive viability. The Nazi government also had confiscated from Mendelssohn & Co. its equity interest in several profitable, going concern businesses, thereby depriving the Bank – and Mendelssohn-Bartholdy derivatively – of significant financial opportunities and income. In addition, Nazi threats, intimidation, and concerns about his personal safety had compelled Mendelssohn-Bartholdy to forsake his mansion in downtown Berlin for the sanctuary of a more remote residence.

In 1934 – the first full year of Nazi rule – Mendelssohn-Bartholdy's income ***was less than 14% of what it had been in 1932***,[3] as Nazi policies and predation had all but negated the value of Mendelssohn & Co. bank as a going concern entity, and – concomitantly – his 22% equity interest in this business. In fact, by 1934 Mendelssohn-Bartholdy's expenses vastly exceeded his income. These circumstances – which inherently wrongful Nazi policies purposefully induced – compelled him to begin liquidating his modern art collection in order to survive financially. This was a remarkable development, since Mendelssohn-Bartholdy had never sold a single significant artwork from the time he began collecting in the early 1900s until the Nazis came to power in January 1933, and in fact had continued to purchase art and expand his collection into the early 1930s. Yet, from September 1933 until his untimely death of a heart attack in May 1935, Mendelssohn-Bartholdy consigned or sold 16 of his masterpieces from his elite private collection, including the Drawing.

Significantly, Mendelssohn-Bartholdy sold or consigned 13 of the 16 works – including the Drawing – in the sixth month period between July 1934 and February 1935, when Nazi persecution of Mendelssohn-Bartholdy intensified and his actions became increasingly desperate.[4] Moreover, the dismal art market at that time further corroborates that Mendelssohn-Bartholdy would not have sold any art unless he was under the most severe financial distress purposefully and directly caused by Nazi persecution.[5]

---

[3] In 1932 – the last full year before the Nazi takeover – Mendelssohn-Bartholdy's income was RM 436,357. In 1934 – the first full year of Nazi rule – Mendelssohn-Bartholdy's income had plummeted to RM 59,374. *See* Memorandum at 20.

[4] *See* Memorandum at 27-28.

[5] *See* Memorandum at 29.

3

September 11, 2017                                                        **Byrne Goldenberg & Hamilton, PLLC**

### B. The Heirs Fulfill All Legal Requirements for a Restitution Claim

As the Memorandum elaborates, to be entitled to a constructive trust for their benefit based upon the equitable doctrine of restitution, claimants need show only that "wrongful coercion" induced Mendelssohn-Bartholdy to transfer the Drawing, and that NGA is not a *bona fide* purchaser. NGA cannot be a *bona fide* purchaser because it accepted the Drawing as a gift. Moreover, no prior possessor of the Drawing qualified as a *bona fide* purchaser because each such person – Thannhauser, the Guggenheim Museum, and Woodner – acquired the Drawing with either actual or constructive notice of the Nazi duress that compelled Mendelssohn-Bartholdy to relinquish it.

It is self-evident that the notorious Nazi policies to exclude Jews from the economy of Germany based upon their race and the concomitant duress and coercion that the Nazi government employed to achieve this objective – which induced Mendelssohn-Bartholdy to transfer the Drawing – were inherently and paradigmatically wrongful. Indeed, and as the Memorandum confirms, Nazi abuses provided both the historical backdrop as well as the legal rationale for much of the modern international law of human rights.[6]

Accordingly, the only plausible question is whether Nazi persecution was the "legal cause" of Paul's transfer of the Drawing to Thannhauser, and this question is readily answered in the affirmative. For wrongdoing intended to cause injury – such as the intentional and malicious Nazi policies towards Jews – the range of legal causation is quite broad, and even "***very remote causation***" is legally sufficient.[7] The Heirs far surpass this standard, and, in fact – as the Memorandum demonstrates – Nazi persecution was in fact the ***only*** reason that Mendelssohn-Bartholdy sold the Drawing and began liquidating his art collection. *See also Schoeps v. Museum of Modern Art*[8] (in a case involving the same essential facts as presented here, the court ruled that the Heirs had "adduced competent evidence that Paul never intended to transfer any of his paintings and that he was forced to transfer them ***only*** because of threats and economic pressures by the Nazi government"). (Emphasis and italics supplied).

### C. Prominent American Real Estate Developer, Art Collector and Convicted Felon Ian Woodner Acquired the Drawing at Sotheby's in New York in 1981 with a Provenance That Conspicuously Related "*Paul von Mendelssohn-Bartholdy, Berlin until 1937*"

Noted American real estate developer and art collector Ian Woodner bought the Drawing at Sotheby's in New York in 1981 with a provenance that stated "*Paul von Mendelssohn-*

---

[6] *Id*. at 37.
[7] *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 111 n.14 (D.D.C. 2006), aff'd 531 F.3d 884 (D.C. Cir. 2008); *see also Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 548 n. 3 (1983)(intentional torts require only proof that acts were a "cause-in-fact" of injury and "very remote causation" is sufficient).
[8] 594 F. Supp.2d 461, 466 (S.D.N.Y. 2009).

4

*Bartholdy, Belin until 1937*."[9]  A sophisticated, worldly, Harvard-educated architect who also studied in Paris, Mr. Woodner (born 1903) was 30 years old when Hitler took power in Germany in 1933. So Woodner knew – or certainly reasonably should have known – about the notorious Nazi policies to dispossess Jews, and the vast quantities of artworks that filtrated into the lackadaisical international market after World War II as a result of pernicious Nazi policies and art looting.[10]  So it cannot credibly be argued that Mr. Woodner acquired the Drawing in "good faith," that is, with no reasonable basis for investigating further the circumstances that induced Mendelssohn-Bartholdy to transfer the Drawing in Berlin in 1937. The conspicuous constructive notice that Woodner had of Nazi policies during the 1930's precludes any possibility that he can be considered a *bona fide* purchaser under the equitable principles of restitution, or that NGA might rely upon his identity in this regard.[11]

In 1962 Mr. Woodner was convicted of federal tax evasion.[12]

### D.  Public Policy Considerations Amplify the Heirs' Equitable Claim and Compel NGA – as a Tax-Exempt Public Trust – to Restitute the Drawing

As a tax-exempt entity under 26 U.S.C. § 501(c) (3) and public trustee, the NGA has fiduciary duties and public policy obligations to obey the pronounced federal policy favoring the restitution of Nazi-confiscated artworks.[13]  As a public trustee, the NGA, of course, does not own the Drawing.  Rather, the Drawing belongs to the American people who have made their will in this regard known through Congress.  As set forth at length in the Memorandum and confirmed by our expert, Dr. Jonathan Petropoulos, NGA acquired the Drawing without taking the appropriate precautions to investigate its conspicuously problematic background, and the circumstances that induced famous Jewish Berlin banker and art collector Mendelssohn-Bartholdy to transfer it.[14]

Under these circumstances the fiduciary duty of NGA is to return the Drawing, not to invoke every resource at its disposal to contest the Heirs' meritorious claim under the misguided notion of protecting the interest of the public in the Drawing.[15]  The interest of the public is

---

[9] Memorandum at 42.

[10] Memorandum at 53-57.

[11] *Id.*  Because the NGA acquired the Drawing in violation of its fiduciary obligations of reasonable care and precaution, equitable principles – as well as important public policies seeking to ensure that tax exempt entities like NGA discharge their duties as trustees and adhere to the consistent U.S. goal of restituting Nazi-confiscated artworks – as a matter of law would preclude the NGA from relying upon the potential status of Woodner as *bona fide* purchaser. Memorandum at 53-54.

[12] *United States v. Woodner*, 317 F.2d 649 (2d Cir. 1963), affirming Woodner's conviction for willful attempt to evade personal taxes for the years 1952 and 1953. *See also* Memorandum at 55-57.

[13] Memorandum at 43-45.

[14] Memorandum at 41-43.

[15] *See, e.g.,* Patty Gerstenblith, *Acquisition and Deacquisition of Museum Collections and the Fiduciary Obligations of Museums to the Public,* 11 Cardozo J. Int'l & Comp. L 409, 454 (2003) (stating that a trustee's "failure to consider adequately the security of title" as well as "the possible violation of other legal rules" when acquiring an art object constitutes a breach of the duties of loyalty and care. Therefore, "museums that do not exercise sufficient due diligence in acquiring works of art… are breaching their public and fiduciary obligations." Moreover, museums do not breach their fiduciary duties when returning contraband – such as Nazi-confiscated artworks like the Drawing –

served – as Congress has prescribed – when Nazi-confiscated artworks such as the Drawing are returned to rightful owners without litigation.

## Conclusion

In August 2016, the NGA restituted two artworks (returning one and purchasing the other) to the heirs of Dr. Marianne Schmidl because Dr. Schmidl had sold the artworks as "a direct result of the persecution by the Nazis of Dr. Schmidl." Although the actual legal standard is a mere showing of "very remote causation" for intentional acts to harm, there is no doubt but that Mendelssohn-Bartholdy – like Dr. Schmidl – sold his art as "a direct result" of Nazi persecution and is entitled to restitution.

