## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JULIUS H. SCHOEPS, *et al.*,
    Plaintiffs

    v.

SOMPO HOLDINGS, INC., *et al.*,
    Defendants

No. 22 CV 7013

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

The plaintiffs, purported heirs of a German art collector who was persecuted by the Nazis, bring this action against Sompo Holdings, Inc. and its affiliates[1] (collectively, "Sompo") to recover a painting by Vincent Van Gogh. The defendants move to dismiss due to lack of personal jurisdiction, lack of subject matter jurisdiction, and *forum non conveniens*. (R. 57.) For the reasons set forth in this memorandum opinion, the Court grants the motion and dismisses the complaint for lack of personal jurisdiction.

## BACKGROUND[2]

In 1888, Vincent Van Gogh left Paris and moved to Arles, a town in the south of France. (R. 39-3 at 14.) While waiting for his friend, Paul Gauguin, Van Gogh began working on a series of oil paintings of sunflowers. (*Id.*) Although his arrival in Arles

---

[1] Sompo International Holdings Ltd., Sompo Fine Art Foundation, and Sompo Japan Insurance Inc.

[2] The facts in the background section are taken from the first amended complaint and the exhibits attached thereto and are presumed true for the purpose of resolving the motion to dismiss. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

marked the beginning of a period of "intense creativity" for Van Gogh, and arguably the pinnacle of his artistic career, his mental health quickly began to deteriorate. (*Id.*) About two months after Gauguin arrived in Arles, Van Gogh threatened him with a razor and, infamously, cut off part of his own left ear. (*Id.*) Although Van Gogh continued working and went on to complete his sunflowers series in 1889, he appears to have never fully recovered from this psychological break. (*Id.* at 22, 25.) He committed suicide the following year. (*Id.* at 25.)

After Van Gogh's death, one of his sunflower paintings ("*Sunflowers*") was acquired by Paul von Mendelssohn-Bartholdy, a prominent German banker and art collector. (R. 39 ("FAC") ¶ 127.)



***Sunflowers* - Vincent Van Gogh (1888)**

Mendelssohn-Bartholdy was a member of a well-known family whose relatives included composer Felix Mendelssohn and Enlightenment philosopher Moses

Mendelssohn. (*Id.*) However, because he was Jewish, Mendelssohn-Bartholdy and his family were persecuted when Adolf Hitler and the Nazi Party came to power in Germany. (*Id.* ¶¶ 133–183.) Throughout the 1930s, Mendelssohn-Bartholdy was subjected to increasingly severe sanctions by the Nazi regime. (*See id.*) In 1934, he was ousted from the Reich Insurance Corporation and from the Central Union of German Banking and Bankers. (*Id.* ¶¶ 158, 162.) He was effectively removed from his role on the board of the Berlin Stock Exchange. (*Id.* ¶ 159.) Profits from his family bank, Mendelssohn & Co., declined precipitously. (*Id.* ¶¶ 173–74.) Eventually, pursuant to Nazi policies, the bank was forcibly transferred to non-Jewish ownership. (*Id.* ¶¶ 203–04.)

Mendelssohn-Bartholdy's increasingly dire circumstances forced him to begin liquidating his art collection, then one of the most prominent modern art collections in Europe. (*Id.* ¶¶ 184–99.) In 1934, he placed *Sunflowers* on consignment with Paul Rosenberg, a Parisian art dealer. (*Id.* ¶¶ 127, 193.) Rosenberg sold the painting to Edith Beatty, a British-American heiress. (*Id.* ¶¶ 208, 216, 239.) Decades later, in 1987, *Sunflowers* was sold again in a highly publicized auction at Christie's auction house in London. (*Id.* ¶¶ 2, 5.) The buyer was Yasuda Fire and Marine Insurance Company, a Japanese insurance company and the predecessor-in-interest of Defendant Sompo Holdings, Inc. (*Id.* ¶¶ 5, 30, 236–39.) Yasuda paid $40 million for the painting. (*Id.*)

*Sunflowers* remained in Japan until 2001, when it was sent abroad for display as part of an international Van Gogh exhibition. (*Id.* ¶ 70.) From September 22, 2001,

to January 13, 2002, the painting was displayed at the Art Institute of Chicago ("AIC") in Chicago, Illinois. (*Id.* ¶¶ 5–6, 246–255.) From February 9, 2002, to June 2, 2002, the painting appeared in an exhibition at the Van Gogh Museum in Amsterdam. (R. 39-18.) It returned to Tokyo later that year. (*Id.*; R. 39-19 at 2.)

In 2016, Congress enacted the Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat 1524 (2016) ("HEAR Act"). The HEAR Act preempts state law statutes of limitations for actions to recover property stolen or misappropriated by the Nazis between 1933 and 1945. *Id.* §§ 2(6), (7), 3(2). The Act allows litigants to file a claim to recover property within six years of "actually discover[ing]" either (a) the identity and location of the artwork or other property, or (b) a possessory interest of the claimant in the artwork or other property. *Id.* § 5(a).

The plaintiffs, Mendelssohn-Bartholdy's heirs, seek to use the lengthened statute of limitations established by the HEAR Act to recover *Sunflowers*. (*See generally* FAC.) They filed a twelve-count complaint against Sompo to recover the painting, its fair market value (allegedly $250 million) and damages. (*See id.*) The complaint asserts state law claims for replevin (Count I); conversion (Count II); trover (Count III); imposition of a constructive trust (Count IV); unjust enrichment (Count V); breach of fiduciary duty (Counts VI and VII); and slander of title (Count VIII). The plaintiffs also assert claims for restitution and unjust enrichment under federal common law (Counts IX and X) and pursuant to the Court's "plenary equitable authority" Article III (Counts XI and XII). Sompo now moves to dismiss based on lack of standing, lack of personal jurisdiction, and *forum non conveniens*. (R. 57.)

4

## LEGAL STANDARD

"Rule 12(b)(1) is the means by which a defendant raises a defense that the court lacks subject-matter jurisdiction." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020); *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The plaintiff bears the burden of establishing subject matter jurisdiction in response to a Rule 12(b)(1) motion. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). When deciding a facial challenge to subject matter jurisdiction—that is, when the defendant argues that the plaintiff's jurisdictional allegations are inadequate—"the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). By contrast, when considering a factual challenge to subject matter jurisdiction, [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008).