Please let us know if you have any questions or would like additional information. We look forward to meeting with you in the near future – as you suggested in your 2006 correspondence -- to discuss the merits of the Heirs' claim.

Sincerely,

**BYRNE GOLDENBERG & HAMILON, PLLC**

John J. Byrne, Jr.

Thomas J. Hamilton

Attorneys for the Heirs of Paul von Mendelssohn-Bartholdy

---

to their rightful owners, but rather when museums acquire such materials without conducting appropriate due diligence. As Professor Gerstenblith observes, *"[t]he failure to fulfill these fiduciary duties does not occur at the time of deaccession: rather, it occurs at the time that the object is first acquired."* (Emphasis and italics added) *Id.*at 453-54. *See also* Charles A. Goldstein and Yael Weitz, *Claim by Museums of Public Trusteeship and their Response to Restitution Claims: A Self-Serving Attempt to Keep Holocaust-Looted Art* at 9, stating that *"if there was a breach of fiduciary duty, it is likely to have occurred not with the restitution, but with the acquisition or continued custody of the stolen work."* (Emphasis and italics added) (Article available at 14 *Art & Advocacy* 1 (2013). *See also www.herrick.com...weitz*

September 11, 2017                                      **Byrne Goldenberg & Hamilton, PLLC**

cc: David J. Skorton, MD
    Secretary – Smithsonian Institute
    c/o Office of General Counsel
    Room 302
    1000 Jefferson Avenue, S.W. MRC012
    Washington D.C. 20560

# EXHIBIT 3



# THE ART NEWSPAPER

**Get your copy of The Year Ahead - your essential art world companion.  Buy now**

**Adventures with Van Gogh** // Blog

# Van Gogh's Tokyo Sunflowers: Was it a Nazi forced sale? And is the painting now worth $250m?

Bought for a Japanese museum in 1987, the masterpiece has just been claimed by the heirs of a Jewish Berlin banker

**Martin Bailey**

**Enjoy unlimited access to The Art Newspaper.**





Van Gogh's *Sunflowers* (December 1888-January 1889)
Sompo Museum, Tokyo

---



### Adventures with Van Gogh

Adventures with Van Gogh is a weekly blog by Martin Bailey, our long-standing correspondent and expert on the artist. Published every Friday, his stories range from newsy items about this most intriguing artist to scholarly pieces based on his own meticulous investigations and discoveries. © Martin Bailey

---

Van Gogh's *Sunflowers* painting in Tokyo is at the centre of a legal claim 35 years after it was sold for a record price by Christie's. In 1987 the work was



Van Gogh's *Sunflowers* hanging in Schloss Börnicke (around 1915)

Joseph Popp, *Bruno Paul* (book published in 1916)

The 1987 Christie's provenance recorded that Mendelssohn-Bartholdy had bought the *Sunflowers* by 1910 and later sold it to the Paris-based Paul Rosenberg gallery, although no year was stated.

More evidence has recently emerged to show that the Mendelssohn-Bartholdy consignment to Rosenberg took place in October 1934. A 1934 date also appears to be confirmed by a photographic record in the Rosenberg archive (inventory number 3241). The following year Rosenberg sold the *Sunflowers* to Edith Beatty, the London-based wife of New York-born mining tycoon Alfred Beatty.

This dating is crucial, since it means that the Van Gogh was consigned after the Nazis had seized power in Germany in 1933. The Mendelssohn-

# EXHIBIT  4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

THE MUSEUM OF MODERN ART, and THE ) 
SOLOMON R. GUGGENHEIM FOUNDATION, )
 )
        Plaintiffs, )
 )
        -v- )        07 Civ. 11074 (JSR)
 )
JULIUS H. SCHOEPS, )
 )
        Defendant. )
 )
——————————————————————— )
 )
JULIUS H. SCHOEPS, EDELGARD VON )
LAVERGNE-PEGUILHEN and FLORENCE )
KESSELSTATT, )
 )
        Counterclaim-Plaintiffs, )
 )
        -v- )
 )
THE MUSEUM OF MODERN ART, and THE )
SOLOMON R. GUGGENHEIM FOUNDATION, )
 )
        Counterclaim-Defendants. )
——————————————————————— )

## DECLARATION OF EDELGARD VON LAVERGNE-PEGUILHEN IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

        Pursuant to 28 U.S.C. § 1746, Edelgard von Lavergne-Peguilhen declares as follows:

### Introduction

1.    I am a counterclaim-plaintiff in this action. I submit this Affidavit in opposition to the

October 20, 2008 Motion for Summary Judgment filed by plaintiffs and counterclaim-

defendants The Museum of Modern Art and the Solomon R. Guggenheim Foundation

1

(together the "Museums").

2.  I was born on June 24, 1919 in Bremen, Germany. I am the niece of Elsa von Mendelssohn-Bartholdy, born Lavergne-Peguilhen ("Elsa"). My father, Hans George Oskar von Lavergne-Peguilhen, was Elsa's brother. My father and Elsa were very close friends. Over the years Elsa and I became quite close as well.

**Marriage of Elsa and Paul von Mendelssohn-Bartholdy**

3.  Elsa married Paul von Mendelssohn-Bartholdy (Paul) on September 22, 1927. When they married Paul was 51 years of age, while Elsa was only 28. The marriage was Paul's second but Elsa's first.

4.  Paul was from a prominent and successful family, had inherited great wealth, and was co-owner of Mendelssohn & Co., one of the largest private banks in Germany. Paul was a noteworthy banker and businessman with 30 years of professional experience.

5.  The main offices of Mendelssohn & Co. were located in downtown Berlin, Germany in beautiful buildings owned by the bank. Paul and his cousin, Franz Mendelssohn, managed Mendelssohn & Co. for the entire period that I knew Paul, that is, from about 1929 until his death in May, 1935.

6.  Paul brought into the marriage an extensive and remarkable art collection which he had accumulated over most of his adult life.

7.  Elsa had no business experience or professional background and was not an art collector. Further, Elsa came from a middle-class background, and her father was a general lieutenant in the military. To my knowledge, Elsa exhibited very little interest in art throughout her life. She never talked about art, and I do not believe she had any art books. In fact, I

2

inherited her entire library when she died, and I know that she did not have any books on art. Further, during her life, she tended to keep the paintings that she owned in storage, and never talked about them.

8. I am not aware of any instance that Elsa purchased any work of art after Paul died.

9. Elsa had no university education. In fact, she completed her formal schooling at approximately age 15. Elsa worked as a secretary for awhile in Hamburg, and she lived with our family for part of the time in the 1920's.

10. Elsa began working for Paul von Mendelssohn-Bartholdy's first wife, Charlotte, as a "lady in waiting," in or around 1925. During this period, Elsa rented a room in someone's house in Berlin.

**Alsenstrasse**

11. After their 1927 wedding, Paul and Elsa lived in a mansion at Alsenstrasse 3 & 3a (Alsenstrasse) until some time in 1933, or 1934 at the latest. Alsenstrasse was located in the heart of downtown Berlin, in close proximity and within easy view of the Reichstag building. Paul von Mendelssohn-Bartholdy had lived in that house since approximately 1918.

12. Paul and Elsa lived on the second floor of Alsenstrasse. The residential area was beautifully decorated, with grand chandeliers hanging from the ceilings. Paul and Elsa entertained in their residence in the pre-Nazi period. Alsenstrasse in fact was magnificent, and was built for official receptions.

13. From 1929 through 1931, I spent considerable time at Alsenstrasse with Elsa and Paul. I stayed at Alsenstrasse for about a month in each of these years, usually from Christmas until

the end of January. Also, I visited Alsenstrasse throughout each of these years, since I attended school in Berlin during this period. I remember my time at Alsenstrasse quite vividly, and I recall playing with Paul and Elsa's dogs, Hattie and Doreen, and their puppies named Poker, Lo, Buck and Harry. I never went to Alsenstrasse after 1931.

14. I was quite familiar with the structure and layout of the Alsenstrasse mansion, and also remember its tenants and employees. For example, Mr. Blank was Paul's chauffeur. Mr. Blank lived with his wife and daughter in small quarters in back of the estate. Mr. Stenz was the housemaster. A French chef, Mr. Schilling, wore a fancy chef's hat and had assistants who helped him prepare meals. A house mistress supervised several maids and other servants who lived on the third floor. There were about nine employees in all.

15. Paul was the Royal Danish consul, and the Consul's staff's office was located on the first floor of Alsenstrasse. The Consul's entrance door was on the north side of the building.