A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party. Fed. R. Civ. P. 12(b)(2). As with a Rule 12(b)(1) challenge, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (citation omitted). In resolving a Rule 12(b)(2) motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint," *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012), and "read[s] the complaint liberally with every inference drawn in favor of [the] plaintiff." *GCIU-Emp. Ret. Fund*

*v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). Although the Court may consider extrinsic evidence in deciding the motion, where—as here—the Court rules on a defendant's Rule 12(b)(2) motion without an evidentiary hearing, "the plaintiff bears only the burden of making a *prima facie* case for personal jurisdiction." *Curry*, 949 F.3d at 393.

## ANALYSIS

### I.    SUBJECT MATTER JURISDICTION

The Court begins with Sompo's argument that the complaint should be dismissed for lack of subject matter jurisdiction. *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 902 (7th Cir. 2019) ("Subject-matter jurisdiction is the first issue in any case").

### A.    Representative Standing

Sompo first argues that the plaintiffs lack standing to sue as Mendelssohn-Bartholdy's heirs. (R. 58 at 20–24.) Standing is "an essential component of a federal court's subject matter jurisdiction to resolve parties' disputes." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 284 (7th Cir. 2020).

A litigant's ability to sue as a representative of a decedent's estate is determined by the law of the state in which the Court is located. *Owsley v. Gorbett*, 960 F.3d 969, 970 (7th Cir. 2020); Fed. R. Civ. P. 17(b)(3). "Illinois law has long made clear that" a cause of action that survives the holder's death "must be brought by and in the name of the representative or administrator of the decedent's estate." *Will v. Nw. Univ.*, 881 N.E.2d 481, 492 (Ill. App. Ct. 2007) (collecting cases). To file suit as an estate representative or administrator under Illinois law, a litigant must either possess letters of office issued by a court in Illinois or "by a court of competent

jurisdiction of any other state, territory, country or the District of Columbia." 755 ILCS 5/22-3.

The plaintiffs have not complied with this requirement in the literal sense. They are not the administrators or representatives of Mendelssohn-Bartholdy's estate, and they lack letters of office issued by a court in Illinois or any other jurisdiction. Nonetheless, they contend that they have standing to sue because their rights as Mendelsohn-Bartholdy's heirs arise under German law. Because German law lacks the concept of an "estate," a legal abstraction central to American and British inheritance law, the plaintiffs argue that they do not need to literally comply with 755 ILCS 5/22-3 to have standing to sue. (FAC ¶ 14.)

To support this contention, the plaintiffs submit a sworn declaration from Ulf Bischof, a German attorney who specializes in art restitution and inheritance law. (R. 67-4 ("Bischof Decl.").) Bischof explains that, under German law, rights and possessory interests vest immediately upon the death of a decedent. (*Id.* ¶ 5(a).) If the decedent has multiple heirs, then, immediately upon death, the heirs take possession of the property jointly and severally as members of what Bischof refers to as a "community of heirs." (*Id.*) The individual co-heirs may individually bring legal actions concerning property that may be subject to the claims of multiple descendants. (*Id.* ¶ 8.) Although the individual heir sues under their own name, they make a demand for performance as to all members of the community. (*Id.* ¶¶ 8–9.)

That is exactly what the plaintiffs did in this case. (FAC ¶¶ 17, 329(a).) Although the plaintiffs filed this action in their personal capacity, the complaint

states that they are suing on behalf of all Paul von Mendelssohn-Bartholdy's living heirs. (*Id.*¶ 17.) Bischoff states, under penalty of perjury, that each of the plaintiffs has standing to sue under German law. (Bischof Decl. ¶¶ 10–12.) Sompo has provided no evidence to refute Bischof's interpretation of German law, or to suggest that the individual plaintiffs lack standing. The Court finds that the sworn declaration of Bischof, along with the plaintiffs' allegations provide a legitimate basis for the plaintiffs to pursue their claims, notwithstanding the fact that they have not obtained letters of office under 755 ILCS 5/22-3.

*Wilson v. Sunstrand Corporation*, No. 99 C 6946, 2002 WL 99745 at *3 (N.D. Ill. Jan. 25, 2002), is instructive. There, the district court considered whether heirs of a German decedent had standing under Rule 17 to pursue wrongful death and survival actions in Illinois. *Id.* The plaintiffs lacked letters of office, and the district court analyzed whether the plaintiffs' failure to obtain letters under 755 ILCS 5/22-3 barred their claims. The court concluded that it did not, reasoning that:

> There is no basis to believe that the [Illinois] legislature intended to bar the door of the Illinois courts to persons who, under the law of a foreign legal system different from our own, are fully and properly authorized to sue on behalf of a deceased person. If a foreign legal system lacks a procedure for appointment of an administrator of an estate but has some other mechanism which accomplishes these purposes, we see no basis to require more and do not believe that the Illinois courts would require more if faced with the issue.

*Id.* Like the plaintiffs in this case, the plaintiffs in *Wilson* submitted documentary proof of their status as heirs and the testimony of a German law expert who verified that the plaintiffs had authority to bring suit. *Id.* at *1. The court held that the

8

plaintiffs had standing since they had presented evidence that they had complied with the relevant procedures under German law. *Id.* at *4.

Here, too, the plaintiffs have presented evidence that they complied with prerequisites for bringing suit. Bischoff testified that (1) Germany lacks a procedure for appointment of an estate administrator comparable to Illinois, (2) that an individual suit on behalf of a community of heirs would fulfill the same purpose as an action brought by an appointed representative, and that (3) the plaintiffs have standing to bring such a claim under German law. (R. 67-4.) This is sufficient to establish, at least for present purposes, that the plaintiffs have standing to sue as Mendelssohn-Bartholdy's heirs. Indeed, in another case involving the same named plaintiffs, the U.S. District Court for the Southern District of New York reached a similar result under New York law, accepting the plaintiffs' characterization of German law and holding that "the [c]laimants' failure to be appointed representatives of the relevant estates" as required by a New York statute was not "a bar to bringing their conversion and replevin claims." *Schoeps v. Museum of Mod. Art*, 594 F. Supp. 2d 461, 467 (S.D.N.Y. 2009).