16. At no time did Paul's sisters live with Paul and Elsa at Alsenstrasse or anywhere else.

**Gutshaus Boernicke**

17. Paul and Elsa spent their summers at a village named Boernicke, which was located approximately fifty miles outside downtown Berlin. Paul owned a large country estate in the village named Gutshaus Boernicke (Boernicke). The large staff Paul and Elsa employed at Alsenstrasse moved to Boernicke for the summer, except for those needed to maintain Alsenstrasse.

18. From 1929 through May 1935, I visited Paul and Elsa regularly at Boernicke. Typically I would spend a month with them there in the Spring. I also visited them for weeks at a time at Boernicke during the summer months.

**In 1932 Paul Expresses Concern About the Nazis**

19. In or around 1932, I remember Paul speaking with Elsa and referring to the Nazis in my presence. He mentioned that the Jews were vulnerable because they held many prominent positions. I remember that he seemed scared, which was unusual for him, since he was normally very confident and self-assured. Paul was considered a Jew by the Nazis, and this was true and accepted by all of his family members.

**The Nazis Persecute Germany's Jews**

20. I vividly recall Germany in the early years of the Nazi rule before Paul's death, and the intense, pervasive hostility that the Nazis directed toward Germany's Jewish citizens. For example, I remember a Nazi S.A. man standing outside a clothing store telling people not to go in because it was a "Jewish" store. Also, I had a little Jewish friend at school whose father was a Rabbi. She took me to see her Synagogue one day. Shortly after that, the Synagogue was burned down and I never saw my friend again.

21. I also saw how Nazi persecution distressed Paul and Elsa personally. As noted Mr. Blank was Paul von Mendelssohn-Bartholdy's chauffeur. At school, Mr. Blank's daughter was asked what her father's profession was. She stated that her father was the chauffeur for Paul von Mendelssohn-Bartholdy. The teacher, who was a Nazi, then passed this information on, and the Nazis began pressuring Mr. Blank to stop driving for a Jew. I saw Mrs. Blank crying about the episode, and she seemed desolate and did not know what to do. This occurred while Paul and Elsa -- and the Blank family -- all lived at Alsenstrasse in or around 1933. Mr. Blank then started to look for another job. Mr. and Mrs. Blank lived at Boernicke after this incident to get away from Nazi pressure. I did not see the Blanks much

after this, and I assume Mr. Blank eventually resigned from his employment as Mendelsohn-Bartholdy's chauffeur due to the Nazi pressure.

22. In retrospect, I believe this incident, among other things, may have caused Paul and Elsa to leave Alsenstrasse for a small garden house in a wooded area so that attention would not be drawn to them. In fact, this is consistent with the 1934 purchase of a remote, small, farmhouse in Bavaria, that Elsa told me was purchased as a way to get away from the Nazis, especially in light of Paul's Jewish background.

**Paul and Elsa moved from Alsenstrasse to Schlosspark Bellvue**

23. Paul and Elsa moved from Alsenstrasse to a very small five room garden house located at Schlosspark Bellvue in or around the summer of 1933, and certainly by 1934. I believe they moved out of Alsenstrasse in 1933, however, since I have reviewed documents indicating that Paul also moved the Danish Consul from Alsenstrasse to the Mendelssohn & Co. buildings in the Fall of 1933.

24. Unlike Alsenstrasse, Schlosspark Bellvue was not a prestigious location, and Paul and Elsa's neighbors were employees of different companies and forest experts. After the move, Paul and Elsa's lifestyle changed dramatically. When I visited there, there was a cook, but the other staff members were not there. There were no paintings at Schlosspark Bellvue. Elsa told me that she believed that Paul was trying to survive the Nazi period in the hopes of later regaining his stature and position in life. Upon reflection, I now believe that Paul and Elsa moved from Alsenstrasse to Schlosspark Bellvue in order to escape the Nazis' attention. I believe that the move was motivated by the fear of the Nazis.

25. Schlosspark Bellvue was in a wooded area, and was removed from the center of Nazi

activity in downtown Berlin. Alsenstrasse, on the other hand, was an attention-getting

mansion, was in a prominent location, stood closer to the Reichstag building, and was in

close proximity to regular Nazi demonstrations and activities.

26. Alsenstrasse and Schlosspark Bellvue were approximately the same distance from

Mendelssohn & Co. and Boernicke, so the move was not motivated by convenience.

### A refuge from the Nazis: a small Bavarian farm house

27. Paul and Elsa purchased a small farm in a remote area of Bavaria for 100,000 RM in 1934.

This was a refuge from the Nazis, because Berlin and the surrounding area had become a

disturbing place to live, especially in light of Paul's Jewish background.

### Relationship Between Paul and Elsa

28. From 1929 through 1935 I spent much time with Paul and Elsa, and got to know them quite

well. I saw them in a variety of situations -- both personal and social -- and observed how

they interacted. It was clear to me that Paul was very protective of Elsa, and assumed all

responsibility for any of the business affairs of the couple. Elsa later confirmed this to me.

29. Paul dealt exclusively with any issues relating to money or finance. Elsa was a traditional

1920-30's housewife. Her responsibilities in the relationship were to decorate and maintain

Alsenstrasse and Boernicke, and to organize the activities of the staff. The traditional roles

that Elsa and Paul played were even more pronounced than in most couples of that era

because Paul was more than 20 years older than Elsa and had extensively greater business

and professional experience. Elsa told me later in life that she had thoroughly enjoyed being

married to Paul, and that he had always taken care of her.

30. In fact, after Paul died, Elsa needed financial advisors and lawyers to assist her in handling

financial issues relating to her inheritance from Paul, since Paul had handled this type of issue exclusively while he was alive.

**Elsa moved to Boernicke after Paul's death**

31. Paul died of a heart attack on or about May 10-11, 1935 at age 59. Elsa and Paul remained married until Paul's death.

32. After Paul died, Elsa told me that she was shocked at the extent of his financial problems, and that Paul had not informed her of the degree of his financial decline. In fact, Elsa told me that Paul had not even told her that he had placed "Grundschulden" (encumbrances) on both Alsenstrasse and Boernicke. Elsa told me that she was most shocked that Paul had borrowed close to a million Reichmarks secured by Boernicke, and that she had to pay off this loan.

33. After Paul died, Elsa had very little money and I remember that she was always trying to save money. In addition, Elsa told me that she received little if any money from Mendelssohn & Co. after Paul died.

34. In retrospect, it is clear that Paul was trying to shield Elsa from the extent of his financial losses in Nazi Germany and to maintain a calm demeanor in the face of great pressure and adversity.

35. Elsa moved to Boernicke after Paul died. Elsa was forced to reduce the cost of running the estate. So she let go several staff members, including the French chief, and hired a cook for the remaining employees at Boernicke. She abandoned a tennis court as too expensive to maintain. In addition, Elsa did not know how to manage Boernicke as a business, so she hired an organization named Ritterchaft to handle the farming at Boernicke and to sell the

milk that was produced by approximately 100 cows. Ritterchaft handled the accounting for Boernicke. Elsa felt she had to do this to reduce the loan Paul had taken out on Boernicke.

36. In 1936 my mother died. Thereafter, I lived with my grandmother for part of the time, and with Elsa at Boernicke the rest of the time. In or around 1936, Elsa once explained to me that she suffered from lack of money, and that in the future we would have to rely upon ourselves, and to do things for ourselves.

37. Elsa changed her name back to Lavergne-Peguilhen after Paul died because she was afraid that the Nazis would confiscate Boernicke as being "Jewish" property. By changing her name, the Nazis could not attack her anymore and she felt she had rescued Boernicke from Nazi confiscation by her name change.

38. Elsa lived at Boernicke until she was forced to leave due to safety concerns shortly before the end of World War II. There were many family portraits that hung on the walls at Boernicke for many years. I believe the family portraits were abandoned at Boernicke in the face of the on-coming Soviet army.

39. After World War II ended, I stayed in close contact with Elsa and we maintained a very close relationship until her death in 1986.

**Elsa's List of Artworks**

40. Elsa died in 1986 in Ascona, Switzerland. Elsa's adopted daughter, Florence Kesselstatt, and I are Elsa's sole heirs. As one of her two heirs, I went through her papers following her death and found two documents relating to artworks. The documents had the same typewritten list of artworks that Elsa created, I believe, in the years following Paul's death. The difference between the two documents is that Elsa's handwritten annotations were made



9

at two different times.  (See Elsa's List of Artworks with undated annotations, a copy of which is attached as Exhibit 1; see also  Elsa's List of Artworks with a date of 1955, attached hereto as Exhibit 2). In the course of living with Elsa at Boernicke up until 1945, and then reading her many letters up until 1986, I came to know her handwriting extremely well and can recognize it quite easily. I can say definitively and without qualification that the handwriting on the List of Artworks is Elsa's.

41. The original typed List of Artworks -- before any annotations were made -- appears to have been carefully created and professionally typed. It is broken down according to artist, and states valuations in a separate column. Furthermore, the total collective value of all the artworks included on the List is calculated at the end of the document.