Sompo attempts to distinguish these cases by pointing out that the plaintiffs are seeking the right to sue in their individual capacities (rather than in their representative capacities). This is a distinction without a difference, however, since Bischof's declaration indicates that there is no such thing as a "representative capacity" suit under German law in this context. As a matter of German law, the fact that the plaintiffs are suing "in their individual capacities" is not inconsistent with

the notion that they are bringing the action on behalf of all Mendelssohn-Bartholdy's heirs.

Sompo also cites *Schoeps v. Andrew Lloyd Webber Foundation*, 66 A.D.3d 137 (N.Y. 2009), a New York appellate court decision holding that—under a New York analog of Illinois' "right to sue" statute—the plaintiffs lacked standing because they had not obtained letters of office naming them as estate representatives. (R. 58 at 23.) *Andrew Lloyd Webber* is distinguishable from the case at bar, however, since the plaintiffs in that case failed to submit a verified affidavit or documentary proof to substantiate their claims regarding German law. *See* 66 A.D.3d at 142. The court held that "[a]t a minimum, the absence of the affirmation of an expert in German law, opining as to the applicability of German law to plaintiff's standing to bring this lawsuit without being appointed as a personal representative, renders the record insufficient." *Id.* Here, Bischof's declaration details the operation of German inheritance law and the concept of a community of heirs.

Because the weight of authority suggests that the plaintiffs have representative standing to sue as Mendelssohn-Bartholdy's heirs, notwithstanding the fact they have not obtained letters of administration, the Court denies Sompo's motion to dismiss the complaint due to lack of standing.

### B.    Federal Common Law Claims

Sompo next argues that the Court lacks subject matter jurisdiction over the federal causes of actions alleged in the complaint. (R. 58 at 24–28.) Specifically, it asks the Court to dismiss the plaintiffs' restitution and unjust enrichment claims

10

premised on "federal common law" and on the Court's "plenary equitable authority" under Article III, Section 2 of the U.S. Constitution.

As an initial matter, the plaintiffs' appeal to the Court's "plenary equitable authority" under Article III as a separate basis for jurisdiction is a nonstarter. "Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986). Article III, Section 2 provides, in pertinent part, that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . ." In other words, while the Constitution empowers federal courts to hear suits in equity, this power is limited to "cases and controversies . . . arising under federal law or within the diversity jurisdiction." *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 911 (7th Cir. 2017). Whether the Court can hear the plaintiffs' equitable causes of action depends on whether such claims exist under federal common law.

"[T]here is no federal general common law." *Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "Instead, only limited areas exist in which federal judges may appropriately craft the rule of decision." *Id.* (citation omitted); 32 Am. Jur. 2d Federal Courts § 356 ("The reluctance to create common law is a core feature of federal court jurisprudence."). These areas are "few and restricted" and must involve "extraordinary" circumstances. *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 87, 89 (1994). In general, a court may only recognize a federal common law claim if (1) a

federal rule of decision is "necessary to protect uniquely federal interests" or (2) if "Congress has given the courts the power to develop substantive law." *United States v. Park*, 389 F. Supp. 3d 561, 579 (N.D. Ill. 2019) (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).

The Court first considers whether the creation of equitable remedies is necessary to protect "uniquely federal interests." *Texas Indus.*, 451 U.S. at 640. Examples of such interests include interstate or international disputes between states or foreign nations or the admiralty. *Id.* at 641 (collecting cases).

The plaintiffs liken this lawsuit to an international dispute since *Sunflowers* has moved across at least six different nations and three continents, and because of the painting's "Nazi taint." (*See* R. 67 at 21 ("[T]he restitution of Nazi-confiscated artworks involves foreign affairs and affects international relations."); *see also id.* at 38 n.93.) Despite its international character, however, this is a dispute between private parties. None of the parties are "states or foreign nations." *Texas Indus.*, 451 U.S. at 641. This fact renders most of the cases that the plaintiff cites distinguishable. *Republic of Philippines v. Marcos*, 806 F.2d 344, 348 (2d Cir. 1986), concerned "an action brought by a foreign government against its former head of state," *Provincial Government of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083 (9th Cir. 2009), involved an action brought by foreign provincial government, and *Mashayekhi v. Iran*, 515 F. Supp. 41 (D.D.C. 1981), was an action for damages against a foreign government.

12

*Ungaro-Benages v. Dresdner Bank AG*, is the only case that the plaintiffs cite in which a court applied federal common law to a dispute between two private actors. 379 F.3d 1227 (11th Cir. 2004). There, a descendent of a Jewish heir to a German corporation sued German banks that had stolen the heir's stock pursuant to Nazi divestment policies. *Id.* at 1229. The Eleventh Circuit held that federal common law applied because the case implicated the uniquely federal area of foreign relations. *Id.* at 1232–33. Crucially, however, the Eleventh Circuit identified an executive agreement between the United States and Germany that provided "the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." *Id* at 1234. This agreement preempted contrary state law and "firmly establish[ed] that issues related to litigation against German corporations from the National Socialist era are governed by federal law . . . ." *Id.* at 1234–35 (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)).

The plaintiffs have not identified a comparable executive agreement that mandates the application of federal common law as opposed to state law in this case. They cite the Terezin Declaration, a "legally non-binding" document promulgated on June 30, 2009, at the Prague Holocaust Era Assets Conference. Because the Terezin Declaration has no legal effect, it is distinguishable from the agreement at issue in *Ungaro-Benages*.

Nor has Congress given federal courts the power to develop substantive law in this area. The plaintiffs cite the HEAR Act as conferring such authority. (FAC

13

¶¶ 232–33; R. 68 at 21–22.) But, unlike the treaty at issue in *Ungaro-Benages*, the HEAR Act does not preempt state law property or tort claims. To the contrary, the HEAR Act implicitly sanctions the application of state law to claims concerning stolen Nazi art by extending state law statues of limitations. Nor does the HEAR Act include a remedial scheme for the recovery of stolen property. The Act states that "[n]othing in this Act shall be construed to create a civil claim or cause of action." Pub. L. No. 114-308, §5(f).

*Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 195 (2d. Cir. 2019), is persuasive as to why the HEAR Act does not create a federal common law cause of action. In considering an action to recover expropriated art, the Second Circuit clarified that the HEAR Act fulfilled the limited purpose of abrogating state statute of limitations periods and rejected an attempt to create a federal common law cause of action. *Id.* at 195 n.9 The plaintiffs argue that the Second Circuit's ruling in *Zuckerman* is merely persuasive and does not "negate the ability" of this court to recognize a federal common law cause of action on its own. (R. 67 at 22.) But the fact that a course of action lies within this Court's authority does not make it advisable. In the absence of any federal court recognizing a federal common law cause of action under the HEAR Act, this Court will not be the first to do so.

Similarly, the plaintiffs cite the Holocaust Victims Redress Act, Pub. L. No. 105-158, 112 Stat 15 (1998). But federal courts have interpreted this statute as not creating a federal common law cause of action to recover art stolen by the Nazis. *See, e.g.*, *Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 576 (5th Cir. 2010); *Orkin v. Taylor*,

14

487 F.3d 734, 739 (9th Cir. 2007). In sum, the plaintiffs have failed to establish that applying Illinois state law to their claims would impose a "significant conflict with an identifiable federal policy or interest." *Id.* Accordingly, the Court dismisses Counts IX, X, XI, and XII due to lack of subject-matter jurisdiction.[3]

## II. PERSONAL JURISDICTION

The Court next considers whether it may exercise personal jurisdiction over Sompo. Where—as here—no federal statute authorizes service of process, personal jurisdiction is governed by the law of the forum state and must comply with both statutory and constitutional requirements. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Because Illinois' long-arm statute allows for personal jurisdiction to the full extent authorized by the Illinois and United States Constitutions, only the Constitutional inquiry is necessary. *See id.* (citing ILCS § 5/2–209(c)); *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 732 (7th Cir. 2013).

Under the Due Process Clause of the Fourteenth Amendment, a district court may exercise personal jurisdiction over an out-of-state defendant only if the

---

[3] This dismissal raises the possibility that the Court lacks subject matter jurisdiction over the plaintiffs' remaining state law claims. Although Sompo does not raise this issue, the Court has an independent obligation to assess subject matter jurisdiction at any stage of the proceedings. *Foster v. Hill*, 497 F.3d 695, 696–697 (7th Cir. 2007). Under *Gunn v. Minton*, federal question jurisdiction extends to state law causes of action in circumstances where a "federal law issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." 568 U.S. 251, 258 (2013). District courts have held that the extension of state law statute of limitations periods pursuant to the HEAR Act raises a federal question and provides a basis for federal question jurisdiction under *Gunn. See, e.g.*, *Holtzman as Tr. of Elizabeth McManus Holtzman Irrevocable Tr. v. Philadelphia Museum of Art*, No. 22 C 122, 2022 WL 2651851, at *8 (E.D. Pa. July 7, 2022). This Court agrees with the analysis in *Holtzman* and concludes that the application of the HEAR Act supplies a basis for federal question jurisdiction over the plaintiffs' remaining state law claims.

defendant has "certain minimum contacts with the state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Millikin v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts exist where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017).

Personal jurisdiction comes in two flavors—general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 126–28 (2014). A court may exercise general personal jurisdiction only when a defendant is "essentially at home" in the forum state. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Specific personal jurisdiction, by contrast, covers "a narrower class of claims" based on the defendant's "purposeful availment" of the forum state. *Id.*; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). There is no dispute that the Court cannot exercise general personal jurisdiction over Sompo; the only question is whether the exercise of specific personal jurisdiction is proper.

## A.  Minimum Contacts

To establish that the Court may exercise specific personal jurisdiction over Sompo, the plaintiffs must satisfy two requirements. First, they must plausibly allege that Sompo took "some act by which it purposefully avail[ed] itself of the privilege of conducting activities within" Illinois. *Ford Motor Co.*, 592 U.S. at 359–60 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Sompo's contacts must be voluntary and not "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine,*

16

*Inc.*, 465 U.S. 770, 774 (1984)). Second, the plaintiffs' claims "must arise out of or relate to" Sompo's contacts with Illinois. *Id.* at 359 (citation omitted).

### 1. Whether Minimum Contacts May be Imputed Among the Sompo Entities

Before assessing whether the plaintiffs have alleged the requisite minimum contacts, the Court addresses the threshold issue of whether the contacts of the various Sompo entities may be imputed to one another.

As a general matter, "[e]ach defendant's contacts with the forum State must be assessed individually." *AFI Holdings of Ill., Inc. v. Nat'l Broad. Co.*, 239 F. Supp. 3d 1097, 1101 (N.D. Ill. 2017) (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)); *see also Keeton*, 465 U.S. at 781 ("[J]urisdiction over a parent corporation [does not] automatically establish jurisdiction over a wholly owned subsidiary."); *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 (7th Cir. 2003); *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). Only in the "narrow instances where a parent utilizes its subsidiary in such a way that . . . the parent has greater control over the subsidiary than normally associated with common ownership and directorship or where the subsidiary is merely an empty shell" are the "contacts of a subsidiary [ ] aggregated with the contacts of the parent." *Purdue Rsch. Found.*, 338 F.3d at 788 n.17 (internal quotation marks and alterations omitted).

The plaintiffs' allegations fall short of demonstrating that the Sompo entities' contacts may be imputed to one another for personal jurisdiction purposes. The complaint does not allege that the Sompo entities have common ownership or

17

directorship or failed to observe corporate formalities. Nor does it describe Sompo's corporate structure in detail. The complaint alleges, in conclusory fashion, that Sompo Holdings, Inc. "exercises dominion and exclusive control" over the other entities. But the Court need not credit these boilerplate allegations. *See Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 735 (N.D. Ill. 2017). The only allegations regarding corporate form that the complaint sets forth in any detail are that the defendants "promote an international corporate identity," that "all of the Sompo entities are united in identity, function, and purpose internationally as 'One Sompo'" and that the defendants have "a unity of interest and ownership that causes the separate identities of these entities to no longer exist." (FAC ¶ 89(a).)