42. I believe for several reasons that Elsa compiled this typed List for a specific purpose -- perhaps insurance. The typing is especially neat, the document is most orderly, and it enumerates all artworks comprehensively, including copper-plated engravings that were worth only 60 RM each. But perhaps most important, the document relates a total value for the artworks collectively -- indicating a need or desire to determine the value of the entire collection.

43. I believe that Elsa created the typed List of Artworks in the period after Paul died -- although I cannot specify an exact date -- because I found the List with other inheritance documents relating to Paul.

44. It appears, however, that Elsa made the handwritten notations on the List of Artworks after World War II.  I believe this because the word "verkauft", which is German for "sold", is written next to some paintings that I know Elsa sold after World War II.  Next to other

10

paintings, including the Pablo Picasso painting entitled [in English] "Blue Head of a Woman", Elsa has written "verloren", which is German for "lost". I believe that Elsa intended this designation to mean that such paintings were either stolen or had left her possession without her knowing how. Among other notations, Elsa has written "safe" next to some paintings, indicating that these items were in a safe somewhere. Next to other paintings, Elsa has written "verloren Boernicke." I believe that this notation refers to certain paintings that were located at Boernicke before Elsa fled to avoid the advancing Russian army in 1945. At that time, Elsa was not able to take any paintings with her. As a result, she gave some of them to friends and acquaintances in the hopes that they would be able to get the paintings out of the area, and that she would be able to retrieve them at a later date. However, Elsa was never able to recover any of these paintings.

45. During the time I knew Elsa from the 1920's until her death in 1986, Elsa never once intimated that she had anything to do with any sales or consignments of any paintings that Paul may have made before his death in 1935.

46. In the more than 60 years that I knew Elsa she never mentioned an art dealer named Justin Thannhauser. Nor did Elsa ever mention receiving payment for any artwork Paul or she sold before the end of World War II.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 18, 2008 in Ascona, Switzerland.

*Edelgard v. Lavergne-Peguilhen*

Edelgard von Lavergne-Peguilhen

Date: November 19, 2008

Sworn and subscribed before me this 19th day of November 2008.

Notary Public

My commission expires: indefinitly

12

# EXHIBIT 5

Abschrift.

G e m ä l d e .

### von van Gogh:

| | | | |
|---|---|---|---|
| verkauft | Selbstporträt............................................. | RM | 60.000.- |
| safe | Irrenhaus in Arles...................................... | " | 40.000.- |
| versch... | Garten vom Irrenhaus................................. | " | 40.000.- |
| safe | Olivengarten mit Sonne.............................. | " | 15.000.- |
| safe | Landschaft mit Mohnblumen...................... | " | 15.000.- |
| safe | Arbeiter mit Nelken.................................... | " | 15.000.- |
| | ~~Frau mit Kind.~~..................................... | " | ~~12.000.-~~ |
| safe | Vase......................................................... | " | 8.000.- |

### von Henri Rousseau:

| | | | |
|---|---|---|---|
| versch... | Gr. Urwald................................................ | " | 5.000.- |
| verkauft | Gr. Urwald mit Tiger................................. | " | 5.000.- |
| versch... | Flamingos................................................ | " | 5.000.- |
| " | Freiheit..................................................... | " | 5.000.- |
| " | Konzert..................................................... | " | 2.000.- |
| verkauft | ~~Eva.~~...................................................... | " | 1.000.- |
| " | ~~Kl. Urwald I.~~........................................ | " | 800.- |
| " | ~~Kl. Urwald II.~~........................................ | " | 800.- |
| " | ~~Fortifikations.~~...................................... | " | 800.- |

### von Picasso:

| | | | |
|---|---|---|---|
| zu einfach | Witwe....................................................... | " | 20.000.- |
| zu einfach | blauer Junge mit Kranz............................ | " | 20.000.- |
| verkauft | Frauenkopf............................................... | " | 1.500.- |
| verloren | blauer Frauenkopf.................................... | " | 1.000.- |

### von Manet:

| | | | |
|---|---|---|---|
| safe | La Brioche................................................ | " | 40.000.- |

### von Renoir:

| | | | |
|---|---|---|---|
| safe | Mädchen am Strand.................................. | " | 30.000.- |
| safe | Kleine Landschaft..................................... | " | 600.- |

### von Monet:

| | | | |
|---|---|---|---|
| safe | Landschaft an der Seine............................ | " | 20.000.- |

### von Lenbach:

| | | | |
|---|---|---|---|
| kloster Rohr. | Bismarck ................................................. | " | 12.000.- |
| | Übertrag | RM | 375.500.- |

- 2 -

| | | Übertrag | RM | 375.500.- |
|---|---|---|---|---|

**von Degas:**

| | | | |
|---|---|---|---|
| *Böru verlag* | Frau neben Badewanne........................... | " | 1.200.- |
| *" Rohr* | 2 engl. Landschaften........................... | " | 1.000.- |
| *" verloren* | Skizze: Frau auf einem Sessel................. | " | 500.- |

**von Derain:**

| | | | |
|---|---|---|---|
| | Vase.......................................... | " | 700.- |
| *verkauft* | Frauenkopf mit schwarzem Haar................. | " | 500.- |
| *verloren* | Skizze von Frau............................... | " | 200.- |

**von Laurencin:**

| | | | |
|---|---|---|---|
| *verloren* | Frauenkopf.I.................................. | " | 400.- |
| *verloren* | Frauenkopf II................................. | " | 400.- |
| *Böru. verloren* | Jungfrauen bei der Toilette................... | " | 300.- |

**von Guardi:**

| | | | |
|---|---|---|---|
| *Rohr verdau* | Torbogen...................................... | " | 2.500.- |
| *DDR* | Venedig....................................... | " | 1.000.- |

**von Vlaminck:**

| | | | |
|---|---|---|---|
| *Thüringen* | Landschaft am Hafen........................... | " | 1.000.- |

**von Signac:**

| | | | |
|---|---|---|---|
| *safe* | Vorgebirge.................................... | " | 700.- |

**von Hoggarth:**

| | | | |
|---|---|---|---|
| | Porträt....................................... | " | 4.000.- |

**von Tiepolo:**

| | | | |
|---|---|---|---|
| *Rohr ?* | 5 Skizzen..................................... | " | 500.- |

**von Matthieu:**

| | | | |
|---|---|---|---|
| *verkauft* | Porträt....................................... | " | 3.000.- |

**Verschiedene Gemälde, Bilder, Kunstgegenstände:**

| | | | |
|---|---|---|---|
| *okohr ?* | ca. 20 alte englische Stiche................. | " | 10.000.- |
| | 25 Stiche Rosenberg.......................... | " | 7.500.- |
| *verloren ?* | 50 Kupferstiche.............................. | " | 3.000.- |

| | | Übertrag | RM | 413.900.- |
|---|---|---|---|---|

- 3 -

|  | Übertrag | RM | 413.900.- |
|---|---|---|---|
| 15 alte englische Stiche.......................... | " | 5.000.- |
| 2 alte Stilleben............................... | " | 4.000.- |
| Japanische Bronzen............................. | " | 1.000.- |
| Div. Wandbilder von E.R. Weiss................. | " | 500.- |
| verschiedene alte und neue Stiche.............. | " | 500.- |
|  | RM | 424.900.- |

1714



**Global Language Services**
Translations · Interpreting
DTP · Localization

**KERN Corporation**
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of : <u>New York</u>

County of: <u>New York</u>

ss.:

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

**LISTING OF PAINTINGS**

*from the **GERMAN** language into the **ENGLISH** language and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by:

(Eric Schloss)

for

**KERN Corporation**
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169
Tel: 212 953-2070
www.e-kern.com

Sworn to before me this 3

Day of _____, 2008.