These allegations are an insufficient basis for disregarding the corporate form.[4] *See Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 867–68 (N.D. Ill. 1998) (rejecting veil piercing allegations in the context of a motion to dismiss for lack of personal jurisdiction over a Japanese parent company since ambiguous references to "*[o]ur* key overseas operation," "*our* international marketing efforts" and "*our* marketing position" were consistent with a subsidiary's existence as a separate

---

[4] Federal courts sitting in Illinois apply "the law of the state of incorporation to veil piercing claims." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012). The defendants are incorporated in Japan and Bermuda, and the plaintiffs identify no authority regarding veil-piercing and alter-ego under Japanese and Bermudan law. The Court need not perform legal research on their behalf. *White v. Richert*, 15 C 8185, 2019 WL 4062539, at *9 (N.D. Ill. Aug. 28, 2019) (citing *Pelfrense v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)). That said, the Court notes that, under either jurisdiction's law, veil piercing is permitted only in "extraordinary circumstances." *In re Arb. between Promotora de Navegacion, S.A.*, 131 F. Supp. 2d 412, 422 (S.D.N.Y. 2000) (Bermuda law); *Semiconductor Energy Laby Co. v. Samsung Elecs. Am.*, Inc., 116 F.3d 1497 (Fed. Cir. 1997) (Japanese law requires a plaintiff to plead facts showing that "a juridical entity is . . . abusively used in order to avert application of law.").

entity) (emphases in original); *Medco Rsch., Inc. v. Fujisawa Pharm. Co.*, No. 93 C 2705, 1994 WL 87453, at *4 (N.D. Ill. Mar. 16, 1994) (similar); *see also Sompo Japan Nipponkoa Ins., Inc. v. CSX Transp., Inc.*, No. 19 C 1154, 2020 WL 7074558, at *7 (M.D. Fla. Dec. 3, 2020) ("The mere fact that [two entities] share a principal place of business, a website, and some overlap of governing officers is insufficient to pierce the corporate veil.")

The plaintiffs also allege that Sompo's corporate form should be disregarded because Sompo has used it to "circumvent the provisions of a statute." (FAC ¶ 59 (*quoting Ill. Bell Tel. Co., Inc. v. Glob. Naps Ill., Inc.*, 551 F.3d 587, 591 (7th Cir. 2008)). But the complaint does not explain how Sompo's corporate form—as opposed to its conduct—undermines the policies of the HEAR Act (or any other federal statute). Similarly, the plaintiffs contend that Sompo's corporate form should be disregarded based on fraud. (R. 67 at 26.) They point to a communication between Sompo and the AIC prior to the 2001 exhibition in Chicago in which a Sompo employee stated that "we cannot change the ownership" of *Sunflowers* because a "Nazi[] confiscation problem may arise in America and in Holland." (R. 39-1.) Based on this communication, the plaintiffs allege that Sompo and the AIC falsified or fraudulently concealed information in an application for immunity from judicial seizure that was approved by the State Department prior to the exhibition. (FAC ¶¶ 6, 33, 72, 106(b), 250, 253.)

There are a couple of problems with this theory. First, the Federal Rules require fraud or mistake to be pleaded with particularity. Fed. R. Civ. P. 9(b). The

19

plaintiffs' allegations demonstrate, at best, that Sompo was aware of the potential
"Nazi taint" of *Sunflowers* before it obtained an order of immunity from judicial
seizure in advance of the 2001 exhibition. The complaint does not identify any false
or misleading statement that Sompo made to the State Department in connection
with this application, or any information that was concealed. Instead, the plaintiffs'
allegations of fraud are made "upon information belief," which, as a general matter,
is insufficient to satisfy Rule 9(b). *Bankers Trust Co. v. Old Republic Ins. Co.*, 959
F.2d 677, 683 (7th Cir. 1992). More fundamentally, even accepting the plaintiffs'
allegations as true, the fact that Sompo may have concealed aspects of *Sunflowers'*
provenance from authorities does not demonstrate that its *corporate structure* should
be disregarded. *Cf. In re Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d
1111, 1124 (N.D. Ill. 2022) (identifying requirement that "corporate structure *cause*
fraud or similar injustice") (emphasis added). Simply put, there is no connection
between this alleged fraud and Sompo's corporate form.[5]

Nor have the plaintiffs adequately alleged that Sompo's corporate form should
be disregarded based on an agency theory. A recent decision from this District, *Theta
IP, LLC v. Motorola Mobility, LLC*, No. 22 C 3441, 2024 WL 1283706, at *1–2 (N.D.
Ill. Mar. 25, 2024), is instructive on this point. In *Theta IP*, the plaintiff filed suit

---

[5] The plaintiffs also allege that Sompo Holdings, Inc. misrepresented on its website that
it conducted "an extensive enterprise-wide human rights due diligence investigation." (FAC
¶ 39.) These allegations are similarly insufficient. The plaintiffs do not identify any false
statement on the website, and they allege no facts indicating that Sompo did not undertake
the human rights investigation that it claims it did. At any rate, whether Sompo completed
an internal human rights investigation is not relevant to whether its corporate form should
be disregarded for personal jurisdiction purposes.

against Motorola Mobility LLC, its affiliate, Lenovo (United States) Inc., and their Chinese parent company. *Id.* The plaintiffs alleged that the Court could exercise personal jurisdiction over the parent company based on its subsidiary's contacts because the corporations shared overlapping executives, were parties to the same insurance contracts, and because statements in the corporation's reporting indicated the parent company had the ability to "direct the activity" of its subsidiaries. *Id.* at *4–5. The district court found that these allegations were insufficient to establish personal jurisdiction over the parent company, pointing out the absence of allegations or evidence that the companies maintained separate books and records, or that the parent company participated in "the staffing, marketing, sales, and pricing decisions of its subsidiaries." *Id.* at *5.

The plaintiffs' allegations in this case are even more sparse than those at issue in *Theta IP*. Apart from statements identifying the company as "One Sompo," and a company-wide branding strategy, the plaintiffs do not point to any facts indicating that the Sompo entities are essentially integrated. And the defendants submitted unrebutted declarations indicating that, with respect to the conduct at issue in this case, they are not involved in the activities of their affiliates'. (*See* R. 58-1; R. 58-2; R. 58-3; R. 58-4); *see, e.g.*, *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1045 (N.D. Ill. Apr. 30, 2015) ("When Defendant challenges by declaration a fact alleged in the Complaint, Plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."). Accordingly, the

21

plaintiffs may not impute the contacts of the Sompo entities to one another for personal jurisdiction purposes.