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
No. 01WI - 6093589
Qualified in New York County
My Commission Expires June 2, 2011

Notary Public

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

London: Tel. 011 44 (20) 78 31 56 00 | Frankfurt: Tel. 011 49 (69) 75 60 73-0 | Berlin: Tel. 011 49 (30) 24 72 12 50 | Paris: Tel. 011 33 (1) 53 93 85 20
Zurich: Tel. 011 41 (1) 2 61 11 60 | Hong Kong: Tel. 011 (852) 28 50 44 55 | Amsterdam: Tel. 011 31 (20) 6 39 01 19 | Lyon: Tel. 011 33 (4) 783 783 73

Copy:

## Paintings.

|  | by van Gogh: |  |  |
|---|---|---|---|
| sold | Self-Portrait | RM | 60,000.00 |
| safe | Madhouse in Arles | " | 40,000.00 |
| [illegible] | Garden of the Madhouse | " | 40,000.00 |
| safe | Olive Garden with Sun | " | 15,000.00 |
| safe | Landscape with Poppies | " | 15,000.00 |
| safe | Workers with Carnations | " | 15,000.00 |
|  | ~~Woman with Child~~ | " | ~~12,000.00~~ |
| safe | Vase | " | 8,000.00 |
|  | by Henri Rousseau: |  |  |
| [illegible] | Green Jungle | " | 5,000.00 |
| sold | Green Jungle with Tiger | " | 5,000.00 |
| [illegible] | Flamingos | " | 5,000.00 |
| " | Freedom | " | 5,000.00 |
| " | Concert | " | 2,000.00 |
| sold | Eva | " | 1,000.00 |
| sold | ~~Small Jungle I~~ | " | 800.00 |
| sold | ~~Small Jungle II~~ | " | 800.00 |
| sold | ~~Fortifications~~ | " | 800.00 |
|  | by Picasso: |  |  |
| [illegible] | Widow | " | 20,000.00 |
| [illegible] | Blue Boy with Wreath | " | 20,000.00 |
| sold | Woman's Head | " | 1,500.00 |
| lost | Blue Woman's Head | " | 1,000.00 |
|  | by Manet: |  |  |
| safe | La Brioche | " | 40,000.00 |
|  | by Renoir: |  |  |
| safe | Girl on the Beach | " | 30,000.00 |
| ~~lost~~ safe | Small Landscape | " | 600.00 |
|  | by Monet: |  |  |
| safe | Landscape by the Seine | " | 20,000.00 |
|  | by Lenbach: |  |  |
| [illegible] | Bismarck | " | 12,000.00 |
|  | Amount carried forward | RM | 375,500.00 |

000546

– 2 –

|  |  | Amount carried forward | RM | 375,500.00 |
|---|---|---|---|---|
|  | by Degas: |  |  |  |
| [illegible] lost |  | Woman next to Bathtub | " | 1,200.00 |
| [illegible] |  | 2 English Landscapes | " | 1,000.00 |
| lost |  | Sketch: Woman in an Armchair | " | 500.00 |
|  | by Derain: |  |  |  |
|  |  | Vase | " | 700.00 |
| sold |  | Woman's Head with Black Hair | " | 500.00 |
| lost |  | Sketch of a Woman | " | 200.00 |
|  | by Laurencin: |  |  |  |
| lost |  | Woman's Head I | " | 400.00 |
| lost |  | Woman's Head II | " | 400.00 |
| [illegible] lost |  | Young Woman at Her Toilette | " | 300.00 |
|  | by Guardi: |  |  |  |
| * [illegible] DDR |  | Archway | " | 2,500.00 |
|  |  | Venice | " | 1,000.00 |
|  | by Vlaminck: |  |  |  |
| [illegible] |  | Landscape by the Harbor | " | 1,000.00 |
|  | by Signac: |  |  |  |
| safe |  | Promontory | " | 700.00 |
|  | by Hogarth: |  |  |  |
|  |  | Portrait | " | 4,000.00 |
|  | by Tiepolo: |  |  |  |
| [illegible] |  | 5 Sketches | " | 500.00 |
|  | by Matthieu: |  |  |  |
| sold |  | Portrait | " | 3,000.00 |
|  | Miscellaneous paintings, pictures, objets d'art: |  |  |  |
| [illegible] ? |  | Approx. 20 old English etchings | " | 10,000.00 |
|  |  | 25 etchings Rosenberg | " | 7,500.00 |
| lost? |  | 50 copper etchings | " | 3,000.00 |
|  |  | Amount carried forward | RM | 413,500.00 |

000547

[Page 1714]

|  | | Carryover | RM 413,900.00 |
|---|---|---|---|
| *Vogelsang* | 15 old English engravings | RM | 5,000.00 |
|  | 2 old still-lifes | RM | 4,000.00 |
| *Lost* | Japanese bronzes | RM | 1,000.00 |
| *Lost* | Miscellaneous wall pictures of E.H. Weiss | RM | 500.00 |
| *Lost* | Miscellaneous old and new engravings | RM | 500.00 |
|  |  |  | RM 424,900.00 |

# EXHIBIT  6

Abschrift!

G e m ä l d e .

von van Gogh:

| | | | |
|---|---|---|---|
| Selbstporträt | RM | 60.000.- | |
| Irrenhaus in Arles | " | 40.000.- | |
| Garten vom Irrenhaus | " | 40.000.- | |
| Olivengarten mit Sonne | " | 15.000.- | |
| Landschaft mit Mohnblumen | " | 15.000.- | |
| Arbeiter mit Nelken | " | 15.000.- | |
| Frau mit Kind | " | 12.000.- | |
| Vase | " | 8.000.- | |

von Henri Rousseau:

| | | | |
|---|---|---|---|
| Gr. Urwald | " | 5.000.- | |
| Gr. Urwald mit Tiger | " | 5.000.- | |
| Flamingos | " | 5.000.- | |
| Freiheit | " | 5.000.- | |
| Konzert | " | 2.000.- | |
| Eva | " | 1.000.- | |
| Kl. Urwald I | " | 800.- | |
| Kl. Urwald II | " | 800.- | |
| Fortifikations | " | 800.- | |

von Picasso:

| | | | |
|---|---|---|---|
| Witwe | " | 20.000.- | |
| blauer Junge mit Kranz | " | 20.000.- | |
| Frauenkopf | " | 1.500.- | |
| blauer Frauenkopf | " | 1.000.- | |

von Manet:

| | | | |
|---|---|---|---|
| La Brioche | " | 40.000.- | |

von Renoir:

| | | | |
|---|---|---|---|
| Mädchen am Strand | " | 30.000.- | |
| Kleine Landschaft | " | 600.- | |

von Monet:

| | | | |
|---|---|---|---|
| Landschaft an der Seine | " | 20.000.- | |

von Lenbach:

| | | | |
|---|---|---|---|
| Bismarck | " | 12.000.- | |

Übertrag    RM 375.500.-

EXHIBIT
Kessustatt
28
7/8/2008

- 2 -

|  | | Übertrag | RM | 375.500.- |
|---|---|---|---|---|
| **von Degas:** | | | | |
| *Böcksche* | Frau neben Badewanne...................... | " | 1.200.- |
| *Bolw* | 2 engl. Landschaften...................... | " | 1.000.- |
| *Böcksche* | Skizze: Frau auf einem Sessel............. | " | 500.- |
| **von Derain:** | | | | |
| *verkauft* | Vase...................................... | " | 700.- |
| " | Frauenkopf mit schwarzem Haar............. | " | 500.- |
| *verloren* | Skizze von Frau........................... | " | 200.- |
| **von Laurencin:** | | | | |
| *Böcksche* | Frauenkopf I.............................. | " | 400.- |
| " | Frauenkopf II............................. | " | 400.- |
| " | Jungfrauen bei der Toilette............... | " | 300.- |
| **von Guardi:** | | | | |
| *verkauft* | Torbogen.................................. | " | 2.500.- |
| " | Venedig................................... | " | 1.000.- |
| **von Vlaminck:** | | | | |
| *verkauft* | Landschaft am Hafen....................... | " | 1.000.- |
| **von Signac:** | | | | |
| *verkauft* | Vorgebirge................................ | " | 700.- |
| **von Hoggarth:** | | | | |
| *verkauft* | Porträt................................... | " | 4.000.- |
| **von Tiepolo:** | | | | |
| *Bolw ?* | 5 Skizzen................................. | " | 500.- |
| **von Matthieu:** | | | | |
| | Porträt................................... | " | 3.000.- |
| **Verschiedene Gemälde, Bilder, Kunstgegenstände:** | | | | |
| *...* | 20 alte englische Stiche.................. | " | 10.000.- |
| *Vogelsang* | 25 Stiche Rosenberg....................... | " | 7.500.- |
| *Böcksche* | 50 Kupferstiche........................... | " | 3.000.- |
| | | Übertrag | RM | 413.900.- |

- 3 -

|  | Übertrag | RM | 413.900.- |
|---|---|---|---|
| 15 alte englische Stiche.......................... | " | 5.000.- |
| 2 alte Stilleben.............................. | " | 4.000.- |
| Japanische Bronzen............................ | " | 1.000.- |
| Div. Wandbilder von E.R. Weiss................ | " | 500.- |
| verschiedene alte und neue Stiche............. | " | 500.- |
|  | RM | 424.900.- |



**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of :     New York

                                   ss.:

County of:     New York

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

### LISTING OF PAINTINGS

*from the **GERMAN** language into the **ENGLISH** language and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by: _____

(Eric Schloss)
for

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169
Tel: 212 953-2070
www.e-kern.com

Sworn to before me this
3
Day of Oct, 2008.