### 2. Purposeful Availment Related to the Plaintiffs' Claims

The Court next considers whether the plaintiffs have established a *prima facie* case of personal jurisdiction based on allegations that each of the Sompo defendants purposefully availed themselves of Illinois. Broadly speaking, the plaintiffs allege that the Sompo entities directed their conduct toward Illinois by (1) selling insurance in the state, (2) hosting websites and disseminating advertisements, (2) displaying an image of *Sunflowers* on Sompo Holdings, Inc.'s website, and (3) loaning *Sunflowers* to the AIC for the Van Gogh exhibition in 2001. Because these theories are "dissimilar in terms of geography, time, [and] substance," the Court "cannot simply aggregate" them and instead addresses them separately. *See uBID, Inc. v. Godaddy Grp., Inc.*, 623 F.3d 421, 429 (7th Cir. 2010).

### a. Sompo's Sale of Insurance in Illinois

The plaintiffs first argue that Sompo has purposely availed itself of Illinois because it sells insurance in the state. The problem with this theory is that it does not apply to any of the Sompo entities named in the complaint. (R. 58-1 ¶ 5; R. 58-2 ¶ 6; R. 58-3; R. 58-4 ¶ 7.) Declarations submitted by Sompo indicate that only one Sompo affiliate sells insurance in Illinois and that entity is an unnamed, indirect subsidiary of Sompo International Holdings Ltd. (R. 58-3 ¶¶ 7–8.)

Even if this nonparty subsidiary's contacts could be imputed to Sompo International Holdings Ltd., or to Sompo as a whole, contacts related to the sale of

22

insurance would not be suit-related. *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.,* 582 U.S. 255, 256 (2017) ("What is needed is a connection between the forum and the specific claims at issue."). In *Ford Motor Company*, the Supreme Court clarified that while the defendants' activities in the forum state do not need to *cause* the plaintiff's claims to give rise to specific personal jurisdiction, they must "relate to" those claims in a substantial way. 592 U.S. at 362. Despite the apparent breadth of this phrase, the Supreme Court emphasized that "related to" "does not mean that anything goes." *Id.* Rather, the phrase "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Accepting the plaintiffs' theory of specific personal jurisdiction based on a single Sompo subsidiary's sale of insurance in Illinois would exceed those limits. *See In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prod. Liab. Litig.*, No. 22 C 2011, 2023 WL 8527415, at *9 (N.D. Ill. Dec. 8, 2023) (Pallmeyer, J.) (identifying the "relationship between the defendant's activities and the plaintiff's claims" as the relevant inquiry for the "related to" analysis). Unlike the plaintiffs in *Ford Motor Company*, who were residents of the forum state and had purchased automobiles from the defendant, none of the plaintiffs in this case are residents of Illinois or purchased insurance from Sompo. Their claims relate to Sompo's acquisition of *Sunflowers*, which occurred in London in 1987. The plaintiffs do not challenge Sompo's ability to sell insurance in Illinois, and their alleged injuries are unrelated to the sale of insurance. In sum, the Court concludes that a single nonparty subsidiary's sale of

insurance in Illinois is an insufficient basis for exercising specific personal jurisdiction over Sompo as to the plaintiffs' claims.

### b. Websites and Digital Advertising

The plaintiffs also allege that Sompo's use of websites and online advertisements provides a basis for specific personal jurisdiction in Illinois. (FAC ¶¶ 53, 84.) They cite Sompo Holdings Inc. and Sompo International Holdings Ltd.'s interactive websites, (*Id.* ¶¶ 81–84), which the plaintiffs allege that consumers in Illinois "would consult" in the "exercise of reasonable care and due diligence" prior to purchasing insurance. (*Id.* ¶ 81.) Similarly, the plaintiffs point to an October 2022 advertisement in the *Wall Street Journal* titled "Accelerating Growth in a Time of Great Change." (FAC ¶¶ 39, 84; R. 39-9.) The advertisement consists of a Q&A in which Sompo Holdings Inc.'s Chief Operating Officer describing the company's financial situation. (R. 39-9.)

"As a general rule, 'national advertisements are insufficient to subject a defendant to jurisdiction in Illinois.'" *Eco Pro Painting, LLC v. Sherwin-Williams Co.*, 807 F. Supp. 2d 732, 737 (N.D. Ill. 2011) (quoting *Hot Wax, Inc. v. Stone Soap, Co.*, No. 97 C 6878, 1999 WL 183776, at *4 (N.D. Ill. Mar. 25, 1999)); *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 33 n. 10 (3d Cir.1993). Similarly, "[h]aving an 'interactive website'… should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014). In either case, "[i]f the defendant . . . does not target[] the forum state,

then the defendant may not be haled into court in that state without offending the Constitution." *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011).

Because there are no allegations that Sompo's websites target consumers in Illinois specifically, the fact that Sompo operates websites that are accessible in the state is not sufficient to establish personal jurisdiction. *Id.* at 558–559 (collecting cases). The same is true of the *Wall Street Journal* advertisement; there is no allegation or evidence that Sompo "deliberately directed" this advertisement to consumers in Illinois. *Eco Pro*, 807 F. Supp. 2d at 737.

The plaintiffs rely on *Curry v. Revolution Labs., LLC*, and *uBID, Inc. v. GoDaddy Grp., Inc.* for the proposition that online contacts may be sufficient to establish specific personal jurisdiction when the company employs a "national business model." (*See* R. 67 at 38–39.) But the exercise of personal jurisdiction in *Curry* and *uBID* was not based *merely* on the fact that the defendants maintained websites that were accessible in the forum states. Rather, the plaintiffs also alleged substantial litigation-related conduct in those states. For example, in *Curry* the plaintiffs alleged that the defendant—in addition to advertising online—listed Illinois as a "ship to" option on its website and sold its product to 767 Illinois residents. 949 F.3d at 390–91. Similarly, in *uBID* the plaintiff alleged that the defendant had completed "hundreds of thousands of sales in Illinois." 623 F.3d at 428.