Notary Public

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
**No. 01WI - 6093589**
Qualified in New York County
My Commission Expires June 2, 2011

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

London: Tel. 011 44 (20) 78 31 56 00   Frankfurt: Tel. 011 49 (69) 75 60 73-0   Berlin: Tel. 011 49 (30) 24 72 12 50   Paris: Tel. 011 33 (1) 53 93 85 20
Zurich: Tel. 011 41 (1) 2 61 11 60   Hong Kong: Tel. 011 (852) 28 50 44 55   Amsterdam: Tel. 011 31 (20) 6 39 01 19   Lyon: Tel. 011 33 (4) 783 783 73

<u>Copy:</u>

<u>P a i n t i n g s .</u>

by van Gogh:

| | | | | |
|---|---|---|---|---|
| | Self-Portrait | RM | 60,000.00 | Sold |
| Crossed out words | Madhouse in Arles | " | 40,000.00 | Safe |
| | Garden of the Madhouse | " | 40,000.00 | Sold |
| | Olive Garden with Sun | " | 15,000.00 | Safe |
| | Landscape with Poppies | " | 15,000.00 | Sold |
| | Workers with Carnations | " | 15,000.00 | Safe |
| | ~~Woman with Child~~ | " | 12,000.00 | Sold |
| | Vase | " | 8,000.00 | Illegible |

by Henri Rousseau:

| | | | |
|---|---|---|---|
| Green Jungle | " | 5,000.00 | Sold |
| Green Jungle with Tiger | " | 5,000.00 | " |
| Flamingos | " | 5,000.00 | " |
| Freedom | " | 5,000.00 | " |
| Concert | " | 2,000.00 | " |
| Eva | " | 1,000.00 | " |
| Small Jungle I | " | 800.00 | " |
| Small Jungle II | " | 800.00 | " |
| Fortifications | " | 800.00 | " |

by Picasso:

| | | | |
|---|---|---|---|
| Widow | " | 20,000.00 | Sold |
| Blue Boy with Wreath | " | 20,000.00 | " |
| Woman's Head | " | 1,500.00 | " |
| Blue Woman's Head | " | 1,000.00 | Lost |

by Manet:

| | | | |
|---|---|---|---|
| La Brioche | " | 40,000.00 | Safe |

by Renoir:

| | | | |
|---|---|---|---|
| Girl on the Beach | " | 30,000.00 | Safe |
| Small Landscape | " | 600.00 | Safe |

by Monet:

| | | | |
|---|---|---|---|
| Landscape by the Seine | " | 20,000.00 | Safe |

by Lenbach:

| | | | |
|---|---|---|---|
| Bismarck | " | 12,000.00 | lost |
| Amount carried forward | RM | 375,500.00 | |

– 2 –

|  |  | Amount carried forward | RM | 375,500.00 |
|---|---|---|---|---|
|  | by Degas: |  |  |  |
| [illegible] lost |  | Woman next to Bathtub | " | 1,200.00 |
| [illegible] |  | 2 English Landscapes | " | 1,000.00 |
| lost |  | Sketch: Woman in an Armchair | " | 500.00 |
|  | by Derain: |  |  |  |
|  |  | Vase | " | 700.00 |
| sold |  | Woman's Head with Black Hair | " | 500.00 |
| lost |  | Sketch of a Woman | " | 200.00 |
|  | by Laurencin: |  |  |  |
| lost |  | Woman's Head I | " | 400.00 |
| lost |  | Woman's Head II | " | 400.00 |
| [illegible] lost |  | Young Woman at Her Toilette | " | 300.00 |
|  | by Guardi: |  |  |  |
| * [illegible] DDR |  | Archway | " | 2,500.00 |
|  |  | Venice | " | 1,000.00 |
|  | by Vlaminck: |  |  |  |
| [illegible] |  | Landscape by the Harbor | " | 1,000.00 |
|  | by Signac: |  |  |  |
| safe |  | Promontory | " | 700.00 |
|  | by Hogarth: |  |  |  |
|  |  | Portrait | " | 4,000.00 |
|  | by Tiepolo: |  |  |  |
| [illegible] |  | 5 Sketches | " | 500.00 |
|  | by Matthieu: |  |  |  |
| sold |  | Portrait | " | 3,000.00 |
|  | Miscellaneous paintings, pictures, objets d'art: |  |  |  |
| [illegible] ? |  | Approx. 20 old English etchings | " | 10,000.00 |
|  |  | 25 etchings Rosenberg | " | 7,500.00 |
| lost? |  | 50 copper etchings | " | 3,000.00 |
|  |  | Amount carried forward | RM | 413,500.00 |

– 3 –

|  |  | Amount carried forward | RM | 413,900.00 |
|---|---|---|---|---|
| [illegible] | 15 old English etchings | | " | 5,000.00 |
| [illegible] | 2 old still lives | | " | 4,000.00 |
| [illegible] | Japanese bronze | | " | 1,000.00 |
| " | Diverse wall paintings by E.R. Weiss | | " | 500.00 |
| " | Various old and new etchings | | " | 500.00 |
|  |  |  | RM | 424,900.00 |

# EXHIBIT 7



SOMPO INTERNATIONAL
Promise. Trust. Protect. At the center of everything we do.

# Locations

United States

Illinois

# United States

## Illinois

### Chicago, Illinois

303 West Madison
Suite 1800
Chicago, IL 60606
United States

 | +1 312 980 5300
| +1 312 980 5302

Sompo International                                                            in

©2023 Sompo International Holdings Ltd.

Terms of Use  |  Privacy Policies  |  Modern Slavery Act Statement

# EXHIBIT 8





# EXHIBIT  9

THE REAL DEAL

Lock ↑
Ac...

The **Real Deal**
REAL ESTATE NEWS

Sign in     Subscribe

MARKETS     NEWS     MAGAZINE     EVENTS     PODCAST + VIDEO     DATA     PARTNERS

TRENDING

 Cushman in crisis: $3B in debt, leadership carousel

 Developer sues Rabbi Pinto and partners for "hostile takeover" of h...

 Chetrit's $77M Soho loan heads to special servicing, despite full...

 Trump ordered to pay $355M, barred from New York business

COMMERCIAL   CHICAGO

# Sompo doubles Chicago office footprint in move to Wacker Drive tower

Will occupy over 28K sf in John Buck–developed building



John Buck Company's John Buck and Sompo's Kengo Sakurada with 155 North Wacker Drive (John Buck Company, Sompo International, Google Maps, Getty)

FEB 9, 2024, 2:30 PM

By TRD Staff

 Save article

SHARE THIS ARTICLE

FONT SIZE

A   A   A

A specialty insurance provider has more than doubled its footprint in downtown, hinting at a potential recovery for an office market that's still climbing out from the depths of the pandemic.

Sompo International has leased more than 28,000 square feet in John Buck's 46-story tower at 155 North Wacker Drive, CoStar reported. The company will relocate from 303 West Madison Street, where it occupies about 13,000 square feet.

JLL brokers Deanna Becker, Kyle Harding and Patrick Lennon represented Sompo in lease negotiations, while Newmark's Bill Rolander represented Buck, who developed the building.

The move to the Wacker Drive tower reflects the ongoing flight-to-quality trend, in which companies are opting for newer, amenity-filled office properties. The building is 91 percent leased, considerably higher than the city average of roughly 76 percent.

THE REAL DEAL

NYC REAL ESTATE FORUM

You have **0** free articles left



"It's a feather in the cap, going to a Wacker Drive address from a little bit more dated space with fewer amenities," said JLL's Deanna Becker, who was involved in the Sompo deal.

Sompo chose its space in the 15-year-old tower, where leasing costs are about half of newer buildings along the river or in Fulton Market.

## Sign Up for the National Weekly Newsletter

[ Enter Your Email ]  **SIGN UP**

By signing up, you agree to TheRealDeal Terms of Use and acknowledge the data practices in our Privacy Policy.

The move strategically places Sompo closer to key business partners, including Marsh and Ryan Specialty Group. The tower joins a list of expanding Sompo locations, aligning with the company's growth strategy and preference for Class A buildings. It's unclear how many workers Sompo will house at its new Chicago office.

Since the pandemic ignited the remote-work movement, companies shrinking their office footprint has become the norm. However, there have been a few lease expansions, flashing glimmers of hope for a struggling office sector.



LOCK IN EARLY ADOPTER RATE

**Put the Power of Real Estate Data In Your Hands**

THE REAL DEAL TRD DATA

Market research firm Mintel recently moved into a 30,000-square-foot space at 203 North LaSalle Street, upping its Chicago footprint by 14 percent. In September, renewable energy firm RWE expanded its occupancy from 28,600 square feet to nearly 57,000 square feet in the 47-story tower at 353 North Clark Street, while insurance brokerage Lockton added 14,000 square feet to its lease at 500 West Monroe Street.