As already discussed, no Sompo entity named as a defendant in this suit sells insurance in Illinois. Moreover, in *Curry* and *uBID*, there was a closer connection between the sale of the products at issue and the plaintiffs' claims. The plaintiffs were

25

residents of Illinois and the sales that gave rise to the minimum contacts caused the plaintiffs' injuries. In this case, by contrast, the plaintiffs are not residents of Illinois and they do not allege that they were injured by a Sompo affiliate's sale of insurance in Illinois. In short, the plaintiffs' allegations concerning advertisements and websites are insufficient to establish specific personal jurisdiction.

### c. Display of *Sunflowers* on Sompo Holdings, Inc.'s Website

Relatedly, the plaintiffs allege that Sompo Holdings, Inc.'s display of *Sunflowers* on its website forms a basis for specific personal jurisdiction. A scroll-through banner on the website displays an image of the painting, along with a statement that reads: "True Feeling and an Enriched Heart for People and Society through Arts and Culture." (FAC ¶ 39.)

The plaintiffs contend that this display of *Sunflowers* is central to Sompo's overall brand identity and marketing strategy. (*See id.* ¶¶ 82–83.) They submit a declaration authored by Katie Quinn Spangenberg, an Assistant Professor of marketing at Seattle University in Seattle, Washington. (*See* R. 62-4.) Spangenberg testifies that the Sompo entities "are employing a sophisticated branding strategy known as 'archetypal branding' to capture the distinctive character attributes of Sunflowers and its iconic creative artist Vincent van Gogh, and to transfer and invest these same qualities in Sompo Holdings and the other Sompo entities." (*Id.* ¶ 9.)

A skeptical reader might think it implausible that a Japanese insurance company is using a nineteenth century European painting to subliminally target

26

American consumers.[6] As it pertains to personal jurisdiction, however, the fundamental issue with the plaintiffs' branding theory is that using archetypes to market products to consumers is conceptually no different than using nationwide advertisement or websites to do so. The plaintiffs' allegations indicate that, like Sompo's other websites and online advertisements, the website displaying the painting is "accessible nationally." (FAC ¶ 33, 40, 97.) Even accepting the notion that Sompo is using archetypes created by *Sunflowers* to influence potential customers, there is no evidence that it is doing so in Illinois specifically.

Moreover, as Sompo points out, the plaintiffs do not contest that the image of *Sunflowers* displayed on Sompo Holdings, Inc.'s website is in the public domain. The Copyright Act distinguishes between the ownership of a copyright or exclusive rights under a work and ownership of a material object embodying the work. 17 U.S.C. § 202; *Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 195 (S.D.N.Y. 1999) ("exact photographic copies of public domain works of art are not copyrightable under [U.S.] law because they are not original"). The fact that the Sompo entities are allegedly displaying the *image* of *Sunflowers* does not supply a basis for any suit-related conduct. In sum, Sompo Holdings, Inc.'s display of *Sunflowers* on its website is insufficient to establish specific personal jurisdiction.

---

[6] The plaintiffs' archetypal branding theory "borrows from the research and theories of the preeminent 20th century psychologist Carl Jung." (R. 62-4. ¶ 10) Jung's assumptions have been criticized by psychologists, *see, e.g.*, Andrew Neher, *Jung's Theory of Archetypes: A Critique*, 36 J. HUM. PSYCH. 2, 61–91 (1996) and federal courts have resisted "projection of Jungian analysis" into the realm of civil litigation. *In re Integrated Res. Real Est. Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1115 (S.D.N.Y. 1993).

### d. Sompo's Display of *Sunflowers* at the Art Institute of Chicago in 2001–2002

That leaves the display of *Sunflowers* at the AIC in Chicago from September 2001 to January 2002. Two cases cited by Sompo illustrate why the AIC's less than four-month exhibition of *Sunflowers* over twenty years ago is insufficient to establish personal jurisdiction in Illinois: *Barzilai v. Museum*, No. 153086/2022, 2022 WL 16856131 (N.Y. Sup. Ct. Nov. 10, 2022), and *Graff v. Leslie Hindman Auctioneers, Inc.*, 342 F. Supp. 3d 819 (N.D. Ill. 2018), *vacated on other grounds*, 2019 WL 13196397 (N.D. Ill. Feb. 12, 2019).

In *Barzilai*, the plaintiffs sought to recover a 14th-century Haggadah that was stolen after the original owner was arrested and murdered by the Nazis. 2022 WL 16856131, at *1–2. In the aftermath of World War II, the text was transferred to the Israel Museum in Jerusalem. *Id.* The heirs of the painting filed suit to recover the painting in New York. *Id.* at *2–3. Notwithstanding the fact that the Israeli museum was not a domiciliary of New York, plaintiffs argued that New York courts could exercise personal jurisdiction over it based on, among other things, the fact that the book had been loaned to the New York Public Library for a little over five months. *Id.* The Supreme Court of New York held that the plaintiffs had failed to satisfy the requirements of New York's long arm statute and due process. *Id.* at *4–5. The court stated that because the plaintiffs' alleged claims for replevin and conversion "arose out of a theft and subsequent sale far away from New York," they were not substantially related to whatever New York-based business dealings the Israel Museum may have engaged in decades later. *Id.* at *3, 6–7.

Similarly, in *Graff*, another court in this District addressed whether it could exercise specific personal jurisdiction over a Phoenix, Arizona pawn broker that took possession of paintings that had been stolen by the plaintiff's wife in Texas. 342 F. Supp. at 821–22. The broker later offered the paintings for sale at an auction in Illinois. *Id*. The court rejected the plaintiff's theory that the Illinois auction was a sufficient basis for exercising personal jurisdiction over the defendant. *Id*. at 826–27. Because "the conversion at issue occurred prior to the auction that took place in Illinois," the court held "any connections between [the defendant] and [the plaintiff's wife] related to the subsequent auction of the paintings do not aid [the plaintiff] in establishing personal jurisdiction . . . ." *Id*. at 826.