Why New York lawmakers aren't budging on real estate

**NEW YORK**
Related unwraps $12B Hudson Yards casino proposal

**NATIONAL**
Nir Meir pleads for freedom, gets ticket back to Rikers

**DALLAS**
Crow Holdings closes $3.1B value-add fund

**BRAND STUDIO**



**Unleashing the Speed and Efficiency of Prefabricated Solutions on the Office-to-Residential Market**

---

### Recommended          ALL MARKETS ⏷

Monroe Capital Expanding Office Footprint in Move to North Wacker

Madera Residential Nabs Distressed San Antonio Apartments

Home Showings Surge in Chicagoland

City Council Files Motion to Join Rental Voucher Lawsuit

Big Investors Take Over CA Ventures Industrial Platform

*—Quinn Donoghue*

**READ MORE**

**BRAND STUDIO**



**Michaels is making attainable housing happen**

CHICAGO



**Mintel increases office footprint in move to Sumitomo-owned tower**

CHICAGO

**Heitman, Spear Street score lease expansions downtown**

CHICAGO

**Riverside, Convexity score Antares lease at BMO Tower**

**COMPANIES AND PEOPLE**

JLL    John Buck Company    Sompo International    John Buck

**TAGS**

Expansion    Lease    Relocation

---

✉ **Top stories delivered to your inbox** ━━━━━━━━━━━━━━

**FEATURED**                    **WEEKLY**                    **DAILY**

☐ COMMERCIAL                    ☐ NATIONAL                    ☐ CHICAGO

☐ RESIDENTIAL                   ☐ CHICAGO                     ☐ LOS ANGELES

VIEW ALL NEWSLETTERS            [ Enter Your Email                    ]    **SIGN UP**

---

# EXHIBIT 10

CoStar™ | Product & Solutions | Contact Us | Login | Add a Listing ▾

News | Properties | Leasing | Sales | Funds | Tenants | Professionals | Markets | Public Record | Marketing Center | Benchmark

EXCLUSIVE

# Insurer's Lease More Than Doubles Its Chicago Office Space

Sompo International Plans Move to 46-Story Tower at 155 N. Wacker



Sompo International is moving its Chicago office to the 46-story tower at 155 N. Wacker Drive. (Justin Schmidt/CoStar)

By Ryan Ori
CoStar News

February 8, 2024 | 8:20 P.M.

A global specialty insurance provider is more than doubling the size of its Chicago office in a move a few blocks north, bucking the trend of companies chopping space.

Sompo International has leased 28,144 square feet in the 46-story tower at 155 N. Wacker Drive, according to brokers at JLL who represented the tenant. The company will leave behind about 13,000 square feet in the 26-story tower at 303 W. Madison St.

The long-term lease on the 37th floor is a relatively rare example of a Loop tenant expanding in a new lease, but it adds to a run of leases in high-end, newer-generation office towers near the river and west of there in Fulton Market.

RELATED CONTENT

Safety Testing Firm Opens Chicago Office in Latest Example of Downtown Expansions > >



Sompo looked in both areas before ultimately choosing a deal in a 15-year-old tower that was about 50% below the cost of brand-new properties along the river or in Fulton Market, Becker said. The tower Sompo is leaving opened in 1987.



GATEWAY 95
Warehouse off I-95 near Fort Belvoir and convenient to the Pentagon

Cambridge

### TRENDING

1. Annual Profit Falls 30% at World's Largest Commercial Property Brokerage as Focus Shifts to Acquisitions

2. Dealmaker Bob Knakal Headlines Event After Leaving JLL

3. Some Real Estate Professionals Say US Office Market May Still Have Room to Fall

4. Marcus & Millichap Posts Loss Following Slowdown in Deals

5. New York Investment Firm Buys Industrial Properties in Houston and Dallas-Fort Worth

6. Trump Ordered To Pay More Than $350 Million in Fraud Case for Inflating Real Estate Values

7. Blackstone's Great Wolf Resorts Lines Up $1 Billion Refinancing in Sign of Travel Rebound

8. This J.C. Penney Relocation Reflects Retail Demand Shift

9. Ex-Cushman & Wakefield Midwest Retail Leader Forms Boutique Firm

10. US Hotel Group Dials up £275 Million Deal for London's BT Tower

"This deal is reminiscent of the flight-to-quality trend," one of the JLL brokers, Deanna Becker, told CoStar News. "It's a feather in the cap going to a Wacker Drive address from a little bit more dated space at 303 W. Madison with fewer amenities."

The deal also places the insurance carrier close to companies it does business with, including two within 155 N. Wacker: Marsh and Ryan Specialty Group.

The tower developed and owned by the John Buck Company is the latest to add an expanding Sompo.

"In certain markets, they just knew that if they were going to grow, they wanted to be in a Class A building," Becker said. "Finding a building where they could be all on one floor was important. It's just more efficient."

It's unclear how many employees Sompo has in the Chicago office or how many it might add in the larger space. The company did not respond to requests for comment from CoStar News.

Sompo International was created in 2017 when Tokyo-based Sompo Holdings acquired Endurance Specialty Holdings, according to the company's website. The Japanese holding company has almost 80,000 employees in 46 countries, according to the site.

The Wacker Drive tower is just over 91% leased, according to CoStar data.

In another recent deal, safety testing company UL Solutions opened its first office in downtown Chicago since 1979, taking 40,000 square feet.

Other relatively rare examples of expanding companies have been Invenergy, SpotHero, Total Quality Logistics and Analytics8.

Many companies have contracted as remote and hybrid work schedules persist, including Mesirow, Prudential, Havas and Groupon.

Other corporations have decided to cut back space and stay in place, which PNC Bank did at 1 N. Franklin St. in Chicago after considering a move to 155 N. Wacker.

## For the Record

The tenant was represented by JLL brokers Deanna Becker, Kyle Harding and Patrick Lennon. The landlord was represented by Newmark broker Bill Rolander.

Follow us on Social Media      Have feedback or questions? Email us at news@costar.com

**See CoStar In Action**

REQUEST A DEMO

**Company**
About CoStar
CoStarGroup.com
Careers
Press Room
Privacy Notice
CA: Do Not Sell My Personal Info
Cookie Preferences

**Products**
CoStar
CoStar for Lenders
STR Benchmarking
CoStar Risk Analytics
CoStar Real Estate Manager
CoStar Advisory Services

**Social**
   

Terms of Use

Help Fight Data Theft

Accessibility

Contact Us

© 2024 CoStar Group

# EXHIBIT 11



&#128100; Sign In

Search for Jobs          Introduce Yourself


SOMPO
INTERNATIONAL

# CAREERS

# Underwriter, Commercial Management Liability

**Apply**

&#9673; Chicago (West Madison), IL

 Full time

&#128337; Posted 30 Days Ago

&#128463; R1331

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from those who matter the most: our people. At Sompo International, our values of integrity, collaboration, agility, execution and excellence underpin our culture and our commitment to providing an employee experience that attracts and engages the best talent in the industry. As we continue to grow, we strive to find diverse, innovative and driven professionals to join our teams and offer a broad range of career and development opportunities at all levels, in multiple business areas, in each of our locations throughout the world.  Our compensation and benefits programs are market driven and competitive, with excellent family friendly policies and flexible working provisions.

Job Description

Sompo International is seeking an **Underwriter, Commercial Management Liability (CML)** for our **Chicago, IL** office.

Our CML Underwriting team works on product lines such as Directors & Officers (D&O), Employment Practices (EPL), Fiduciary, and Crime Liabilities. We partner with both public and private companies across several industry verticals, including Fortune 500 and Fortune 1000 public companies. The team focuses on building relationships with brokers and clients, while striving for innovation, collaboration, and high-quality service.

Essential Duties & Responsibilities:

- Analyze individual insurance risks, create terms and conditions, and provide insurance

quotes
- Support the team with production, underwriting, and servicing of profitable CML business
- Develop and utilize a marketing plan utilizing marketing material, product collateral, and individualized tactics for brokers and assigned territories to support the growth of the business
- Monitor industry and account trends through industry related journals, articles, and data sources
- Support implementation and distribution strategies to facilitate the expansion of business growth and opportunities

Qualifications:

- Minimum of 1-3 years of experience in the underwriting, insurance, or financial sector industries
- Ability to effectively communicate information and ideas to influence and grow our business
- Undergraduate degree or demonstrable industry experience

At Sompo International, we recognize that the talent, skills, and commitment of our employees drive our success. This is why we offer competitive, high-quality compensation and benefit programs to eligible employees.

Our compensation program is built on a foundation that promotes a pay-for-performance culture, resulting in higher incentive awards, on average, when the Company does well and lower incentive awards when the Company underperforms.  The total compensation opportunity for all regular, full-time employees is a combination of base salary and incentives that gets adjusted upfront based on overall Company performance with final awards based on individual performance.

We continuously evaluate and update our benefit programs to ensure that our plans remain competitive and meet the needs of our employees and their dependents.  Below is a summary of our current comprehensive U.S. benefit programs:

- Two medical plans to choose from, including a Traditional PPO & a Consumer Driven Health Plan with a Health Savings account providing a competitive employer contribution.