As in *Barzilai* and *Graff*, Sompo's allegedly unlawful acquisition of *Sunflowers* did not take place in Illinois, but in London, over a decade prior to the exhibition in Illinois. As in *Barzilai*, there are no allegations that Sompo attempted to sell or directly monetize the painting while it was on display in Chicago.[7] And even if it had, *Graff* provides that this would not necessarily provide a sufficient connection to Sompo's allegedly unlawful acquisition of the painting.

The plaintiffs' attempt to distinguish *Barzalai* on the grounds that the case involved a private theft rather than Nazi-induced duress and was decided under New York's long arm statute rather than the Due Process Clause. (R. 67 at 42 n.100.) But *Barzalai* also involved claims under the HEAR Act, and the plaintiffs do not explain

---

[7] The only benefit that Sompo allegedly received from allowing the AIC to exhibit *Sunflowers* was "a reciprocal promise" from the AIC and the Van Gogh Museum to lend Van Gogh paintings to an exhibition in Tokyo the following year. (FAC ¶ 70.)

how the presence or absence of Nazi duress is relevant to the lawsuit's connection to Illinois. Moreover, although the limitations of New York's long arm statute and the Due Process Clause are not coextensive, the *Barzalai* court found that, in addition to failing to satisfy the statutory prerequisites, the exercise of jurisdiction would not satisfy the "minimum contacts" requirement of due process.

The plaintiffs also attempt to distinguish *Graff*, arguing that the case relied on a since-abandoned requirement that a plaintiff's injuries must be caused in the forum state. (R. 67 at 42 n.100.) According to the plaintiffs, *Ford Motor Company* heralded a change in the law of specific jurisdiction and Sompo is therefore stuck in a "jurisdictional time warp." (*Id.*) But the district court's reasoning in *Graff* did not rely solely on the location of the plaintiff's alleged injury, but also on the defendant's contacts with Illinois as a whole. 342 F. Supp. 3d at 824–25. Nor does *Ford Motor Company* undermine the district court's reasoning. In *Ford Motor Company* the Supreme Court emphasized that it was synthesizing, rather than overruling, previous decisions. *See* 592 U.S. at 362. Rather than lowering the constitutional limits for specific personal jurisdiction, the Court underscored that "real limits" remain, and that plaintiffs still must establish a significant relationship between the forum and the claims at issue. *Id.* The plaintiffs have failed to do so here. Accordingly, the Court rejects the plaintiffs' argument that the public display of *Sunflowers* at the AIC constitutes "purposeful availment" of Illinois.

30

In conclusion, the Court finds that the defendants lack the requisite minimum contacts with Illinois to face a lawsuit in this jurisdiction. The Court may not exercise specific jurisdiction over Sompo in Illinois.

### B.    Traditional Notions of Fair Play and Substantial Justice

Even if the plaintiffs were able to establish minimum contacts in Illinois, exercising personal jurisdiction would not comport with notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316. The following factors are relevant: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Tamburo*, 601 F.3d at 709.

As to the first factor, the defendants presented evidence that they are not located or incorporated in Illinois have no meaningful business operations in the state. Requiring Japanese and Bermudan companies to litigate in Illinois would impose a substantial burden on them. *See Labtest Int'l, Inc. v. Ctr. Testing Int'l Corp.*, 766 F. Supp. 2d 854, 864 (N.D. Ill. 2011) ("The exercise of jurisdiction over [the defendant] by an Illinois court would impose a significant burden on [the defendant], as its Shenzhen headquarters is located nearly 8,000 miles from Chicago."). The plaintiffs point to the fact that Sompo sent members of its team to the United States for the 2001 AIC exhibition and that Sompo has participated in other lawsuits in U.S. federal court as evidence that the company can litigate its claims here. (R. 67 at 44.)

But just because Sompo employees have traveled to the United States in the past or previously participated in litigation in the U.S. does not mean that this lawsuit would not be burdensome to them.

Moreover, Illinois does not have a particular interest in this dispute. As repeatedly explained, none of the parties are residents of this state, and apart from the brief display of *Sunflowers* at the AIC over twenty years ago, none of the conduct at issue occurred here. The plaintiffs assert, in conclusory fashion, that the defendants committed "torts and crimes" in Illinois (R. 67 at 44), but they do not identify any crimes that Sompo has been charged with in Illinois or explain how Sompo's actions have harmed Illinois residents. This factor weighs in favor of declining to exercise personal jurisdiction as well.

The next factor is the plaintiffs' interest in obtaining effective relief. This factor does not favor bringing the action in Illinois, since "[t]he plaintiff, defendant, most, if not all witnesses, and documentary evidence are located outside Illinois." *Hot Wax, Inc.*, 1999 WL 183776, at *7.

That leaves the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Dworkin*, 601 F.3d at 709. There is no question that returning art expropriated by the Nazis is a desirable social policy. At the same time, "this Court's authority does not extend to serving as the enforcing agent for matters of conscience, or of justice in the abstract." *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 957 (N.D. Ill. 1999), *aff'd* 215 F.3d 727 (7th Cir. 2000).

32

The fact that Sompo's unlawful conversion of *Sunflowers* took place in London and that the painting currently resides in Japan means that Illinois' interest in adjudicating this dispute is limited at best. And while the plaintiffs point to the United States' interest in returning stolen Nazi art as a signatory of the Terezin Declaration, they identify no Illinois-specific interests and fail to explain why adjudicating this dispute outside of Illinois would be contrary to principles of interstate federalism.

Accordingly, the Court grants the defendants' motion and dismisses the plaintiffs' remaining claims due to lack of personal jurisdiction. The Court does not reach the parties' arguments as to whether dismissal on the grounds of *forum non conveniens* is appropriate. *Harbor Grand, LLC v. EMCASCO Ins. Co.*, No. 21 C 5335, 2022 WL 4079436, at *1 (N.D. Ill. Sept. 6, 2022). Nor does the Court address arguments raised in the plaintiff's sur-reply concerning the applicability of the HEAR Act and Sompo's ability to invoke *forum non conveniens*.

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, the defendants' motion to dismiss [28, 57] is granted. Civil case terminated.

Date: June 3, 2024

_____

JEREMY C. DANIEL
United States District Judge