- Pharmacy benefits with mail order options
- Dental benefits including orthodontia benefits for adults and children
- Vision benefits
- Health Care & Dependent Care Flexible Spending Accounts
- Company-paid Life & AD&D benefits, including the option to purchase Supplemental life coverage for employee, spouse & children
- Company-paid Disability benefits with very competitive salary continuation payments
- 401(k) Retirement Savings Plan with competitive employer contributions
- Competitive paid-time-off programs, including company-paid holidays
- Competitive Parental Leave Benefits & Adoption Assistance program
- Employee Assistance Program
- Tax-Free Commuter Benefit
- Tuition Reimbursement & Professional Qualification benefits

Sompo International is an equal-opportunity employer committed to a diverse workforce. M/F/D/V

## About Us



Sompo International is a global specialty provider of property and casualty insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., UK, Continental Europe and Asia. Our commitment to integrity, teamwork, agility, execution and excellence define our culture. As we continue to grow, we strive to find talented, creative and driven professionals to join our diverse workforce. We offer a broad range of career opportunities at all levels, in multiple business areas, in each of our locations throughout the world.

**Read More** ∨

workday.

© 2024 Workday, Inc. All rights reserved.

# EXHIBIT  12

Copied from ZIPRECRUITER website:

https://www.ziprecruiter.com/co/Sompo-International-Holdings/Jobs/-in-Chicago,IL

# Sompo International Holdings

- **Sompo International Holdings Jobs**

---

## 6 Sompo International Holdings Jobs Hiring in Chicago, IL

### Summer 2024 Underwriting Intern - Inland Marine

Sompo International Holdings Ltd. Chicago, IL

- $20 Hourly
- Full-Time

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

### Summer 2024 Underwriting Intern - Surety

Sompo International Holdings Ltd. Chicago, IL

- $20 To $22 Hourly
- Full-Time

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

### Underwriter, Commercial Management Liability

Sompo International Holdings Ltd. Chicago, IL

- Full-Time
- As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

## Real Estate and Facilities AVP

Sompo International Holdings Ltd.Chicago, IL

- $71K To $91K Annually

  **Estimated pay**

- Full-Time

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

## Senior Underwriter, Commercial Management Liability

Sompo International Holdings Ltd.Chicago, IL

- $102K To $120K Annually

  **Estimated pay**

- Full-Time

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

## Senior Underwriter, Excess Casualty

Sompo International Holdings Ltd.Chicago, IL

- $102K To $120K Annually

  **Estimated pay**

- Full-Time

As a leading provider of insurance and reinsurance with worldwide operations and employees in Bermuda, U.S., U.K., Continental Europe and Asia, we recognize that our success is derived directly from ...

Report Job

1. All Jobs

2. Sompo International Holdings Jobs

3. Jobs at Sompo International Holdings in Illinois

4. Jobs at Sompo International Holdings in Chicago, IL

Logos provided by Clearbit

## Job Seekers

- Search Jobs

- Browse Jobs

- Search Salaries

- Who is Phil?

- Job Seeker Reviews

- Mobile Apps

- Create Free Account

- Job Seeker Support

- Trust and Safety

- Career Advice

## Small & Medium Businesses

- Post a Job

- How it Works

- Job Sites

- ZipRecruiter Reviews
- Plans
- Search Resumes
- New Account Help
- Employer Support

## Enterprise Businesses

- Enterprise Overview
- How it Works
- Customer Stories
- FAQs
- Request a Consultation

## Partner with Us

- Job Board Software
- ATS Integrations

## Company

- About Us
- Careers
- Investors
- Blog
- Press
- Engineering
- ZipRecruiter.org
- ZipRecruiter UK

Facebook Twitter LinkedIn Instagram

# EXHIBIT 13

An official website of the United States Government Here's how you know

U.S. DEPARTMENT *of* STATE

Home  >  …  > Best Practices for the Washington Conference …

# Best Practices for the Washington Conference Principles on Nazi-Confiscated Art

**OTHER RELEASE**

MARCH 5, 2024

# BEST PRACTICES FOR THE WASHINGTON CONFERENCE PRINCIPLES ON NAZI-CONFISCATED ART

## March 5, 2024

On 3 December 1998, 44 states participating in the Washington Conference on Holocaust-Era Assets endorsed the Washington Conference Principles on Nazi-Confiscated Art, which is incorporated by reference herein. These principles were subsequently commented on and clarified in the Vilnius Forum Declaration of October 5, 2000, endorsed by 38 states, the

Terezin Declaration of June 30, 2009, endorsed by 47 states, and the 2010 Terezin Guidelines and Best Practices (which recognized the State of Israel's special moral role as a home for the largest number of survivors of the Holocaust (Shoah)).

In recognition of the 25th anniversary of the Washington Conference Principles, the following legally non-binding but morally important best practices clarify and improve the practical implementation of these Principles. As was the case with the Principles, the best practices were drafted with the awareness that there are differing legal systems and that states act within the context of their own laws. Countries will apply the best practices that follow in accordance with national laws.

A. "Art" refers to the cultural property of victims of the Holocaust (Shoah) and other victims of Nazi persecution, in public or private hands, including but not limited to paintings and other visual and decorative art, sacred scrolls, synagogue and ceremonial objects, as well as libraries, manuscripts, archives, records, and musical instruments belonging to individuals and to Jewish and other communities, organizations, and institutions.

B. "Nazi-confiscated" and "Nazi-looted" refer to what was looted, confiscated, sequestered, and spoliated, by the Nazis, the Fascists and their collaborators through various means including but not limited to theft, coercion, and confiscation, and on grounds of relinquishment, as well as forced sales and sales under duress, during the Holocaust era between 1933-45.

C. Taking into account the specific historical and legal circumstances in each case, the sale of art and cultural property by a persecuted person during the Holocaust era between 1933-45 can be considered equivalent to an involuntary transfer of property based on the circumstances of the sale.

D. "Just and fair solutions" means just and fair solutions first and foremost for the victims of the Holocaust (Shoah) and other victims of Nazi persecution and for their heirs. In principle, as set out in the Terezin Declaration, the primary just and fair solution is restitution, among other just and fair solutions.

E. Restitution should be to all lawful beneficiaries and heirs in accordance with a country's usual inheritance law. All pre-War owners who are

identified through provenance research or their heirs should be proactively sought by the current possessors for the purpose of restitution.

F. In case of restitution, current possessors should not seek repayment from the pre-War owners or their heirs of the purchase price of Nazi-confiscated works of art in their collections. Compensation should be tax exempt.

G. Governments should encourage provenance research and projects to catalogue, digitize and make available on the internet public and private archives, including dealer records. Public and private collections should be encouraged to publish their inventories.

H. Provenance researchers should have access to all relevant archives and source documents.

Provenance research carried out by public or private bodies should be made publicly available on the internet. Where queries are made, as a matter of fairness current possessors in particular should disclose all documentation related to acquisition and provenance to claimants. Provenance research, particularly regarding potential claims, ideally should be conducted by an independent research body to avoid possible conflicts of interest. Such an independent institution should be granted access to all relevant archives whether public or private.

I. Countries are encouraged to create an independent expert body whose composition may be the states' responsibility, to which unilateral access is available that can adjudicate cases of art and cultural property and arrive at or recommend a binding or non-binding decision

(for example, the use of commissions in Austria, France, Germany, Netherlands, and the United Kingdom). Such bodies should have balanced, expert, and representative membership. Use of alternative resolution mechanisms is encouraged to avoid litigation.

J. Claims handling bodies such as national commissions, museums or other agencies, are encouraged to publish terms of reference and rules of procedure as well as their decisions and recommendations so that the claims process and grounds for decisions are fully transparent to claimants.

K. To make restitution of art and cultural property that remains in state-owned collections and private hands possible, countries should consider making exceptions to barriers such as regulations

against deaccessioning from state collections, statutes of limitations, market overt, usucapion (mode of acquiring title to property by uninterrupted possession of it for a definite period), good faith acquisition, and export bans.

L. Countries and institutions should maintain and publish online comprehensive information and statistics on research undertaken, works of art that have been identified and restitutions or other fair and just solutions that have been achieved. Information should be published about claims which have been made and that have been resolved, including reasons for the decision, giving due regard to confidentiality.

M. Countries and institutions should establish central contact points to provide information,

advice and help on any query regarding art, records, archives and claims.

N. There is a recognized urgent need to work on ways to achieve a just and fair solution to the issue of spoliated art and cultural property where pre-War owners or their heirs, both individuals and legal persons cannot be identified, while recognizing there is no universal model for this issue and recognizing the previous Jewish or other ownership of such cultural assets.

O. Art and cultural property that is determined to have been the property of Jewish communities should be returned to an existing successor community, institution, or organization, and/or a successor organization for the Jewish people as a whole. The objects should not be seen as collection items but as part of the collective

memory of the Jewish people. As yet unreturned items that exist in textual form, such as manuscripts, archives, scrolls, and books, should be digitized and made easily accessible over the internet.

---

## TAGS

Cultural Properties

Holocaust Issues

Office of the Special Envoy for Holocaust Issues

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

     

Privacy Policy

Accessibility Statement

Copyright Information

FOIA